# EXHIBIT
# G

Abu Bakker Qassim, et al. vs.
George Bush, et al.

CA 05-497

August 1, 2005

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABU BAKKER QASSIM, et          :      Civil Action No. 05-497
al.,                           :
        Plaintiffs,            :      August 1, 2005
v.                             :
GEORGE BUSH, et al.,           :
                               :      4:00 p.m.
        Defendants             :

. . . . . . . . . . . . . :

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE JAMES ROBERTSON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:          P. SABIN WILLETT, ESQUIRE
                             JASON S. PINNEY, ESQUIRE
                             BINGHAM McCUTCHEN, LLP
                             150 Federal Street
                             Boston, Massachusetts  02110-1726
                             (617) 951-8684
                             BARBARA J. OLSHANSKY, ESQUIRE
                             CENTER FOR CONSTITUTIONAL RIGHTS
                             666 Broadway
                             New York, New York  10012
                             (212) 614-6439

For the Defendants:          TERRY M. HENRY, ESQUIRE
                             ROBERT J. KATERBERG, ESQUIRE
                             JOSEPH HUNT, ESQUIRE
                             VINCENT GARVEY, ESQUIRE
                             U.S. DEPARTMENT OF JUSTICE
                             CIVIL DIVISION
                             20 Massachusetts Avenue, NW
                             Room 7144
                             Washington, D.C.  20530
                             (202)514-4107

Court Reporter:              REBECCA KING, RPR, CRR
                             Official Court Reporter
                             Room 4802-B, U.S. Courthouse
                             Washington, D.C. 20001
                             (202) 898-9398

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

Abu Bakker Qassim, et al. vs.                    CA 05-497                              August 1, 2005
George Bush, et al.

Page 2

1                        P R O C E E D I N G S

2            COURTROOM DEPUTY:  Civil action number 05-497, Abu

3    Bakker Qassim, et al., versus George Bush, et al.

4            Counsel, could you identify yourselves for the record.

5            MR. WILLETT:  Good Afternoon, Your Honor.  Sabin

6    Willett of Bingham McCutchen.  With me, Jason Pinney, my

7    colleague; Barbara Olshansky and Tina Foster from the Center For

8    Constitutional Rights, for the petitioners.

9            MR. HENRY:  Good afternoon, Your Honor.  Terry Henry

10   with the Department of Justice, and with me at counsel table is

11   Joseph Hunt, Vincent Garvey, and Mr. Robert Katerberg.

12           THE COURT:  Okay.  Well, there are a lot of people in

13   this courtroom, and I don't know the extent to which everybody

14   knows what the background of this matter is, but the proposition

15   of this case is quite simple.  The petitioners in this case have

16   petitioned for writs of habeas corpus.

17           I did with this case as I have done with all of the

18   Guantanamo cases that I have handled, which is quite a number.

19   I issued a stay order at the request of the government.  In the

20   stay order I said, however -- and I'm not quoting what I said,

21   but in general I said, I now have jurisdiction of this matter,

22   so the government can't do anything to these people without

23   advanced notice to opposing counsel and to me.

24           Both sides have appealed that order to the Court of

25   Appeals; the appeal has just recently perfected, I think.  And I

Abu Bakker Qassim, et al. vs.                    CA 05-497                                    August 1, 2005
George Bush, et al.

Page 3

1    received, I think last week, a rather startling motion from the

2    petitioners to the effect that when their counsel finally had a

3    chance to go talk to them in July in Guantanamo, middle of July,

4    they found out that the petitioners have been found by the

5    Combatant Status Review Tribunal to be noncombatants.  And that

6    this happened sometime in -- I don't know, a long time ago, and

7    that nobody bothered to notify either petitioners' counsel or

8    me.

9         And not only that, but when petitioners' counsel asked

10   questions of the government, they were ignored and the questions

11   were not answered.

12        Now the petitioners have asked since these men have

13   been found not to be combatants, that they be released into the

14   non-prison side of the Guantanamo compound until or unless they

15   are relocated by the government.

16        The government resists that notion, and that's why

17   we're here, to have a hearing and find out what on earth is

18   going on here.

19        I will hear from the petitioners.

20        MR. WILLETT:  Thank you very much, Your Honor.  Again,

21   Sabin Willett for the petitioners.

22        I was about to start with a little excursus on the law,

23   because I think that the government in its brief filed Friday

24   has asked you the wrong question.  The question is not, what

25   justification have my clients for release, the question in a

United States District Court                    202-898-9398                    Rebecca King, RPR, CRR
For the District of Columbia                                                    Official Court Reporter

Abu Bakker Qassim, et al. vs.                    CA 05-497                              August 1, 2005
George Bush, et al.

Page 4

1    habeas case is what justification does the executive proffer for

2    imprisonment.

3          And it has always been the case in the common law writ

4    of habeas, as well as the way it's drafted into the statute,

5    that the very first thing that must happen is that the

6    government must show cause.

7          Now, if they make a showing of cause, if they point to

8    an adjudication or a statute or something in law, then we have a

9    hearing.  But I will tell you candidly, we waited with some

10   anxiety for their brief, thinking there must be some other

11   cause, because the cause they've always asserted to you and the

12   other judges of this court is that they may rest upon Deputy

13   Secretary of the Defense memo that defines enemy combatants and

14   creates the CSRT.

15         Indeed, it appears from their brief, that remains their

16   only lawful justification.  They point to no other statute or no

17   other doctrine that we could determine.

18         So this is not a case that presents a question that's

19   now before the Court of Appeals as to whether it's indeed lawful

20   for a Deputy Secretary to declare a war that Congress never did,

21   or all of those other questions.  This question says what any

22   habeas case says at the outset to the respondent:  What is the

23   justification for imprisonment?  And there is, as I read their

24   brief, no answer to that.

25         Now, I might -- Your Honor has adverted to how we got

Page 5

1    to where we are, and so I won't dwell on that.  It was of

2    concern to us as well.

3           But I would highlight one point for Your Honor.

4    According to the brief that they filed on the 26th -- excuse me,

5    that they filed Friday of last week, the CSRT proceedings were

6    completed on the 26th of March.

7           Now, three days later they filed in this court an

8    opposition to a motion that we have made, and the opposition

9    was, among other things, attempting to persuade you not to

10   require them to come up with returns on the CSRTs.

11           THE COURT:  Yes, that's right.

12           MR. WILLETT:  And in that paper, which was not a form

13   brief filed in 50 habeas cases, it was only filed in this case,

14   in that paper they said -- I want to get the quote right.  They

15   said, "A factual return for a petitioner in a Guantanamo

16   detainee case typically has consisted of the record of

17   proceedings that confirmed petitioner's status as an enemy

18   combatant."

19           Now, they knew that they weren't enemy combatants when

20   they wrote that.  They then wrote a full page about the burden

21   to the government of producing returns in redacted form and

22   carving out all of the classified information and so on.

23           Now, Your Honor, if I might direct your attention to

24   the Navy regulations on this, I have a copy that I can hand to

25   the clerk if that's of help.  To be clear about what this is,

Abu Bakker Qassim, et al. vs.
George Bush, et al.                              CA 05-497                              August 1, 2005

Page 6

1  this is Navy Secretary England's 2004 set of regulations that
2  govern the conduct of CSRTs.

3          And if I can invite Your Honor to turn to the very last
4  page, this is the official one-page Combatant Status Review
5  Tribunal decision report cover sheet. This is what the tribunal
6  president must sign when the hearing finishes, and you will see
7  that all it says is that the tribunal has determined that he,
8  meaning the detainee, is or is not designated as an enemy
9  combatant. That's it. They could have produced one page.

10          That same day that they filed that brief, I sent them
11  another e-mail saying, do you contend that these people are a
12  security threat to the U.S.? And we specifically said, because
13  if you don't, maybe we can work together in some way to try to
14  talk about their release. Which is an important point when they
15  start to talk about the interference they perceive we're now
16  bringing to them, now that it's August.

17          The other thing I would like to mention about the Navy
18  regulations is, first of all, they still haven't turned over the
19  CSRT. I asked them again on Friday, twice. You refer to it in
20  your brief; apparently it's a finding of noncombatant. Can you
21  turn it over? I was told that request was not appropriate. So
22  I don't have it.

23          But I do have the regulations, and what the regulations
24  make clear is that what happened on March 26th was the last step
25  in a three-step process. First the tribunal meets, it

United States District Court
For the District of Columbia                   202-898-9398                   Rebecca King, RPR, CRR
                                                                              Official Court Reporter

Abu Bakker Qassim, et al. vs.                    CA 05-497                              August 1, 2005
George Bush, et al.

Page 7

```
 1    deliberates and it makes a determination.  These are all in the

 2    regulations, Your Honor.

 3           It then goes to the legal officer for a review.  When

 4    he's done or she's done reviewing, it goes up to the director of

 5    CSRT, which I believe to be Admiral Magera.

 6           So what happened on the 26th was the last step.  They

 7    must have known for a long time before that -- at least that the

 8    tribunal had made a determination of noncombatant status.  How

 9    long, we don't know.  They know, but they're not telling.

10           Now, the only thing I know is that one of my clients

11    recalled that his tribunal might have occurred in 2004.  He

12    wasn't sure.  Late 2004, early 2005.  So that's what we know

13    about how long non-enemy combatants have been imprisoned at

14    Guantanamo.

15           Now, the government wants to talk about what's

16    practical, and Colonel Baumgartner talks about basically how you

17    can't have these fellows walking around the base.  I think in a

18    habeas case, the question is simply whether Your Honor orders

19    they be released, but we're trying to be productive and talk

20    about the practical consequences of that.

21           One, but by no means the only one, is that they would

22    be accommodated in the civilian population at the base.  And

23    indeed, I think a hearing would show that in addition to

24    civilians working at McDonald's, you've got actual noncitizens

25    who are working at the base.  This is on information and belief,
```

Abu Bakker Qassim, et al. vs.                    CA 05-497                         August 1, 2005
George Bush, et al.

Page 8

1    and we would need a hearing to know with certainty.  But I

2    believe that to be the case, Your Honor.

3            But if the colonel is unwilling to extend that courtesy

4    or he thinks it somehow compromises the mission, I mean, I can

5    tell Your Honor that the secure facility, the prison, is a long

6    way away from the McDonald's.  You drive down a road between two

7    arroyos, and nobody is getting near that place that doesn't

8    belong there.

9            But if it makes him uncomfortable, I will point out

10   that we learned over the weekend -- and I'll follow up with a

11   declaration on this, but there is a quasi precedent for what

12   we're asking for.  Apparently, sometime in the '90s, Haitian

13   refugees were interdicted on the high seas by the Coast Guard.

14   These people had committed no crime and they had violated no

15   immigration law of the United States.

16           They were brought to Guantanamo, and I am told --

17   again, this is information and belief.  I am told that they were

18   billeted in a Marine barracks, that they received mess

19   privileges, and they found some sort of work at a fast-food

20   restaurant while their asylum petitions to various countries

21   were pending.  Again, a hearing would determine whether this

22   information is correct, but I don't believe it accurate that

23   there has never been this kind of thing on the base before.

24           The second thing I would say, Your Honor, is that we

25   threw that out as an alternative to imprisonment, but I believe

United States District Court                      202-898-9398                    Rebecca King, RPR, CRR
For the District of Columbia                                                      Official Court Reporter

Abu Bakker Qassim, et al. vs.
George Bush, et al.

CA 05-497

August 1, 2005

1   there's another alternative, at least one, which is that as the

2   habeas judge in this case, it lies within your power to require

3   that they bring the person, I think it says the body of the

4   petitioner, to your courtroom.

5           Now, at a hearing where that occurred, you could

6   satisfy yourself as to whether you think there's any risk to the

7   community or to the petitioner or anyone through some kind of

8   release terms.

9           THE COURT:  Then when they're on American soil, they

10  can apply for asylum?

11          MR. WILLETT:  Evidently.  And I'm not in immigration

12  law, but evidently this is not actually that kind of dodge,

13  because if they are paroled here, they are not deemed to make an

14  entry.  At least that's my understanding.  The immigration

15  lawyers could clarify that.

16          And again, an asylum petitioner is purely discretionary

17  with the Attorney General.  There's no way to make it happen,

18  although many of the Uighur expatriate people you see in the

19  courtroom have indeed been granted asylum petitions.

20          The point is that they could be brought here, and while

21  the State Department process is ongoing, with which we do not

22  wish to interfere, they could be released under supervisory

23  conditions.  There is, again, a precedent -- not a precedent,

24  but there is an analogy for this in 8 U.S. Code dealing with

25  asylum and deportation cases.  Indeed, after someone has been

Abu Bakker Qassim, et al. vs.                    CA 05-497                              August 1, 2005
George Bush, et al.

Page 10

```
 1   deported, they can actually be released into the population

 2   under various conditions of supervision, depending on the

 3   circumstances of the case.

 4            So you could have a situation where these petitioners,

 5   who would be welcomed into the Uighur community that is here

 6   today, they could be required to report to the Marshal Service

 7   or whatever the appropriate conditions are, or indeed, Your

 8   Honor could determine that you're not comfortable at all after

 9   you conduct a hearing.  I'm not attempting to prejudge anything.

10   But there are solutions short of this continuing imprisonment.

11            Your Honor, I've been focused on the practical

12   dimension from the point of view of the government, but I think

13   it only fair to spend just a moment on the practical dimension

14   of continued imprisonment to my clients.  They're not soldiers,

15   they're not criminals, they're just Uighur people.  And I've

16   never heard of Uighurs either before this case, but come to find

17   out there might not be a more pro-U.S. Muslim group in the

18   world.  The Uighurs have traditionally suffered under religious

19   and political oppression at the hands of the communist Chinese,

20   and I can remember a time when that made a person someone we

21   liked in this country.

22            My two clients, Abu Bakker and Adel, fled from such

23   persecution originally to Kyrgyzstan, and were trying to make

24   their way to find work in Turkey when they found themselves in

25   the wrong place at the wrong time.  They are husbands, they are
```

United States District Court                    202-898-9398                    Rebecca King, RPR, CRR
For the District of Columbia                                                      Official Court Reporter

Abu Bakker Qassim, et al. vs.
George Bush, et al.                          CA 05-497                          August 1, 2005

Page 11

1    fathers, they are sons.

2          Now, Colonel Baumgartner says it isn't a bad prison,

3    it's only medium security.  You can play ping-pong, you can eat

4    your meal family style, but not with your family.  And it's

5    true:  Compared to some of the other horrors that have happened

6    at Guantanamo and that we've heard about most recently from

7    Fort Meade and the Courts Martial going on down there last week,

8    Camp Four is pretty good, but it's still a prison.

9          Here's what I saw on July 14th:  A slight, gentle man

10   with a shy smile chained to the floor, a man sitting in a box

11   that had no windows.  As far as the guards were concerned, he

12   has no name.  They refer to him by his number.  When he wanted

13   to go to the bathroom, a guard had to come in and put on green

14   rubber gloves --

15         THE COURT:  You're not talking about your client?

16         MR. WILLETT:  I'm talking about my client.

17         THE COURT:  He was chained to a floor?

18         MR. WILLETT:  He had a leg shackle that was chained to

19   a bolt in the floor, Your Honor, in Camp Echo.  Both of my

20   clients.

21         I thought I knew something about what this imprisonment

22   meant, but I was wrong.  I really found out Friday of last week.

23   You see, there had been a newspaper article that had been

24   written about this story, and it had been picked up by the

25   Uighur Diaspora and made its way to Europe.

United States District Court
For the District of Columbia                   202-898-9398                   Rebecca King, RPR, CRR
                                                                              Official Court Reporter

Abu Bakker Qassim, et al. vs.
George Bush, et al.                          CA 05-497                          August 1, 2005

Page 12

1          And late Thursday came an extraordinary telephone call,

2     and on Friday, through an interpreter, I spoke by telephone to

3     Kabsur Abdul Hakim, who is a refugee living in Sweden, and she

4     is Adel's sister.  And while Nury Turkel, the interpreter who

5     was in the room, and I listened to her weep, she told us that

6     she thought her brother was dead.

7          You see, she was right.  These people are dead to the

8     outside world.  They're dead to their children, they're dead to

9     their wives, even their names are a secret.  And but for the

10    fortuity that my clients happen to have outside lawyers, the

11    fact of their acquittal, or whatever you call this, that would

12    be a secret.

13         You can't send them a photograph or a box of cookies,

14    you can't visit them without a law degree and a U.S. passport.

15    They write us letters but they never come out.

16         Your Honor, I submit that in a habeas case, the delay,

17    the time lost, is the harm itself, and every single day this

18    continues is another small death.

19         THE COURT:  Before you sit down, let me ask you a

20    question that I didn't want to interrupt you with.  But are

21    there limits to my jurisdiction here, now that this matter is on

22    appeal?

23         MR. WILLETT:  I don't think so, Your Honor.  There's

24    two matters -- actually only one matter on appeal.  The

25    government took an appeal of your order with respect to what I

United States District Court
For the District of Columbia                    202-898-9398                    Rebecca King, RPR, CRR
                                                                                Official Court Reporter

Abu Bakker Qassim, et al. vs.
George Bush, et al.                          CA 05-497                          August 1, 2005

1    might call rendition.  It might be that that is on appeal --

2    although I believe someone has made a motion to dismiss that

3    appeal, so I'm a little murky about that, at least in one of the

4    other habeas cases.

5           What we did was, we filed a mandamus petition seeking

6    to require that you hold a hearing.  That, as I understand the

7    jurisprudence, doesn't create an appeal unless the Court of

8    Appeals accepts it and notifies the government that they need to

9    respond, which they have not done.

10          In any event, it would become moot and we would

11   withdraw it upon any of the relief that we're asking for here.

12          THE COURT:  All right.  Let me hear from the

13   government.

14          Thank you, sir.

15          MR. HENRY:  Your Honor, may it please the Court, what

16   we're dealing with here ultimately is two requests:  One is

17   whether the stay should be lifted in this case; and the second

18   is whether the living conditions of the petitioners in the case

19   should somehow be altered.

20          Neither of those requests is appropriate, and we

21   believe petitioners' motion should be denied.

22          If I may, let me just deal with the legal issue first.

23   The petitioners have argued that there is no legal basis for the

24   current detention of the petitioners, and that that somehow

25   gives them and this Court the authority to deal with the issue

United States District Court
For the District of Columbia                 202-898-9398                 Rebecca King, RPR, CRR
                                                                           Official Court Reporter

Abu Bakker Qassim, et al. vs.
George Bush, et al.                          CA 05-497                              August 1, 2005

Page 14

1    of the current living conditions of the petitioners.

2            Actually, Your Honor, the executive's authority to make

3    war includes the power to detain individuals as enemy combatants

4    or individuals suspected of being enemy combatants.  That legal

5    authority would necessarily include the authority to wind up

6    that detention in an orderly fashion, and that's exactly what

7    has gone on here.

8            As we indicated in the brief that we filed on Friday,

9    these folks have been determined to be no longer enemy

10   combatants, and I would point out that the determination of the

11   CSRT is that the petitioners are no longer enemy combatants.

12   Prior to that final determination, they were held under the

13   enemy combatant categorization.

14           During the time that they have -- since they have been

15   determined to no longer be enemy combatants, there has been a

16   diplomatic process under way to find a suitable country for

17   transfer of these individuals consistent with the United States

18   policy not to transfer people to countries where it's more

19   likely than not that they will be tortured.  That process is

20   ongoing, those efforts are diligent, multifaceted, and it's our

21   hope that soon there will be an option available for transfer of

22   these petitioners and they can ultimately be released.

23           But since we're dealing with a situation where you have

24   kind of an interim, a transitional detention situation, it's our

25   position that the petitioners shouldn't be permitted to

United States District Court
For the District of Columbia                202-898-9398            Rebecca King, RPR, CRR
                                                                    Official Court Reporter

Page 15

1   interject themselves into that detention at this time, since the

2   detention is really just an extension of the detention, to

3   detain individuals generally as enemy combatants.

4         Now, I would point out as far as the legal basis of the

5   relief that the petitioners seek here, the only thing that they

6   claim is a Constitutional right to have the Court step in and

7   deal with their living conditions.  But the Constitutional right

8   of detainees at Gitmo vis-a-vis the government and its power to

9   detain individuals, that is a subject of the ongoing appeal in

10  the D.C. circuit, and that, we believe, points to the continued

11  propriety of the stay in this case.

12        The case is not moot; the finding that these

13  individuals are no longer enemy combatants did not moot the

14  case.  It's on the way to being moot pending the working out of

15  this diplomatic process, but it's not there yet.

16        And I would point out along these lines that in all the

17  Guantanamo Bay cases, we have moved for stays, we have opposed

18  having to conduct any kind of proceedings in the litigation

19  regarding the merits of these petitioners, other petitioners,

20  all the petitioners in the Guantanamo cases' detention.  And

21  we've also opposed having to produce any factual records with

22  respect to the detention.

23        Just as an aside, the petitioners' counselor complains

24  about us not responding to his requests for information --

25        THE COURT:  I don't think that was an aside.  What's

Abu Bakker Qassim, et al. vs.                    CA 05-497                                August 1, 2005
George Bush, et al.

Page 16

1    your response to that?

2            MR. HENRY:  Your Honor, basically we have 120 cases on

3    behalf of more than 230 detainees.  We receive requests for

4    informal discovery as to the status, all the kinds of aspects

5    with respect to petitioners, and we generally do not respond to

6    those simply because we're not in a position to do it,

7    especially when these cases should be stayed because the legal

8    issues involved are before the Court of Appeals.

9            And I should point out that in this case, given that

10   the detention is ongoing and that petitioners -- the only legal

11   authority they're citing for relief with respect to that

12   detention is a Constitutional right, and that very issue

13   continues to be before the Court of Appeals.

14           THE COURT:  Well, the Constitutional right, I suppose,

15   if you're talking about the writ of habeas corpus, which is

16   enshrined in the Constitution, yes.  But if the Supreme Court

17   has held that there is a right of habeas corpus for people at

18   Guantanamo, what can it mean?  Are you saying that you've got a

19   right to file a writ of habeas corpus, but that's all?  Nothing

20   can ever happen because of it?

21           MR. HENRY:  Well, Your Honor, essentially yes.  The

22   writ of habeas corpus brings the matter before the Court, but

23   the issue of whether --

24           THE COURT:  But the Court can't do anything about it?

25           MR. HENRY:  Well, the issue of whether they are

Abu Bakker Qassim, et al. vs.                      CA 05-497                          August 1, 2005
George Bush, et al.

Page 17

1  substantive rights that a petitioner can assert against his

2  detention, whether that be detention as an enemy combatant or as

3  here, a detention on the tail end of an enemy combatant

4  detention --

5          THE COURT:  Well, turn it around and answer the

6  question that petitioner put.  Because he's right.  What habeas

7  corpus does is to bring the petitioner before the Court, or to

8  require you to bring the petitioner before the Court, and

9  explain by what right you're holding him.

10         Now, explain that.  Is it, as you said earlier, the

11 power to wind up in an orderly fashion?  Is that it?

12         MR. HENRY:  Yes, Your Honor.

13         THE COURT:  That's the right that you assert for

14 hanging on to these people?

15         MR. HENRY:  That is correct, Your Honor.  Once a

16 petitioner or a detainee generally is determined, you know, no

17 longer to be an enemy combatant, it's not a question of you just

18 open the gates of Guantanamo and let them walk out.

19         THE COURT:  Of course not.  You could let them swim, I

20 suppose, but that doesn't make any sense.

21         MR. HENRY:  Well, the executive's power with respect to

22 the detention of individuals, it necessarily includes the

23 authority to wind up that detention in an orderly process.

24         THE COURT:  You're making that argument as a matter of

25 your assertion of the logic of the situation.

United States District Court                      202-898-9398                    Rebecca King, RPR, CRR
For the District of Columbia                                                      Official Court Reporter

Abu Bakker Qassim, et al. vs.                   CA 05-497                                    August 1, 2005
George Bush, et al.

Page 18

```
 1              Do you have any case support for it except for your

 2    logic?

 3              MR. HENRY:  I do not have case support, but I do have

 4    historical precedent.  At the end of World War II, at the end of

 5    the Korean War, at the end of the Gulf War, there were

 6    significant numbers of individuals who could not be repatriated

 7    consistent with the laws of war due to concerns about the laws

 8    of repatriation.  That's essentially what we have here.

 9              That took time to wind up those issues.  In the case of

10    World War II, it was several years.  That's the kind of

11    situation we have here.  A determination has been made that

12    these folks are no longer enemy combatants and should be

13    transferred, released.  The problem is, as of yet there is not a

14    country that has agreed to accept them where there's not this

15    concern about torture or mistreatment.

16              So it's based on the necessary logic of the situation.

17    I don't think the executive could be in the business of making

18    war and detaining individuals if he did not have the concomitant

19    authority to wind up that detention in an orderly fashion.

20              And it's based on historical precedent because, in

21    these large conflicts in the past, there have been significant

22    numbers of individuals where there have been repatriation

23    concerns.  As you may know, Your Honor, the Geneva Convention

24    requires combatants, POWs, whatever, to be repatriated as soon

25    as possible after the end of hostilities, but there are other
```

Abu Bakker Qassim, et al. vs.                    CA 05-497                          August 1, 2005
George Bush, et al.

1    concerns that enter into that.

2            THE COURT:  We all know that I've got no power under

3    the Geneva Convention.

4            MR. HENRY:  According to the D.C. circuit, the

5    Convention was not judicially enforceable.

6            But the issue here is not -- well, that issue is

7    repatriation.  Here the issue is repatriation of sorts, except

8    these folks are not going to be repatriated due to the concerns

9    about the treatment they would receive on that end.

10           And so the executive is in the process of undertaking

11   diligent efforts to try to locate an alternative third country

12   to which these folks can be sent.

13           THE COURT:  But you're not at liberty to explain that

14   to this courtroom, to opposing counsel, or even to me.  That's

15   your position?

16           MR. HENRY:  Your Honor, I'm not in a position to

17   explain it definitely to this courtroom or to opposing counsel.

18   With respect to some sort of ex parte in-camera discussion with

19   you, I'm more than happy to go back to the client and see if

20   that could be arranged.

21           THE COURT:  I'm not sure I want to hear that ex parte.

22           MR. HENRY:  Your Honor, as you understand, diplomatic

23   negotiations, especially on sensitive issue like this, are very

24   delicate, and a public disclosure of those could well adversely

25   affect that.

Page 20

1          THE COURT:  Yes, I can understand that.  And there is

2    certainly a practical conundrum that is posed by this situation

3    because of the -- because the petitioners are Uighurs, and we've

4    all read up enough on their status in China to know that that's

5    a serious problem.

6          I must say, though, that I would like to hear you

7    respond to why -- maybe I can understand that you blow off

8    e-mails and don't answer e-mails, but why did you not tell

9    petitioners' counsel what the situation was?  And why did you

10   file a piece of paper in this court three days after the CSRT

11   proceeding implying that they were combatants?

12         MR. HENRY:  Well, Your Honor, a couple of responses to

13   that.  First of all, as to the general matter, we have not been

14   providing notice of an intent to release individuals.  That

15   issue is on appeal to the D.C. circuit.  We've opposed numerous

16   motions seeking some sort of advance notice of release and that

17   sort of thing, and until we are ready to release someone, we

18   have not been giving advance notice.

19         We have also --

20         THE COURT:  Are you telling me that there are lots of

21   NLECs down there who nobody knows are NLECs?

22         MR. HENRY:  Your Honor, the numbers of NLECs have been

23   publicly released by DOD.  You know, as particular individuals

24   in situations where we've had to file factual returns or

25   whatever, obviously, we comply with that order and that is

Abu Bakker Qassim, et al. vs.
George Bush, et al.                    CA 05-497                        August 1, 2005

Page 21

1    provided to counsel.

2         In situations where factual returns have not been

3    required, and as we've argued in the stay motions we've filed in

4    all these cases, the petitioners have an opportunity to meet

5    with, correspond with counsel and all that sort of thing.

6         THE COURT:  I'll tell you one thing, Counsel.  You've

7    talked me early on into not requiring returns to be filed in the

8    cases.  But I'm going to go back to all of my habeas cases this

9    afternoon and change those orders.  Because if you're telling me

10   that it's only an order to file a return that will allow you to

11   tell opposing counsel that their clients are no longer enemy

12   combatants, that's a little hard for me to understand.

13        MR. HENRY:  But, Your Honor, until we're ready to

14   release someone, I mean, we continue to detain them.  The case

15   is not moot.  The grounds for the detention are, if not the

16   exact subject of, certainly will be affected by what's going on

17   in the Court of Appeals.

18        So the same grounds that animate the stay with respect

19   to proceedings apply across the cases.  And I would also point

20   out that as a practical matter, we have new cases filed

21   virtually every day.  How many of those that we know of right

22   off the bat involve NLECs?  I can't tell you.

23        THE COURT:  Oh, I think you've got a database.  How

24   many people are down there?

25        MR. HENRY:  A little over 500.  Your Honor, I'm telling

United States District Court
For the District of Columbia              202-898-9398              Rebecca King, RPR, CRR
                                                                    Official Court Reporter

Abu Bakker Qassim, et al. vs.
George Bush, et al.                    CA 05-497                          August 1, 2005

Page 22

1    you as --

2            THE COURT:  It's easy, isn't it?  It's a spreadsheet.

3    It's a spreadsheet, isn't it?

4            MR. HENRY:  I don't know, Your Honor.  It involves our

5    inquiry to the client and that sort of thing.

6            But, you know, all I'm intending to point out is that

7    it is a logistical undertaking that is significant, and...

8            In any event, as I've pointed out, the same issues that

9    animate the stay apply across the board in all the cases until

10   we're at a point where we're ready to release someone.

11   Obviously, at that point, the case becomes moot and we notify

12   everyone appropriately, or we comply with whatever orders the

13   Courts may issue with respect to advance notice or, in your

14   case, coming to the Court for advanced permission.

15           THE COURT:  Go back to your repatriation cases after

16   World War II.  The people you're talking about that took a long

17   time to get repatriated were repatriated from where?  POW camps

18   in Michigan?

19           MR. HENRY:  They were POWs, I'm not sure of their exact

20   location.

21           THE COURT:  They were POWs.  They weren't people who

22   had been determined not to be enemy combatants.

23           MR. HENRY:  Well, a cessation of hostilities had

24   occurred, so they were no longer enemy combatants in that sense.

25   This was after the end of the war.

Page 23

1          THE COURT:  And where were they kept?  Were they kept

2     in prisons?

3          MR. HENRY:  They were kept in prisons, I believe.  I

4     don't know if any were here in the U.S.  I know some were in

5     Europe.  They were kept in prisons, and -- until the issues were

6     worked out.

7          They involved citizens of other countries who had been

8     fighting for the Germans, and they claimed our enlistment or our

9     fighting for them had been compelled under various threats of

10    violence.  But they couldn't be sent back to their home country

11    because they would be shot as traitors, that sort of thing, and

12    it took several years to work that out.

13         Like I said, same kind of concerns at the end of the

14    Korean War, same kind of concerns at the end of the Gulf War for

15    significant numbers of individuals, and that's the same kind of

16    situation that we have here.

17         THE COURT:  What about counsel's example of the

18    Haitians?

19         MR. HENRY:  What he's referring to is the Migrant

20    Operations Center; it's a facility at Guantanamo.  It's not a

21    detention facility, but it's a facility where immigrants who are

22    interdicted on the high seas that claim a protected status -- in

23    other words, they can't be immediately repatriated because of

24    fears of torture or whatever.

25         And after an interview process they go through -- like

Abu Bakker Qassim, et al. vs.
George Bush, et al.                    CA 05-497                        August 1, 2005

Page 24

1    I said, they go through multiple interviews, they go through a
2    background check, that sort of thing.  And if they can't be sent
3    back, they are temporarily housed at this Migrant Operations
4    Center pending finding a third country that will take them.
5         After there are various background checks and that kind
6    of thing that goes on, they are permitted to seek work at the
7    various retail establishments and that sort of thing at
8    Guantanamo.  But again, that's after they go through background
9    checks and that sort of thing.
10        THE COURT:  But they're placed in the center before the
11   background checks, aren't they?
12        MR. HENRY:  My understanding is, and my understanding
13   is not complete, but my understanding is that they are in the
14   center, but they can't leave the center.  They're under certain
15   sort of monitoring pending their --
16        THE COURT:  But they're not chained to floors, are
17   they?
18        MR. HENRY:  Well, Your Honor, what happens is, when
19   counsel meet with the detainees at Gitmo --
20        THE COURT:  There's a yes-or-no answer to that
21   question.  Are they chained to floors in the immigrant detention
22   center?
23        MR. HENRY:  The detainees are not chained to floors in
24   their normal detention center either, Your Honor.
25        THE COURT:  But in the immigrant center.  If lawyers go

United States District Court
For the District of Columbia                    202-898-9398                    Rebecca King, RPR, CRR
                                                                                Official Court Reporter

Page 25

1    down to talk to people in that immigrant center, are they

2    chained to floor?

3            MR. HENRY: It's my understanding that lawyers are not

4    permitted to go down to the Migrant Operations Center.

5            THE COURT: So if lawyers show up, they have to chain

6    people to floors.  Is that the rule?

7            MR. HENRY:  I don't believe so, Your Honor.  I don't

8    know what the rule is.

9            Let me tell you what the rule is at Guantanamo with

10   respect to the detention operations, the enemy combatant-related

11   detention operations.  As we pointed out in our filing, and as

12   detailed in the declaration of the commander of the Guantanamo

13   joint task force detention operations, the detainees here are

14   housed in a communal living arrangement, 10-man bays, with other

15   NLECs.  They have all-day access to the exercise yard, they have

16   various recreation activities, that sort of thing.

17           When counsel come down to meet with any detainee

18   petitioner at Guantanamo, the detainee is moved to a special

19   camp called Camp Echo that has huts where a detainee has a cell

20   he's kept in, and there then there's a room where counsel and

21   the detainee can talk.

22           It's standard operating procedure that whenever the

23   detainee is in the presence of counsel, or, like, if there's an

24   interrogation -- if they're moved to an interrogation room or

25   whatever, if it's someone besides the detainee there, the

Abu Bakker Qassim, et al. vs.
George Bush, et al.                          CA 05-497                          August 1, 2005

Page 26

1    detainees are shackled and the chain is bolted to the floor.

2    And we've had situations where the detainee has basically -- not

3    these petitioners, but other petitioners have lunged at,

4    attempted to do violence to, the attorneys.

5            So the chaining to the floor is for everyone's

6    protection; it's a standard operating procedure.  They don't

7    make exceptions based on, well, I think this guy is okay.  I

8    mean, you can see the potential danger of that kind of

9    situation, given that they've got 500 people down there and

10   rotating guard staffs and that sort of thing.

11           So the chaining to the floor, while I certainly

12   understand is an unpleasant image, it happens with respect to

13   all counsel visits or visits from any individuals that are not

14   the detainees themselves.  And it's done for the safety of all

15   concerned.

16           But the detainees are not kept chained in their normal

17   detention facility; in fact, it's quite the opposite.  They're

18   allowed to freely move around the bay where they live with other

19   individuals.  They have all-day access to the exercise yard,

20   they eat their meals communally, they have recreation

21   activities.

22           THE COURT:  Let me ask you the same jurisdictional

23   question I put to petitioners' counsel.  Is there any

24   jurisdictional -- well, I know that you have jurisdictional

25   issues, but, I mean, based on -- is there any jurisdictional

Abu Bakker Qassim, et al. vs.
George Bush, et al.                    CA 05-497                    August 1, 2005

Page 27

1    limits on this proceeding based on what is currently on appeal

2    in this case?

3              MR. HENRY:  Let me say, I don't think so.  But let me

4    just correct something that petitioners' counsel said.  They not

5    only filed a petition for mandamus, they filed a notice of

6    appeal with respect to Your Honor's --

7              THE COURT:  Cross-appeal.

8              MR. HENRY:  -- cross-appeal with respect to Your

9    Honor's stay motion.  But I don't think an appeal of a stay

10   affects the Court's jurisdiction to modify the stay or do

11   whatever in appropriate circumstances.  And the petitioners'

12   counsel is correct that as far as I know, the Court of Appeals

13   has not required any kind of response to the mandamus petition.

14             THE COURT:  Who operates this immigrant detention

15   center?  I suppose that's the State Department.

16             MR. HENRY:  The Department of Homeland Security.

17             THE COURT:  Oh, Homeland Security.

18             MR. HENRY:  And that is an issue with respect to

19   providing asylum or transfer to third countries, that sort of

20   thing, issues that are well beyond the issues that have been

21   vetted in these cases so far.

22             THE COURT:  Well, are -- those people in that

23   immigration detention center, the reason they've been

24   interdicted on the high seas so they don't touch foot on

25   American soil so they don't have the right to seek asylum.

United States District Court
For the District of Columbia                    202-898-9398                    Rebecca King, RPR, CRR
                                                                                Official Court Reporter

Page 28

1   That's why they're not at Guantanamo.  Right?

2          MR. HENRY:  I'm not sure I would characterize it that

3   way, Your Honor.  They interdict people on the high seas in

4   various circumstances, in a boat sinking, whatever.  I mean, the

5   duty of the Coast Guard --

6          THE COURT:  That's called a rescue.  Interdiction is a

7   different concept entirely, isn't it?

8          MR. HENRY:  They overlap, Your Honor, is my

9   understanding.

10         THE COURT:  Well, I'm not through with this point.  I'm

11  trying to figure out why it wouldn't make sense or why it would

12  be unlawful for these people to be placed in a facility like

13  that instead of where they are.

14         MR. HENRY:  Well, Your Honor, if you take a look at the

15  commander's declaration, he's explained the reasons why the

16  petitioners are where they are.

17         Let me just say --

18         THE COURT:  I did take a look at it.  He spoke of his

19  concerns.  He said --

20         MR. HENRY:  Yes.

21         THE COURT:  -- because they might be unhappy with where

22  they were finally sent.

23         MR. HENRY:  That's one concern.  There have been issues

24  with respect to detainees unhappy with their country of ultimate

25  transfer who -- and there are concerns that they could take some

Page 29

1   action against themselves or others to try to avoid going there.

2   There's concerns along those lines.

3          There are concerns about -- you know, the fact that

4   someone has been determined to no longer be an enemy combatant

5   doesn't make them benign in all circumstances.  There are

6   concerns -- you know, you drop these folks into the general

7   population of Guantanamo, there are concerns about their own

8   safety with respect to potential threats from the outside.

9          In a situation --

10          THE COURT:  I thought that's what this whole background

11   investigation thing was for.

12          MR. HENRY:  Well, Your Honor, the background

13   investigation is for immigrants, it's not for folks who are

14   detained as enemy combatants or have been detained as enemy

15   combatants in --

16          THE COURT:  I'm sorry.  I thought you said it was for

17   people who had been interdicted and who were not going to be

18   permitted to be immigrants and were going to be sent somewhere

19   else.

20          MR. HENRY:  I'm sorry.  I used the word "immigrant," I

21   guess, incorrectly, Your Honor.  They have been interdicted but

22   they're not -- they weren't detained as enemy combatants.  So

23   you have a completely different situation.

24          THE COURT:  It sounds like that comment and a few

25   others you've made, like they might be harmful to others, they

Abu Bakker Qassim, et al. vs.
George Bush, et al.                    CA 05-497                    August 1, 2005

Page 30

1    might be harmful to themselves, they might be violent if they

2    didn't like where they were going, it sounds like the fact that

3    they have been detained as enemy combatants creates some sort of

4    presumption in your mind or in the government's mind about them.

5         MR. HENRY:  Your Honor, it's more a situation

6    concerning the finding that someone is no longer an enemy

7    combatant.  As explained in the Navy regulations, the order that

8    petitioners' counsel handed up, an enemy combatant is defined as

9    someone, and I'm paraphrasing, that's a member of or associated

10   with Al-Queda or the Taliban, and includes people who committed

11   belligerent acts against the United States and its coalition

12   partners.

13        If you've determined that a detainee is no longer that

14   kind of person, that's all the decision is.  It's not a decision

15   that they're wonderful people who should be integrated into any

16   available society as soon as possible.  So the commander at

17   Guantanamo has to make his decisions concerning the security of

18   the detainees and of the base, based on his experience and what

19   he knows.

20        And as explained in the declaration, you know, he's

21   made a determination based on the good order, safety, and

22   security of the base and the detainees.  And that's what's going

23   on here.

24        Again, this is part and parcel with enemy combatant

25   detention and winding this up in an orderly process.  I mean,

United States District Court                202-898-9398                Rebecca King, RPR, CRR
For the District of Columbia                                            Official Court Reporter

Abu Bakker Qassim, et al. vs.
George Bush, et al.                      CA 05-497                      August 1, 2005

Page 31

1    the historical examples that I gave you, just because there were

2    repatriation concerns, my understanding is they didn't turn

3    these folks loose to run around until they found a country

4    suitable for them, and that's what's going on here.  The

5    petitioner is being detained in the least-restrictive conditions

6    available at the detention facility.

7         I might add, you know, if they were moved outside the

8    detention facility, I think all that would mean is a relocation

9    of the security force situation, because the commander would

10   still feel an obligation to monitor -- you know, to provide the

11   care and emergency and security services that they do at the

12   detention camp.  It would just mean that it's done somewhere

13   else on the base.

14        THE COURT:  Yeah.  The petitioners' notion that he

15   should be placed in the civilian and military side of the

16   detention facility to live with the Marines is a nonstarter as

17   far as I'm concerned.  I agree that that doesn't make sense.

18        But I haven't quite let loose of the immigrant facility

19   that you've been talking about, or some sort of other -- you

20   said early on, Counsel, you said that -- you used the word

21   "soon" to describe when you thought that this might be resolved.

22   Define "soon."

23        MR. HENRY:  I don't know when that is.  I apologize if

24   I misspoke.  I mean, I think I said "soon" in kind of the

25   hopeful sense of the word.  Like I said, the diplomatic efforts

Page 32

1    are ongoing, multifaceted, and I think the government would like

2    nothing better than to find suitable countries of transfer for

3    these individuals, as well as other NLECs that have similar

4    concerns.

5             But I am not in a position, because I can't, not -- I

6    simply lack the knowledge to be able to give you any kind of

7    estimate as to when someone could be found.  And obviously, a

8    foreign country's decision to take these folks is up to that

9    country, and we can't really predict for sure what they're going

10   to do.

11            But I would say that these folks -- since they've been

12   determined to be NLECs, the diplomatic process is ongoing and

13   the government is trying its best to find a suitable country to

14   send these folks to.

15            THE COURT:  All right.  I'll hear from the petitioner

16   again by way of brief reply.

17            MR. WILLETT:  Thank you, Your Honor.

18            Let me start at the end.  We don't know what the State

19   Department is doing, but I can tell you, here are the facts that

20   are in the record:  One of my clients was told in Khandahar that

21   they already knew it was a mistake.  That's some time before

22   June of '02.

23            Then-Secretary of State Powell was quoted in press

24   accounts in August of '04 saying, yeah, we know about the

25   Uighurs.  It's a problem.  They're not going to be sent back to

Page 33

1   China.

2          We, on our side, have made efforts such as we can.

3   We've been on the phone to Sweden, we've been on the phone to

4   Turkey, we've been on the phone to the U.N. High Commissioner

5   for Refugees.  All I can tell the Court is we have yet to trip

6   over the State Department's trail.  When we call people, they

7   don't tell us, we can't talk to you, we're already talking to

8   other people.

9          So what they're doing, who knows?  All we can really

10  say is they kept it secret that they made this determination and

11  who knows whether they've done anything.

12         I do want to talk about -- Your Honor asked questions

13  of counsel about the legal basis of this wind-up concept, and I

14  agree that there is none.  There is a case we cited called

15  Zadvydas, which is a case about what happens when someone is

16  deported and no one will take them.  There, Justice Bryer held

17  for the Supreme Court that there's a rebut-able presumption that

18  six months is about as far as you can go detaining somebody,

19  even when there was a Congressional statute authorizing it.

20         And Zadvydas was a case involving convicted criminals.

21  The two people at issue there had been convicted of serious

22  crimes.  So I believe there is no lawful basis for what is

23  clearly indefinite imprisonment.

24         I would point out as well, that with respect to the

25  wind-up of World War II, what you had then was prisoners of war

Page 34

1    held in a fully Hague Convention-compliant prisoner of war

2    facility.  So far as I know, at least so far as the record

3    shows, the case reports, no one was contesting his being held

4    there at the time, because the alternative, I suppose, was to be

5    sent back to some crater in Germany.

6         So there's no -- I don't think any legal rule comes out

7    of those situations that would deal with the situation where

8    someone who has been adjudged not to be a prisoner of war, even,

9    is held indefinitely.

10        I do apologize that I was mistaken.  We did

11   cross-appeal, and Mr. Henry is correct about that.  I agree,

12   though, I think we both agree there's no jurisdictional problem

13   here.

14        And I wanted to re-emphasize, we do not rest on some

15   Constitutional right.  We think we have them, but we don't need

16   to rest on them.  It's their burden to proffer a legal basis for

17   detention, which they haven't done.

18        All of the solutions are imperfect.  The Migrant

19   Operations Center may be better than some.  It's not perfect,

20   but I would ask the Court to consider the alternative of

21   bringing the body here.

22        And then last, if I could ask --

23        THE COURT:  Well, bringing the body here would entail

24   bringing the body here in chains, number one, locking him up in

25   some local facility which is probably not as pleasant as the

Abu Bakker Qassim, et al. vs.
George Bush, et al.                CA 05-497                August 1, 2005

Page 35

1    facility in Guantanamo, and then what?  Then you would hope for

2    some parole to the community.

3            MR. WILLETT:  Yes, Your Honor.

4            THE COURT:  That's not even close to a foregone

5    conclusion.

6            MR. WILLETT:  I don't expect that it would be.  Your

7    Honor's decision might be that they had to be returned.  I don't

8    know what it would be.  But at least you would be able to assess

9    these sort of vaporous allegations that somebody might be

10   harmful to someone else.

11           THE COURT:  Well --

12           MR. WILLETT:  That is an option.  And I think it's

13   really the government's problem to come up with a solution.

14           THE COURT:  I didn't hear counsel say that there's an

15   individual determination being made that any of these

16   petitioners might be harmful.  I heard him say that it's sort of

17   a -- my word, not his, sort of a bureaucratic determination made

18   by a commander who is trying to keep the whole place under

19   order.  I mean, that's the excuse given for locking him up when

20   he was -- or for shackling him when he was brought to see you.

21           MR. WILLETT:  Yes, I understand, Your Honor.

22           THE COURT:  And at some level we can all understand

23   that, whichever side we're on.  He's got to -- I don't think the

24   commander of the base can be charged with making individual

25   harm/not harm decisions about people under his control.

Abu Bakker Qassim, et al. vs.                    CA 05-497                          August 1, 2005
George Bush, et al.

Page 36

```
1              MR. WILLETT:  Well, I agree with Your Honor.  But I
2    don't also think that the commander of the base therefore gets a
3    lawful basis to imprison.  If it's not convenient for these
4    people to be at the base, and it may not be, they have to be
5    released somewhere else.  I mean, this is the Pottery Barn rule.
6    They broke it, they have to fix it.  And if they can't be
7    repatriated to China, and they can't, then maybe they have to
8    sit here while this problem gets solved.
9              Your Honor, I want to ask, if I can, for two things
10   more while you ponder what you're going to do.  The first is
11   that the protective order in this case forbids telephone contact
12   with detainees except in unusual circumstances.  I think this
13   qualifies.  We would like to have telephone contact with our
14   clients.  It's particularly important to help us try to develop
15   a repatriation solution, to identify Uighur communities abroad
16   where we might be able to make an asylum petition.  Sweden is an
17   example, but there might be others.
18             We would like for their families to be able to talk to
19   them by telephone.  That's my first request.
20             The second is that I can't tell you how difficult it is
21   to get to Guantanamo with a DOD-approved Uighur-speaking
22   translator.  Their rule is, you've got to be a U.S. citizen and
23   you've got to speak Uighur; and my rule is you can't have shown
24   up before for the interrogators because then they won't know if
25   I'm a lawyer or interrogator.  That subset gets you down to
```

Page 37

1    zero.

2            Now, I have in the room Mr. Nury Turkel, who is a

3    lawful alien resident in the Washington, D.C. area.  He is a

4    Uighur, he speaks Uighur.  He is a graduate of the American

5    University Law School.  I have been asking for months for the

6    government to approve Mr. Turkel as an interpreter so that we

7    could take him with us to Guantanamo, and there is no response.

8    It would be helpful if we could have Mr. Turkel on the telephone

9    with our clients, and as well if he could come with us to

10   Guantanamo.

11           THE COURT:  Is Mr. Turkel a member of any bar?

12           MR. WILLETT:  May I have just a minute, Your Honor?

13           Your Honor, his admission to the New York bar is

14   pending.

15           THE COURT:  He's passed the New York bar exam?

16           MR. WILLETT:  Yes, he has.

17           THE COURT:  Okay.  Mr. Henry, do you want to respond to

18   those two requests?

19           MR. HENRY:  Yes, Your Honor.  Thank you.

20           With respect to the interpreter situation, my

21   understanding is that petitioners' counsel submitted a security

22   clearance application with respect to him, and that that's under

23   consideration by -- you know, there's a background investigation

24   the FBI does, that sort of thing.

25           That's all being handled through the Court security

Page 38

1    officers that are assigned to this case.  All counsel, all

2    interpreters that go down to Guantanamo have to possess a

3    security clearance, and the situation is his clearance hasn't

4    come through.  That typically has taken in the past anywhere

5    from six weeks to, you know, eight, ten weeks, things like that.

6            So I don't know the exact status of the security

7    clearance situation because that's not in our control.  It's

8    handled through the court security office.

9            With respect to telephone contact -- let me just add, I

10   assume that if the gentleman obtains his security clearance,

11   then, like many other translators for the other counsel in the

12   other cases have gotten their security clearance, they go down

13   and do their thing.

14           With respect to the issue of telephone situation, the

15   telephone contact, you know, Your Honor, we went through a

16   carefully crafted and very contentious process back last fall

17   coming up with this protective order that applies in all of

18   these Guantanamo cases so far.  These issues of telephone

19   contact and those kind of things were all presented to Judge

20   Green, and she signed off on this.  It has worked so far, you

21   know, not without some complaint from both sides, but it appears

22   to be working.

23           And if Your Honor starts making special exceptions for

24   telephone contact and that sort of thing, I think, since it's on

25   a slippery slope, we'll get all kinds of requests and motions

Abu Bakker Qassim, et al. vs.                    CA 05-497                         August 1, 2005
George Bush, et al.

Page 39

```
 1   for exceptions based on individual circumstances of individual

 2   detainees, and it will significantly undermine what has been a

 3   very difficult process to manage these counsel visits and

 4   counsel communications with clients in a fashion that, you know,

 5   maintains the various equities of each side that's involved.

 6          Thank you.

 7          THE COURT:  If I study the briefs that you-all have

 8   submitted very carefully, am I going to find all that you have

 9   to tell me on the question of whether I have the power to order

10   the petitioners brought to the United States, where presumably

11   the clearance of an interpreter would not be required and the

12   telephone restrictions would not be imposed?

13          MR. WILLETT:  We can very quickly supplement the brief,

14   Your Honor.

15          MR. HENRY:  Your Honor, we, too, can submit a brief

16   addressing that issue.  I would point out that under the

17   statutory scheme, the way I understand it, the bringing the body

18   before the Court is in habeas practice a rare circumstance.

19   It's usually done to try to resolve factual issues having to do

20   with the -- typically the grounds, in most cases the criminal

21   trial situation.

22          THE COURT:  Clearly in modern habeas practice, it has

23   not been thought that bringing the body before me is -- although

24   that is -- you know, "You have the body, bring it to me" is the

25   first language -- the first words of the Latin phrase of the
```

Page 40

1   classical writ of habeas corpus.  But I agree with you that in

2   modern practice that has not been thought to be the function of

3   a writ of habeas corpus.

4        But I am -- just as the commander in Guantanamo has

5   expressed concern, I have concerns about two people who are not

6   any longer enemy combatants who can't talk to their family on

7   the telephone or even have an interpreter.  That's a problem,

8   Counsel.

9        MR. HENRY:  Well, Your Honor, the family communication

10   situation, again, was vetted before Judge Green.

11        THE COURT:  Who I don't think was thinking about NLECs,

12   was she?

13        MR. HENRY:  Your Honor, the order was developed I think

14   before that became an issue.

15        I would point out that, you know --

16        THE COURT:  Look, I don't want to -- I don't want to

17   argue that any further.  My question was, if I study the briefs

18   that have been filed before me, will I find everything you have

19   to tell me on that subject.  You both answered no.

20        MR. HENRY:  That's correct.

21        THE COURT:  So I'll see whatever you have to tell me

22   in, what, five days?

23        MR. WILLETT:  We'll get it before that.

24        THE COURT:  All right.  Anything further from either

25   side?

Abu Bakker Qassim, et al. vs.
George Bush, et al.

CA 05-497

August 1, 2005

Page 41

1          Thank you very much.

2          We're adjourned.

3          (Proceedings adjourned at 5:11 p.m.)

4

5

6               CERTIFICATE OF OFFICIAL COURT REPORTER

7

8          I, Rebecca King, certify that the foregoing is a

9    correct transcript from the record of proceedings in the

10   above-entitled matter.

11

12

13

14   _____

15   SIGNATURE OF COURT REPORTER              DATE

16

17

18

19

20

21

22

23

24

25

United States District Court
For the District of Columbia

202-898-9398

Rebecca King, RPR, CRR
Official Court Reporter