IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MOHAMED AL-ZARNOUQI, *et al.*, | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-CV-1767 (RMU) |
| | ) | |
| GEORGE W. BUSH, | ) | |
| President of the United States, | ) | |
| *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |

### RESPONDENTS' FACTUAL RETURN TO PETITION FOR WRIT OF HABEAS CORPUS BY PETITIONER MOHAMED AL-ZARNOUQI AND NOTICE OF SUBMISSION OF FACTUAL RETURN UNDER SEAL

Respondents hereby submit, as explained herein, the final record of proceedings before the Combatant Status Review Tribunal pertaining to petitioner Mohammed Ali Zarnuqi (listed in the petition as Mohamed Al-Zarnouqi) as a factual return to petitioner's petition for writ of habeas corpus. For the reasons explained in the record, petitioner Mohammed Ali Zarnuqi has been determined to be an enemy combatant. Accordingly, petitioner Mohammed Ali Zarnuqi is lawfully subject to detention pursuant to the President's power as Commander in Chief or otherwise, and is being detained.[1]

---

[1] The respondents have filed a motion to dismiss this habeas corpus action for lack of jurisdiction (Resp'ts' Mot. to Dismiss (dkt. no. 35)) and a motion to vacate or stay the Court's February 14, 2007, order to produce factual returns in this case (Resp'ts' Mot. to Vacate or Stay February 14, 2007 Order and for Expedited Consideration (dkt. no. 30)). The D.C. Circuit held in Boumediene v. Bush, 476 F.3d 981 (D.C. Cir.), cert. denied, 127 S. Ct. 1478 (2007), that U.S. district courts lack jurisdiction over habeas corpus and other actions challenging or otherwise relating to the detention of aliens held as enemy combatants. See id. at 988. The Detainee Treatment Act of 2005, Pub. L. No. 109-148, tit. X, 119 Stat. 2680, which was enacted on December 30, 2005, amended 28 U.S.C. § 2241 and created an exclusive review mechanism in the D.C. Circuit, applicable to pending cases, to address the validity of the detention of aliens held by the Department of Defense as enemy combatants at Guantanamo Bay, Cuba. A

The portion of the record suitable for public release is attached hereto.  See Exhibit A.
The remaining portions of the record, including information that is classified or not suitable for
public release, are being submitted under seal through the Court Security Officers.  One copy of
the factual return is being submitted to the Court for in camera review.  Another copy of the
factual return, containing information suitable for disclosure to counsel under seal, is being made
available to petitioner's counsel who have been issued security clearances, consistent with the
Protective Order.  See December 4, 2006, Memorandum Order (applying Amended Protective
Order and Procedures for Counsel Access to Detainees at the United States Naval Base in
Guantanamo Bay, Cuba in In re Guantanamo Detainee Cases, No. 02-CV-0299, et al., 344 F.
Supp. 2d 174 (D.D.C. Nov. 8, 2004), and related orders, to this case).  Any redactions made in
the factual return are explained in the declaration(s)/certification(s) submitted therewith.  Both
copies of the factual return contain highlighting, explained therein, consistent with the Court's
Order for Specific Disclosures Relating to Respondents' Motion to Designate as "Protected
Information" Unclassified Information and Petitioners' Motion for Access to Unredacted Factual
Returns, entered on December 8, 2004 by Judge Green in the coordinated cases.  Respondents

---

subsequent statute, the Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600
(2006) ("the MCA"), enacted on October 17, 2006, amended § 2241 to eliminate district court
jurisdiction to consider habeas petitions and any other actions "relating to any aspect of the
detention, transfer, treatment, trial, or conditions of confinement" of aliens detained by the
United States as enemy combatants.  See id. § 7; Boumediene, 476 F.3d at 988.  The MCA
expressly applies the amendment "to all cases, without exception, pending on or after the date of
the enactment of this Act," which includes the above-captioned case, thereby unambiguously
divesting this Court of jurisdiction over this action.  The questions raised in Boumediene
concerned the applicability of the MCA to habeas cases and the constitutionality of that statute.
The court ruled that the MCA is indeed applicable to habeas cases and that it is constitutional.
Notwithstanding these provisions and the D.C. Circuit ruling, pursuant to the Court's minute
order of February 14, 2007, respondents hereby submit a factual return pertaining to petitioner
Mohammed Ali Zarnuqi, inasmuch as respondents' motion to vacate or stay the order for
production of a factual return and their motion to dismiss remain pending.

2

have designated certain highlighted, unclassified information in the factual return as "protected information" under the Protective Order. Pursuant to the Protective Order, once counsel for petitioner has reviewed the factual return and counsel for the parties have conferred, respondents will file a motion requesting that the Court designate the information in the factual return as "protected" pursuant to the Protective Order.[2]

For the reasons explained in the factual return, petitioner Mohammed Ali Zarnuqi has been determined to be an enemy combatant and is, therefore, lawfully subject to detention pursuant to the President's power as Commander in Chief or otherwise. Accordingly, the petition for writ of habeas corpus should be dismissed and the relief sought therein denied.

---

[2] Pursuant to the Protective Order, respondents are disclosing this information to petitioner's counsel, who shall treat such information as "protected" unless and until the Court rules that the information should not be designated as "protected."

Dated: April 23, 2007

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DOUGLAS N. LETTER
Terrorism Litigation Counsel

/s/ JAMES C. LUH
JOSEPH H. HUNT (D.C. Bar No. 431134)
VINCENT M. GARVEY (D.C. Bar No. 127191)
JUDRY L. SUBAR (D.C. Bar No. 347518)
TERRY M. HENRY
JAMES J. SCHWARTZ
ROBERT J. KATERBERG
NICHOLAS J. PATTERSON
ANDREW I. WARDEN
EDWARD H. WHITE
JAMES C. LUH
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC 20530
Tel: (202) 514-4938
Fax: (202) 616-8460

Attorneys for Respondents

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MOHAMMED ALI ZARNUQI,     )
                   )
                   )
      Petitioner,     )
                   )
     v.             )    Civil Action No. 06-1767 (RMU)
                   )
GEORGE W. BUSH, *et al.*,     )
                   )
      Respondents.     )
                   )

## DECLARATION OF DAVID N. COOPER

Pursuant to 28 U.S.C. § 1746, I, Lieutenant Colonel David N. Cooper, Judge Advocate, Judge Advocate General's Corps Reserve, United States Air Force, hereby state that to the best of my knowledge, information, and belief, the following is true, accurate and correct:

1.    I am a Legal Advisor to the Office for the Administrative Review of the Detention of Enemy Combatants at U.S. Naval Base Guantanamo Bay, Cuba (OARDEC). In that capacity I am an advisor to the Director, Combatant Status Review Tribunals.

2.    I hereby certify that the documents attached hereto constitute a true and accurate copy of the portions of the record of proceedings before the Combatant Status Review Tribunal related to petitioner Mohammed Ali Zarnuqi that are suitable for public release. The portions of the record that are classified or considered law enforcement sensitive are not attached hereto or were redacted by an OARDEC staff member. This staff member also redacted information that would personally identify certain U.S. Government personnel in order to protect the personal privacy and security of those individuals.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: *15 February 2007*

DAVID N. COOPER, Lt Col, USAFR
Staff Judge Advocate
DOD, HQ OARDEC
Washington, DC



# Department of Defense
## Director, Combatant Status Review Tribunals

OARDEC/Ser: 9 4 9 .

FOR OFFICIAL USE ONLY

2 5 FEB 2005

From: Director, Combatant Status Review Tribunal

Subj: **REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL FOR DETAINEE ISN # 691**

Ref:    (a) Deputy Secretary of Defense Order of 7 July 2004
        (b) Secretary of the Navy Order of 29 July 2004

1. I concur in the decision of the Combatant Status Review Tribunal that Detainee ISN #691 meets the criteria for designation as an Enemy Combatant, in accordance with references (a) and (b).

2. This case is now considered final and the detainee will be scheduled for an Administrative Review Board.

J. M. McGARRAH
RADM, CEC, USN

Distribution:
NSC (Mr. John B. Wiegmann)
DoS (Ambassador Prosper)
DASD-DA
JCS (J5)
SOUTHCOM (CoS)
COMJTFGTMO
OARDEC (Fwd)
CITF Ft Belvoir

FOR OFFICIAL USE ONLY

UNCLASSIFIED

1 Feb 05

MEMORANDUM

From: Assistant Legal Advisor
To: Director, Combatant Status Review Tribunal
Via: Legal Advisor

Subj: LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL FOR DETAINEE ISN #691

Ref: (a) Deputy Secretary of Defense Order of 7 July 2004
(b) Secretary of the Navy Implementation Directive of 29 July 2004

Encl: (1) Appointing Order for Tribunal #12 of 29 September 2004
(2) Record of Tribunal Proceedings

1. Legal sufficiency review has been completed on the subject Combatant Status Review Tribunal in accordance with references (a) and (b). After reviewing the record of the Tribunal, I find that:

   a. The detainee was properly notified of the Tribunal process and elected to participate. *See* exhibit D-a. The detainee also provided a sworn oral statement in question and answer format. *See* enclosure (3). The Tribunal considered the detainee's statement in its deliberations.

   b. The Tribunal was properly convened and constituted by enclosure (1).

   c. The Tribunal substantially complied with all provisions of references (a) and (b). Note that some information in exhibits R-3 and R-8 was redacted. The FBI properly certified in exhibit R-2 that the redacted information would not support a determination that the detainee is not an enemy combatant.

   d. The detainee requested 14 witnesses:

      i. The Tribunal President determined that the proffered testimony of the witnesses was not relevant due to its redundant nature.

      ii. The Tribunal President did allow the detainee three witnesses of his choice. The detainee's Personal Representative was directed to assist the detainee by interviewing the potential three witnesses. Two of the three requested witnesses testified to the Tribunal. *See* enclosure (3). The Tribunal considered the witnesses' testimony in its deliberations.

UNCLASSIFIED

UNCLASSIFIED

Subj:  LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL
FOR DETAINEE ISN # 691

    iii,  In my opinion, the Tribunal President should have determined that all 14 witnesses' testimony was relevant, and allowed the detainee the opportunity to ask their assistance in his Tribunal by testifying.  However, it also my opinion that the Tribunal acted properly in determining that the detainee is properly classified as an enemy combatant absent the testimony of the 11 witnesses the detainee requested.

    2.  The proceedings and decision of the Tribunal are legally sufficient and no corrective action is required.

3.  I recommend that the decision of the Tribunal be approved and the case be considered final.

PETER C. BRADFORD
LT, JAGC, USNR



# Department of Defense
## Director, Combatant Status Review Tribunals

29 Sep 04

From: Director, Combatant Status Review Tribunals

Subj: APPOINTMENT OF COMBATANT STATUS REVIEW TRIBUNAL #12

Ref: (a) Convening Authority Appointment Letter of 9 July 2004

By the authority given to me in reference (a), a Combatant Status Review Tribunal established by "Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba" dated 29 July 2004 is hereby convened. It shall hear such cases as shall be brought before it without further action of referral or otherwise.

The following commissioned officers shall serve as members of the Tribunal:

### MEMBERS:

███████████████████ Colonel, U.S. Marine Corps Reserve; President

███████████████████ Lieutenant Colonel, JAGC, U.S. Army;
Member (JAG)

███████████████████ Lieutenant Colonel, U.S. Air Force; Member

J. M. McGARRAH
Rear Admiral
Civil Engineer Corps
United States Navy



# HEADQUARTERS, OARDEC FORWARD
GUANTANAMO BAY, CUBA
APO AE 09360

MEMORANDUM FOR DIRECTOR, CSRT                    28 January 2005

FROM: OARDEC FORWARD Commander ICO ISN 691

1. Pursuant to Enclosure (1), paragraph (I)(5) of the *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba* dated 29 July 2004, I am forwarding the Combatant Status Review Tribunal Decision Report for the above mentioned ISN for review and action.

2. If there are any questions regarding this package, point of contact on this matter is the undersigned at DSN ███████.

CHARLES E. JAMISON
CAPT, USN

SECRET//NOFORN//X1

(U) **Combatant Status Review Tribunal Decision Report Cover Sheet**

(U) This Document is UNCLASSIFIED Upon Removal of Enclosures (2) and (4).

(U) TRIBUNAL PANEL: ___#12___

(U) ISN#: ___691___

Ref:    (a) (U) Convening Order for Tribunal #12 of 29 September 2004 (U)
        (b) (U) CSRT Implementation Directive of 29 July 2004 (U)
        (c) (U) DEPSECDEF Memo of 7 July 2004 (U)

Encl:   (1) (U) Unclassified Summary of Basis for Tribunal Decision (U/FOUO)
        (2) (U) Classified Summary of Basis for Tribunal Decision (S/NF)
        (3) (U) Summary of Detainee/Witness Testimony (U/FOUO)
        (4) (U) Copies of Documentary Evidence Presented (S/NF)
        (5) (U) Personal Representative's Record Review (U/FOUO)

1. (U) This Tribunal was convened on 10 November 2004 by references (a) and (b) to make a determination as to whether the Detainee meets the criteria to be designated as an enemy combatant, as defined in reference (c).

2. (U) On 10 November 2004 the Tribunal determined, by a preponderance of the evidence, that Detainee #691 is properly designated as an enemy combatant as defined in reference (c).

3. (U) In particular, the Tribunal finds that this Detainee is a member of, or affiliated with, al Qaida forces that are engaged in hostilities against the United States or its coalition partners, as more fully discussed in the enclosures.

4. (U) Enclosure (1) provides an unclassified account of the basis for the Tribunal's decision. A detailed account of the evidence considered by the Tribunal and its findings of fact are contained in enclosures (1) and (2).



Colonel, U.S. Marine Corps
Tribunal President

DERV FM: Multiple Sources    SECRET//NOFORN//X1
DECLASS: X1

UNCLASSIFIED//~~FOUO~~

# UNCLASSIFIED SUMMARY OF BASIS FOR TRIBUNAL DECISION

## (Enclosure (1) to Combatant Status Review Tribunal Decision Report)

TRIBUNAL PANEL: _____#12_____
ISN #: _____691_____

## 1. Introduction

As the Combatant Status Review Tribunal (CSRT) Decision Report indicates, the Tribunal has determined that this Detainee is properly classified as an enemy combatant because he is a member of, or affiliated with, al Qaida forces that are engaged in hostilities against the United States and its coalition partners. In reaching its conclusions, the Tribunal considered both classified and unclassified information. The following is an account of the unclassified evidence considered by the Tribunal and other pertinent information. Classified evidence considered by the Tribunal is discussed in Enclosure (2) to the CSRT Decision Report.

## 2. Synopsis of Proceedings

The unclassified evidence presented to the Tribunal by the Recorder indicated that the Detainee is associated with the Taliban and al Qaida and is a member of Jama'at al-Tabligh. The Detainee's travels were facilitated by Jama'at al-Tabligh. The Detainee engaged in hostilities against the United States or its coalition partners in that he fought on the front lines with the Taliban in the Karbogh area and in Kabul. The Detainee chose to participate in the Tribunal process. He called two witnesses, requested no documents be produced, and made a sworn verbal statement. The Detainee, in his verbal statement, denied being associated with the Taliban and al Qaida and claimed he traveled only to learn about religion. He indicated that the Jama'at al-Tabligh never helped him, except to obtain a visa. The Tribunal President's evidentiary and witness rulings are explained below.

## 3. Evidence Considered by the Tribunal

The Tribunal considered the following evidence in reaching its conclusions:

    a. Exhibits: D-a and R-1 through R-17.

    b. Testimony of the following persons: *Ahmed Abdul Qader* and *Mohammed Hassan*. Their Internment Serial Numbers are included at Enclosure (2) to the CSRT Decision Report.

    c. Sworn statement of the Detainee.

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//FOUO

### 4. Rulings by the Tribunal on Detainee Requests for Evidence or Witnesses

The Detainee initially requested fourteen (14) witnesses who were all captured together in a Pakistani house. Due to the redundant testimony that would have been provided by each witness, the Tribunal President allowed the Detainee to call no more than three witnesses. The Personal Representative assisted the Detainee in choosing the three of the original fourteen to testify. Of the three chosen, one did not wish to participate; therefore the remaining two were produced for the hearing and are listed below:

| Witness | President's Decision | Testified? |
|---------|---------------------|------------|
| Ahmed Abdul Qader | Reasonably Available | Yes |
| Mohammed Hassan | Reasonably Available | Yes |

The Detainee requested no additional evidence be produced.

### 5. Discussion of Unclassified Evidence

The Tribunal considered the following unclassified evidence in making its determinations:

    a. The Recorder offered Exhibits R-1 and R-2 into evidence during the unclassified portion of the proceeding. Exhibit R-1 is the Unclassified Summary of Evidence. While this summary is helpful in that it provides a broad outline of what the Tribunal can expect to see, it is not persuasive in that it provides conclusory statements without supporting unclassified evidence. Exhibit R-2 provided no usable evidence. Accordingly, the Tribunal had to look to classified exhibits for support of the Unclassified Summary of Evidence.

    b. Essentially the only unclassified evidence the Tribunal had to consider was the Detainee's sworn testimony and the sworn testimony of the two witnesses. A summarized transcript of the Detainee's sworn testimony and the sworn testimony of the witnesses is attached as Enclosure (3) to the CSRT Decision Report. In sum, the Detainee testified that all the accusations that were said before are not true. He only left to learn about Jama'at al-Tabligh, he was not a member and only wanted to learn about their religion. They never helped him except to help him get a visa. The witnesses corroborated the Detainee's involvement as a missionary with the Jama'at al-Tabligh, stayed at this same house with him, and were arrested together. The Tribunal found the Detainee's testimony in large part unconvincing after reviewing all of the evidence and noting that the Detainee's denials of the points on the Unclassified Summary of Evidence were in fact refuted by other exhibits.

UNCLASSIFIED//FOUO

UNCLASSIFIED//~~FOUO~~

The Tribunal also relied on certain classified evidence in reaching its decision. A discussion of the classified evidence is found in Enclosure (2) to the Combatant Status Review Tribunal Decision Report.

### 6. Consultations with the CSRT Legal Advisor

No issues arose during the course of this hearing that required consultation with the CSRT legal advisor.

### 7. Conclusions of the Tribunal

Upon careful review of all the evidence presented in this matter, the Tribunal makes the following determinations:

a. The Detainee was mentally and physically capable of participating in the proceeding. No medical or mental health evaluation was requested or deemed necessary.

b. The Detainee actively participated in the hearing and asked how it was decided that he was an enemy combatant when all of the evidence is not true? The Tribunal President answered his question by further explaining the CSRT process and stating that only after hearing all the testimony and reviewing all the information about him would the Tribunal determine his enemy combatant status. After this additional explanation it was clear that the Detainee understood the Tribunal process.

c. The Detainee is properly classified as an enemy combatant because he is a member of, or affiliated with, al Qaida forces that are engaged in hostilities against the United States and its coalition partners.

### 8. Dissenting Tribunal Member's report

None. The Tribunal reached a unanimous decision.

Respectfully submitted,

Colonel, U.S. Marine Corps
Tribunal President

UNCLASSIFIED//~~FOUO~~

ISN #691
Enclosure (1)
Page 3 of 3

UNCLASSIFIED//~~FOUO~~

## Unsworn Detainee Statement – ISN 691

**Detainee:** All of the things said about me earlier are not true. What should I present if they were not true?

**Tribunal President:** You will have an opportunity to make a statement, and, with the assistance of your Personal Representative, you can tell us your story.

**Detainee:** If you bring me true accusations, I will talk about them, but those are all false. How can I reply to something that's false?

**Tribunal President:** That will be your decision. You will have an opportunity to reply and we may ask you questions.

**Detainee:** All the points said before were all not true. What else should I say? I'm telling you they are all untrue.

**Tribunal President:** After you have made your statement and we ask you some questions, we'll give you an opportunity to call your two witnesses. They will have the opportunity to testify on your behalf, and you will be given the first option to question the witnesses. The Tribunal panel will then question the witnesses, and then we will continue with the process. Before we conclude the open session, I will explain the processes following this tribunal.

Before we continue, would you like to make your statements under oath?

**Detainee:** Yes, that's no problem.

*The Detainee began to cough due to his fasting and requested a cup to spit in. The Personal Representative retrieved a cup and napkins for the Detainee.*

*The Detainee had a question and the Tribunal President asked him to wait until the Personal Representative returned to ask his question.*

**Personal Representative:** The Detainee had that cough during our interview sessions as well.

**Tribunal President:** Whenever you're [Detainee] ready, you may ask your question.

**Detainee:** How did they decide I'm an enemy combatant when all of the evidence is not true?

**Tribunal President:** We'll be happy to discuss that after you take the oath.

UNCLASSIFIED//~~FOUO~~

*The Detainee was sworn.*

## Sworn Detainee Statement

*Tribunal President:* To address your question, the Tribunal has been assigned to determine whether you have been properly classified as an enemy combatant or not. We have come in here with an open mind; we have not seen your file and we did not see this evidence until this morning.

The United States government has previously determined you to be an enemy combatant because of the items listed on the Unclassified Summary of Evidence. Today, you are given an opportunity to be made aware of that, *to make a statement on your behalf in* reference to these allegations and you've been given an opportunity to call witnesses. You've decided to do that and we've allowed two witnesses to appear today, who will also be given the opportunity to testify on your behalf.

After we have heard your statements and reviewed the evidence, we will close the open session. If there is classified evidence against you, we will review that as well. After we have reviewed all information about you, we will make a decision about your classification as an enemy combatant. Later in these proceedings I will explain what will happen after the Convening Authority notifies you of our decision.

If you are ready, you may begin your statement.

*Detainee:* All the accusations that were said before are not true. There were two points mentioned about me being a member of Jama'at al Tabligh. That is not true; I am not a member of Jama'at al Tabligh.

I only left to learn about Jama'at al Tabligh; I was not a member. I learned about [their] religion only. The second point was that Jama'at al Tabligh helped me. That's not true. They never helped me. I only took one paper from them, which proves I was there to learn. That paper was to help me get a visa. They never helped me with anything.

The rest of the points are not true. I'm not them in any way and I cannot talk about it.

*Personal Representative:* The Detainee and I met on 25 October [2004] for about an hour. Like today, he denied the majority of the evidence. He did clarify that the Jama'at al Tabligh only helped him put paperwork together to get a visa. He stated he was not a member of Jama'at al Tabligh, nor a member of the Taliban or al Qaida.

For the record, on the Unclassified Summary of Evidence, 3(a)5 through 3(a)8 are outright not true.

The Detainee also told me that he did not go to Afghanistan at any time, so point 3(a)4, that he met a senior al Qaida Lieutenant at a guesthouse in Kabul, is not true either.

UNCLASSIFIED//FOUO

The Detainee stated he was arrested in Pakistan, but points 3(b)1 and 3(b)2 are not true. He then talked about the 14 people in the house that were all arrested, and that he would like some of those witnesses help identify that he was there and what he was doing and that he was not there to be a fighter.

Correct me if I'm wrong [Detainee], you went to learn about Islam as a student. Is there anything you'd like to add?

Detainee: What do you mean when I went to study Islam?

Personal Representative: You were in Pakistan to learn about Islam?

Detainee: I was in Pakistan with Jama'at al Tabligh to learn.

Personal Representative: Would you like to add anything else? Sir, [Tribunal President] that was the essence of our meeting.

Detainee: I don't have anything else.

## Personal Representative's Questions to Detainee

Q:     You stated you never went to Afghanistan?

A:     I never went to Afghanistan.

Q:     When did you go to Pakistan?

A:     I went to Pakistan in the end of February.

Q:     Of what year?

A:     I don't remember. I've been here three years. It's in my file. After ten months the Americans arrested us in the house, through the Pakistan government.

Q:     How long were you in the house? Ten months?

A:     I was in that house a month and a half.

Q:     You and thirteen others were arrested at the same time?

A:     Yes, but they were not with me. Correction...the date was August, not February. There were people in the house when I went there and when I was there people were coming in that I did not know.

ISN# 691
Enclosure (3)
Page 3 of 19

UNCLASSIFIED//FOUO

UNCLASSIFIED//~~FOUO~~

Q:    What was the purpose of what was going on in that house?  What were people doing?

A:    People were students; some were sick.  People I don't exactly know.

Q:    You were a student?

A:    They were studying religious philosophy.  They were students.

Q:    Why do you think you were arrested?

A:    It was pointed out to the Pakistan government that we were religious students.  I do not know why they arrested us.

**Tribunal Members' Questions to Detainee**

Q:    What country do you come from?

A:    Yemen.

Q:    What was it that made you decide to go to Pakistan?

A:    I replied to all of those questions.  When you review my file, you will find all of my answers.

Q:    As explained earlier, we have not had access to your file.  I'm trying to understand the rest of your story.

A:    Because I've been here three years, I've forgotten most of the details.  I remember the things that stood out.

Q:    I thought I'd start with a pretty easy question, which was why did you decide to go to Pakistan?

A:    I went to learn about Jama'at al Tabligh.

Q:    Did you have an occupation in Yemen before you left for Pakistan?

A:    I was a farmer.

Q:    Do you have a strong interest in religious matters?

A:    The only important thing to me was agriculture.

UNCLASSIFIED//~~FOUO~~

Q:      Was it an expensive trip from Yemen all the way to Pakistan?

A:      In my situation, I would say yes, it was expensive for me.

Q:      Did anyone help you fund your travel or did you have to do it yourself?

A:      No one.

Q:      How long were you originally planning to stay in Pakistan?

A:      I didn't have a time.  I was going to finish my learning and leave.

Q:      Did you have a farm at home and someone was taking care of it for you?

A:      I had a farm; I had people watching it.  The time I took off was vacation time.  I wanted to be back for planting season to start planting.

Q:      What time of year is planting season in that part of the world?

A:      Planting time differs by which kind of plant.

Q:      When you were in Pakistan, were you only in one place or did you move around to different places?

A:      I would go with Jama'at al Tabligh from one mosque to another.

Q:      Roughly, your total time in Pakistan before you were arrested was about three months, or was it longer than that?

A:      With Jama'at al Tabligh, four months, and when I was sick in that house, and there is proof that I was ill because I was taking medication, it was about a month and a half.

Q:      So, four months with Jama'at al Tabligh and you were sick for a month and a half?

A:      Yes.

Q:      Were you seriously ill, if you don't mind me asking what was wrong with you?

A:      I broke out, and I had pimples on my hands, like chicken pox.  I have scars from them.  [The Detainee showed the pox marks on his hands and wrists.]  I had medication I was taking in Pakistan.  It was in the house with me.  The Americans have it all.

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//FOUO

Q:    Were you restored to health before you were arrested or were you still ill when you were arrested?

A:    I was still ill.

Q:    You did get some medical care in Pakistan?

A:    Sometimes I would get shots and take pills.

Q:    Did they help you at all?

A:    In prison, or...?

Q:    No, I assume you were taking the pills in the house.

A:    I never improved.

Q:    The people in the house with you when you were arrested, were they all from Yemen?

A:    There were people from Yemen and people from other places. I don't know exactly where. I didn't go there for those people; I just went there to get medication and to study. That's it.

Q:    The Jama'at al Tabligh people are the ones that helped you find the house to stay in?

A:    No.

Q:    How did you know how to find the house to stay in, where they would accept you?

A:    When I went to the Salafia University, the religious university, they told me where to go. I sat with a group of Arabs and also to get better so I could go back to the University to finish my studies.

Q:    So, you were enrolled as a student there?

A:    I was a visitor, visiting for an hour or two only.

Q:    You didn't take any classes there?

A:    At the time I was very sick. I just wanted to get well. Just to meet people.

UNCLASSIFIED//~~FOUO~~

Q:    You didn't get sick until you were in Pakistan. Is that correct?

A:    I got sick in Pakistan.

Q:    Concerning the witnesses you have asked to testify for you today, what do you expect they will tell us?

A:    They know I was at that house, that I was a student, and I was with Jama'at al Tabligh.

Q:    Were they also people that were studying with you?

A:    I was with Jama'at al Tabligh and they were studying at the university, but I do not know who they are exactly. When I see them, I can tell you who they are and I can tell you if this guy was studying or if he was Jama'at al Tabligh.

Q:    So, some people at the house were at Salafia University and some people were like you, with Jama'at al Tabligh?

A:    Maybe one was Jama'at al Tabligh. I don't remember exactly. I don't know if he's registered as Jama'at al Tabligh.

Q:    When you traveled to Pakistan, was that the first time you left Yemen?

A:    Yes.

Q:    So, you were never anywhere else in the world besides Yemen?

A:    No.

Q:    When you were in the house, you said that people were either students or learning about religion. Were there any individuals in the house that spoke about al Qaida, the Taliban, or fighting for Islam?

A:    I never mixed with other people. Most of the time I was sick in the room. At the house, I think just one of them was Jama'at al Tabligh; most of them were at Salafia University.

Q:    All the money you needed in Pakistan came from your own money that you saved and brought with you?

A:    Yes.

UNCLASSIFIED//~~FOUO~~

Q:    When you were arrested, did you have a passport?

A:    It was in the house.

Q:    So, you had it?

A:    It was with me in the house. When the Pakistani government took me outside, my passport was in my bag, inside the house.

Q:    Have you ever seen your passport again?

A:    When I spoke about it, they [unknown] told me the Pakistani government took it.

Q:    Do you have any idea why someone thinks you altered dates in your Pakistani visa?

A:    That's not true. At my last interrogation, they told me they don't have my passport, so how can they bring such a thing if they don't have my passport?

Q:    Have you ever had, in your lifetime, any military training?

A:    I've never known anything about it.

**Tribunal President's Question to Detainee**

Q:    In Yemen, what type of crops did you grow as a farmer?

A:    According to the season, we have tomato season, potato season and we have flower season. What kind of crop I would plant would depend on the season. I planted many things; not just one. I just wanted to make a living and make some profit.

Q:    Was life good, or did you have trouble sustaining your family?

A:    Sure, it was a little difficult.

Q:    What caused you to decide, at this time in your life, to travel to Pakistan to study with the Jama'at al Tabligh?

A:    Religious purposes. The most important thing is to learn about religion.

Q:    Did any religious leader suggest this to you in Yemen?

A:    No, *it was my choice to go or not.*

UNCLASSIFIED//~~FOUO~~

Q:    Did any of your family or friends do this before you?

A:    No, most of them were busy. They didn't pay attention to those things.

Q:    How did you learn about Jama'at al Tabligh in Pakistan?

A:    From the Jama'at al Tabligh in Yemen.

Q:    Did they assist you in your transportation and setting up your travel to Pakistan?

A:    They didn't help me. I only went with them from Yemen to learn. The origin of the missionary or the Tabligh came from India and Pakistan, so I chose to go there to learn more. There were more things to learn there.

Q:    Did you have any stopovers before you got to Pakistan, or was it a straight flight from Yemen to Pakistan?

A:    *I stopped in one place, but I don't remember if it was Qatar or United Arab Emirates, but I think it was United Arab Emirates.* We stopped for 45 minutes, more or less.

Q:    Was there someone there at the Pakistan airport to meet you from the Jama'at al Tabligh?

A:    Yes, I was a stranger and didn't know anything, so they came to the airport.

Q:    Before you got sick, were you able to conduct any missionary work, with the assistance of the Jama'at al Tabligh?

A:    I was with them for four months. After that, I got sick, but it wasn't major. I had chicken pox, but it wasn't as bad. I didn't pay attention to it in the beginning; I thought it was a rash and it would go away. Day by day my situation got worse. I used a lot of medications and most of them didn't do anything. I was at Salafia University as a visitor. They said there was a house with Arabs, so I decided to go stay there to get treated and get well. I asked some of them for help if I needed to go to the hospital or to take medication.

Q:    *I'm interested more about the time you were healthy; the four months you were studying with the Jama'at al Tabligh. What type of activities did you do during that time?*

A:    I stayed with them in Lahore for two months, and we went from mosque to mosque. Every three days, we'd go to a different mosque. We'd sit and learn. Two months after that I went to Islamabad and we did the same thing there. When those two months ended, I went to (inaudible). I took my passport and my

UNCLASSIFIED//~~FOUO~~

personal belongings and by then if I wanted to benefit more from the Islamic teaching, I should attend Islamic schools. I went to Faisalabad to visit the university to see what kind of classes and programs they have and that's when I was notified about the Arab house, so I went to the Arab house.

I don't have a problem repeating my story twenty times. Every time interrogators and investigators ask me the same thing, so I have to repeat it over and over again. If there were a tape recorder and a tape, if you played it that much, it would have been broken by now. I've said it so many times, and hopefully this is the last time I'll say it.

*The Personal Representative called Ahmed Abdul Qader, ISN 690 and Mohammed Hassan, ISN 681. The Detainee did not know the witnesses by name, but stated that we could bring them in.*

*The Personal Representative showed the Detainee photographs of the individuals identified as witnesses. The Detainee recognized them, but knew them by slightly different names.*

*The Tribunal President stated as long as the witnesses are still acceptable to the Detainee, we will call them.*

Personal Representative: State your name please. [Witness, ISN 690]

Witness: My name is Ahmed Abdul Qader.

Tribunal President: You have been called here to testify on behalf of Mohammed Ali Salem Al Zarnuki. The Recorder will now administer the oath.

Witness: I choose not to take the oath.

Tribunal President: Witnesses will be required to take an oath, or they will not appear. If you choose not to take a Muslim oath, we will ask that you promise to tell the truth. The Recorder will identify the promise you will take.

Witness: Good.

Tribunal President: Are you willing to take the Muslim Oath?

Witness: Yes.

*The witness, Ahmed Abdul Qader, ISN 690, was sworn.*

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//FOUO

## Detainee's Questions to Witness Ahmed Abdul Qader, ISN 690

Q:     I was shown your picture, Ahmed Abdullah, and I was told I could have you as a witness because you were one of the people in the house. That's why I called you here. You were brought here to testify that I was at that house. Please tell them [the Tribunal panel] what you know about me and that I was at the house. You know everything about me living in Pakistan.

A:     I know this man from a house in Faisalabad. About a month and a half before…I only know he is a missionary person. I have never seen him before that. That's what I know about him.

## Personal Representative's Questions to Witness Ahmed Abdul Qader, ISN 690

Q:     First, thank you for coming to testify today. The house you stayed at; how big was the house?

A:     I don't know the distance, but I'd say it had about five rooms.

Detainee: There were four rooms, a kitchen and two bathrooms.

Q:     How many…

Tribunal President: Excuse me. Let's clarify, for the record, that the Detainee responded, not the witness. Now, if the witness could answer that question?

A:     I'm not sure, but I'd say four to five rooms.

Q:     Did each person have his own bedroom?

A:     No.

Q:     So, you shared sleeping quarters?

A:     It was a particular place. Personally, I didn't have my own place.

Q:     Did you get to see people coming and going throughout the day?

A:     I did not see them.

Q:     Are you a student?

A:     I didn't study in school.

UNCLASSIFIED//FOUO

Q:      What was your purpose for being in the house?

A:      I wanted to return to Yemen.

Q:      How often did you see Mohammed Ali [Detainee]?  Once a day?  Once a week?

A:      We all ate together and we would pray together during prayer time.

Q:      You saw him every day then?

A:      Sometimes, he was ill and couldn't eat and pray with us, but we would eat and pray together.

Q:      Did you say he was ill?  He was sick?

A:      I'm not sure if I said if he was.  I can't say I saw him everyday, but I saw him regularly or normally during prayer time and eating time.

Q:      You did not see him coming or going out of this house?

A:      I did not.

Q:      Do you know if he had his own room?

A:      I do not remember.

Q:      Do you know what the other people were doing at the house?

A:      We would cook and clean together.  We didn't have work.

Q:      Why do you believe the group was arrested?

A:      Me, personally, I didn't know why I was arrested.  When they came and asked for my passport and I gave it to them, I think I was arrested because my visa was expired.

**Tribunal Members Questions to Witness Ahmed Abdul Qader, ISN 690**

Q:      Did you say you were also a student in Faisalabad?

A:      I didn't study.

Q:      So, what was your purpose for being in the house?

A:      I wanted to return to Yemen.

ISN# 691
Enclosure (3)
Page 12 of 19

UNCLASSIFIED//FOUO

UNCLASSIFIED//~~FOUO~~

Q:    What brought you to Pakistan in the first place?

A:    I went to Pakistan to learn computers and the Holy Koran.

Q:    Were you also involved with the Jama'at al Tabligh missionary group?

A:    No.

Q:    So, your computer study, was that something on your own or did you go to school for that?

A:    I wanted to register in school, but I didn't see a school that was teaching in Arabic.

Q:    You traveled all the way from Yemen to Pakistan to study computers, but you didn't know where to enroll to do that?

A:    No.

Q:    Was there anyone to help you figure out how to do this?

A:    No.

Q:    Were you in the house longer than Mohammed Ali [Detainee], or was he there before you?

A:    I was there before he was.

Q:    The entire time he was in the house, you were there also?

A:    Yes.

Q:    The people in the house, they were all doing different things, but they were all Arabic people?

A:    They were all Arab.  The cook was Pakistani.

Q:    The Arabic guests all had their own reasons for being there?

A:    I did not know all of their reasons for being there, but I know they were all Arabs.

Q:    Were any of them with you doing the same things you were doing?

A:    I don't know.

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//~~FOUO~~

Q:    There were no other computer students or people to study the Koran with you?

A:    I don't know.

Q:    Did you travel anywhere else other than Pakistan?

A:    I wanted to say my story in my own tribunal, with the help of my own Personal Representative, but I'm here to testify about the time I spent with him [Detainee].

Q:    Okay.  At the time of the arrest of the 14 people in the house, did you own a computer?

A:    No.

*The Witness, Ahmed Abdul Qader, ISN 690, was excused.*

*The Personal Representative left the room to call the next witness.*

Detainee:  I just want to remind the Tribunal that there was a Russian with us.

Witness:  It's true.  I remember now.  There was one Russian with us.

Detainee:  God be with you [Witness].

*The witness, Ahmed Abdul Qader, ISN 690, was removed from the Tribunal room.*

*The Tribunal President advised the Personal Representative that the Detainee and the Witness stated there was also a Russian at the house with them.*

Detainee:  I thought I was given a chance to questions or ask my witness.  I thought you were going to give me that chance.  It appears to me that he forgot the number of rooms and that we had a Russian with us.  If we had met before, we might have been able to ask each other what we remembered.  Maybe he would have remembered more.

Tribunal President:  You will be given the first opportunity to ask the questions to your witness.  If there is anything…

Detainee:  I don't have a problem with anything; I just wanted to be prepared to ask the questions.  We've been away from each other for three years now.

Tribunal President:  You'll have the opportunity to do whatever you want in the time we have here.

UNCLASSIFIED//FOUO

Detainee:  When I was in Pakistan, I was ill, but I was being treated.  Here, I am ill and no one is giving me any treatment.

Tribunal President:  It is my understanding that you have access to medical care here.

Detainee:  Not 100%.  I've had the bump on my head for one year now and I've been *telling them about it.*  This happened to me here in Cuba and it hurts a lot, especially when I pray.  [The Detainee had a bump in the center of his forehead approximately the size of a quarter.]  I don't know why I'm not getting the treatment.

Tribunal President:  We will bring it to the attention [of the appropriate agency] that you are not getting medical care.

Detainee:  If you could do that.

*The Personal Representative called the witness, Mohammed Hassan, ISN 681.*

Tribunal President:  The witness is here to testify on behalf of this Detainee.

Personal Representative:  *Please state your name [Witness].*

Witness:  Mohammed Mohammed Hassan Al Udien.

Tribunal President:  I'd like to confirm with the Detainee that this is an acceptable witness for him.

Detainee:  I can talk now?

Tribunal President:  No, I just want to confirm that this is one of the witnesses you requested.

Detainee:  I want to say that he [Witness] came in the night we were arrested and he knows we were arrested together in Faisalabad and he will tell what happened.

Tribunal President:  This is one of the witnesses you requested, yes?

Detainee:  Yes, he is one of them.  He will testify to what he knows.

Tribunal President:  Very good.  That's all I wanted at this point.  Now, to the witness, you are here to testify on behalf of the Detainee.  We ask that you take an oath or a promise to tell the truth.  Would you like to take the Muslim oath?

Witness:  Yes.

*The witness, Mohammed Hassan, ISN 681, was sworn.*

ISN# 691
Enclosure (3)
Page 15 of 19

UNCLASSIFIED//FOUO

UNCLASSIFIED//~~FOUO~~

## Detainee's Questions to Witness Mohammed Hassan, ISN 681

Q:     First, I want to thank you for coming here. Second, I was shown your picture and given a chance to ask you (inaudible) and I want you to testify to tell the truth about what happened.

I've said it before, everyone at that house knows I'm a missionary and you can testify to that too. May God give you long health.

Tribunal President: Do you have any other questions for the witness?

Detainee: *The problem is that I didn't have time to sit with him and ask him [questions] but he was with us the night we were arrested. I don't have anything else.*

## Personal Representative's Questions to Witness Mohammed Hassan, ISN 681

Q:     Mohammed, thank you so much for coming out today. You were with Mohammed Ali the night you were all arrested?

A:     I came to his house and saw him at that house.

Q:     The night of the arrest, was that the first time you saw Mohammed Ali?

A:     Yes.

Q:     Did you come to the house early in the morning or late in the afternoon? When did you come to the house?

A:     I ate dinner with them.

Q:     You did not know Mohammed Ali before you ate at that house?

A:     That was the first time I'd seen him.

Q:     Did you know anybody else at that house?

A:     Yes, I know Mohammed Ali is a missionary person, a Jama'at al Tabligh person.

Q:     I'm sorry; he's a missionary person?

A:     A group called Jama'at al Tabligh.

Q:     He was a missionary for that group?

A:     I don't know the details. We met more in prison.

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED/~~FOUO~~

Q:     Did you know he was a missionary that night in Pakistan?

A:     Yes, at that time I knew he was a missionary.

Q:     Did you see him with any type of weapons that night?

A:     No, I did not.

Q:     Did anyone in the house have weapons?

A:     No.

Q:     Are you a student?

A:     I'm a student at Salafia University.

Q:     Why do you think the group was arrested?

A:     I do not know, but the interrogator said the house was suspected.

Q:     Did you know that before you went to that house?

A:     No, I didn't know.

Q:     Why did you go to that house?

A:     When I was at the university, I was told that there were Yemeni people at that house.  I went to visit them.

Q:     You didn't go to stay?  You went to visit?

A:     I was just visiting.

Q:     Many people at that university went to that house to stay and to visit?

A:     I do not know, but one of the students gave me the address of the house.

Q:     One of the students at the university?

A:     Yes, he lives in that house.

Q:     About how far is that house from the university?

A:     I don't know, but driving in a vehicle takes five minutes.

UNCLASSIFIED/~~FOUO~~

**Tribunal Members' Questions to Witness Mohammed Hassan, ISN 681**

Q:      You are also a native of Yemen.  Is that right?

A:      Yes, I'm Yemen.

Q:      You were a student at the Salafia University in Faisalabad.  Is that correct?

A:      Correct.

Q:      What attracted you to travel all the way to Pakistan to go to school?

A:      My father advised me to go there and study and memorize the Koran.

Q:      Did you have a job in Yemen before you left?

A:      I was studying high school in Yemen.

Q:      After you finished high school, your father said you should go to this school to learn?

A:      Yes.

Q:      How long were you able to be at the school before you were arrested?

A:      I was at the university for four months.

Q:      But, you did not live at the same house as Mohammed Ali?  You lived somewhere else?

A:      I stayed in the university dorms.

Q:      You visited him the night he was arrested.  It was just a mere coincidence that you saw him that same day?

A:      Yes.

Q:      Do you know any of the other people in the house that you went to visit?

A:      Yes, I know one, the one who gave me the address.  His name is Ahmed.

Q:      He was also a student and from Yemen.

A:      Yes.

UNCLASSIFIED/~~FOUO~~

UNCLASSIFIED//~~FOUO~~

Q:    Have you traveled anywhere other than Pakistan since leaving Yemen?

A:    Never.

Q:    It's just been in Yemen and Pakistan?  That's it?

A:    Yes.

Tribunal President:  Mohammed Ali Salem Al Zarnuki, do you have any other questions to this witness?

Detainee:  I don't have any more questions.

*The witness, Mohammed Hassan, ISN 681, is excused.*

Detainee:  May God be with you, Mohammed.

Witness:  May God be with you.


## AUTHENTICATION

I certify the material contained in this transcript is a true and accurate summary of the testimony given during the proceedings.



Colonel, U.S. Marine Corps
Tribunal President

UNCLASSIFIED//FOUO

# DETAINEE ELECTION FORM

**Date:** 25 October 2004

**Start Time:** 1040 hrs

**End Time:** 1140 hrs

ISN#:   0691

**Personal Representative:** ████████████ MAJOR, USAF
**(Name/Rank)**

**Translator Required?** YES        **Language?** ARABIC

**CSRT Procedure Read to Detainee or Written Copy Read by Detainee?** YES

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## Detainee Election:

[X]   **Wants to Participate in Tribunal**

[ ]   **Affirmatively Declines to Participate in Tribunal**

[ ]   **Uncooperative or Unresponsive**

## Personal Representative Comments:

Detainee desires to participate in the Tribunal.  Detainee requested ~14 detainee witnesses who were all captured together in the same Pakistani house.  PR is researching files to determine ISNs.  President approved three witnesses.  After PR interviewed all three witnesses, 2 witnessed desired to participate in the Tribunal.  There is no documentary evidence.

*Personal Representative:* ████████████████████

Exhibit D-a

UNCLASSIFIED//FOUO

UNCLASSIFIED

**Combatant Status Review Board**

TO: Personal Representative

FROM: OIC, CSRT (15 October 2004)

Subject: Summary of Evidence for Combatant Status Review Tribunal – SALEM AL ZARNUKI, Mohammed Ali

1. Under the provisions of the Secretary of the Navy Memorandum, dated 29 July 2004, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base Cuba*, a Tribunal has been appointed to review the detainee's designation as an enemy combatant.

2. An enemy combatant has been defined as "an individual who was part of or supporting the Taliban or al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who committed a belligerent act or has directly supported hostilities in aid of enemy armed forces."

3. The United States Government has previously determined that the detainee is an enemy combatant. This determination is based on information possessed by the United States that indicates that the detainee is a member of the Taliban and al Qaida and engaged in hostilities against the United States or its coalition partners.

   a. The detainee is associated with the Taliban and al Qaida:

      1. The detainee is a member of the Jama'at al-Tabligh.

      2. The detainee's travel to Pakistan was facilitated by Jama'at al-Tabligh.

      3. Jama'at al-Tabligh, a Pakistani-based-Islamic missionary organization, is being used as a cover to mask travel and activities of terrorists including members of al Qaida.

      4. The detainee reportedly met a senior al Qaida lieutenant at a front line guesthouse in Kabul.

      5. The detainee reportedly altered the dates on his Pakistani visa.

      6. The detainee reportedly was at the al Qaida village near the Kandahar airport.

      7. The detainee reportedly was at the Mes Aynak training camp.

      8. The detainee is associated with al Qaida.

   b. The detainee engaged in hostilities against the United States or its coalition partners:

      1. The detainee fought on the front lines with the Taliban in the Karbogh area north of Kabul.

      2. The detainee was on the Taliban lines in Kabul.

UNCLASSIFIED

Exhibit **R-1**

UNCLASSIFIED

4.  The detainee has the opportunity to contest his designation as an enemy combatant.  The Tribunal will endeavor to arrange for the presence of any reasonably available witnesses or evidence that the detainee desires to call or introduce to prove that he is not an enemy combatant. The Tribunal President will determine the reasonable availability of evidence or witnesses.

## Memorandum



| | | |
|---|---|---|
| To | : | Department of Defense    Date 10/14/2004<br>Office of Administrative Review<br>for Detained Enemy Combatants<br>Col. David Taylor, OIC, CSRT |
| From | : | ~~FBI  GTMO~~<br>Counterterrorism Division<br>Asst. Gen. Counsel ███████████ |
| Subject | | REQUEST FOR REDACTION OF<br>NATIONAL SECURITY INFORMATION |

████████████████

Pursuant to the Secretary of the Navy Order of 29 July 2004, Implementation of Combatant Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba, Section D, paragraph 2, the FBI requests redaction of the information herein marked[1]. The FBI makes this request on the basis that said information relates to the national security of the United States[2]. Inappropriate dissemination of said information could damage the national security of the United States and compromise ongoing FBI investigations.

CERTIFICATION THAT REDACTED INFORMATION DOES NOT SUPPORT A DETERMINATION THAT THE DETAINEE IS NOT AN ENEMY COMBATANT

The FBI certifies the aforementioned redaction contains no information that would support a determination that the detainee is not an enemy combatant.

The following documents relative to ISN 691 have been redacted by the FBI and provided to the OARDEC:

FD-302 dated 06/19/2002
FD-302 dated 03/26/2002

---

[1]Redactions are blackened out on the OARDEC provided FBI document.

[2]See Executive Order 12958

Exhibit **22**

Memorandum from ████████ to Col. David Taylor
Re:  REQUEST FOR REDACTION, 10/14/2004


     If you need additional assistance, please contact Asst.
Gen. Counsel ████████████████████ or Intelligence Analyst ████
Intelligence Analyst ████████████████████████████████

UNCLASSIFIED//~~FOUO~~

# Personal Representative Review of the Record of Proceedings

I acknowledge that on __25__ January 2005 I was provided the opportunity to review the record of proceedings for the Combatant Status Review Tribunal involving ISN #691.

███ I have no comments.

____ My comments are attached.

████████████ Lt Col, USAF

_____
Name PERSONAL REP TEAM LEAD

*25 Jan 05*
Date

████████████████████
████████████████
Signature
FOR MAJ ████████

ISN #691
Enclosure (5)

UNCLASSIFIED//~~FOUO~~