**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| MOHAMED AL-ZARNOUQI, *et al.*, <br> **Petitioners** <br><br> 01767-RMU <br> *v.* <br><br> GEORGE W. BUSH, *et al.*, <br> **Respondents.** | ) <br> ) <br> ) <br> ) <br> )      **Civil Action No. 06-cv-** <br> ) <br> ) <br> ) <br> ) <br> ) |

## PETITIONERS' OPPOSITION TO RESPONDENTS' MOTION TO DISMISS

Petitioners Mohamed Al-Zarnouqi and Mashour Abdullah Muqbel Alsabri (here-inafter referred to collectively as "Petitioners"), together with Next Friend Mohamed Muqbel Ahmed Alsabri as Co-Petitioner, by and through undersigned counsel, in re-sponse to Respondents' Motion to Dismiss ("Motion to Dismiss"), respectfully request that this Court (i) deny Respondents' Motion to Dismiss their habeas actions, and (ii) hold this action in abeyance pending Petitioners' exhaustion of their remedies in the Court of Appeals under the Detainee Treatment Act of 2005[1] ("DTA") and the Supreme Court's ultimate determination whether the jurisdiction stripping provision of the Military Commission Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 (2006) ("MCA") is constitutional and enforceable. Petitioners expect to file a petition under the DTA within the next few weeks. The jurisdictional issue raised by the MCA is likely to be

---

[1] Detainee Treatment Act of 2005, Pub. L. No. 109-148, 119 Stat. 2680 (2005).

presented to the Supreme Court in a renewed petition for certiorari to review the Court of Appeals' jurisdictional holding in *Boumediene v. Bush*[2] ("*Boumediene I*"), and is already being presented to the Supreme Court in a pending original habeas corpus petition filed in *In re Ali*, No. 06-1194, which also challenges the MCA jurisdictional holding of the Court of Appeals.

Respondents argue that dismissal of this habeas action is consistent with the established law of this Circuit as well as the clear intent of Congress. Respondents fail to recognize that the constitutionality of the MCA is still in dispute and being actively litigated. In the Supreme Court's denial of certiorari in *Boumediene v. Bush* ("*Boumediene II*"),[3] three Justices state in the dissent that the habeas-stripping provision of the MCA is a "significant [question]…warranting…review."[4] Two more Justices stated that they could not review the issue "at this time"[5] because Petitioners had failed to exhaust alternative remedies.[6] In other words, five Justices have signaled a willingness to rehear the issues raised in *Boumediene I* once alternative remedies have been exhausted.

This is far from a case of first impression for the courts. In a prior case, the Supreme Court held that in habeas actions where alternative remedies exist, and where there is a danger of dismissal of the underlying habeas action by statute while those remedies

---

[2] *Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007).

[3] *Boumediene v. Bush*, 127 S. Ct. 1478 (2007).

[4] *Id.* at 1480.

[5] *Boumediene II*, 127 S. Ct. 1478 (2007).

[6] It is the contention of habeas counsel that the alternative remedies provided under the DTA fails to meet the standard required under *I.N.S. v. St. Cyr*, (533 U.S. 289 (2001) et sequelae to lawfully suspend habeas corpus.

are being exhausted, the original court of the pleading would be abusing its discretion were it *not* to stay dismissal pending abeyance of said exhaustion of remedies, provided there is good cause, potentially meritorious claims, and the absence of unreasonable delay.

Respondents would have this Court believe that it has no choice but to apply the holding in *Boumediene I* to this habeas action. But this Court is not bound by the decision *Boumediene I*; this Court has the discretion to stay this action while the jurisdictional issues continue to be litigated. Respondents argue that this Court has no jurisdiction to hear Petitioners' habeas action. It is well established that courts have jurisdiction to determine their own jurisdiction. Nor has the Court of Appeals even issued its mandate in *Boumediene I*. The *Boumediene* petitioners have asked the court to stay the issuance of its mandate pending the completion of DTA proceedings and the filing of a renewed petition for certiorari to review the court's jurisdictional ruling in *Boumediene I*. The court has not yet acted on the motion.

While questions of jurisdiction are being decided, as they are here, the court in question still has the authority to issue orders maintaining the status quo of the petition. In fact, two of the Justices in the denial of certiorari in *Boumediene II* specifically charged the courts with preventing any actions by Respondents that would damage Petitioners' ability to exhaust their remedies under the DTA.[7] Dismissal of this case could

---

[7] The Justices specifically expressed concern regarding maintenance of the status quo during the litigation: "Were the Government to take additional steps to prejudice the position of petitioners in seeking review in this court, 'courts of competent jurisdiction,' including this Court, 'should act promptly to ensure that the office and purposes of the writ of habeas corpus are not compromised.'" *Boumediene II*, 127 S. Ct. at 1478 (quoting *Padilla v. Hanft*, 126 S. Ct. 1649, 1650 (2006)).

void the Amended Protective Order issued in this case as well as other orders and rulings regarding access to clients. Negotiating a new protective order that provides the same levels of access to clients and protection of the attorney-client privilege could take weeks or longer, ultimately interfering with counsel's ability to communicate with Petitioners and delaying if not outright preventing counsel from being able to seek full and effective review under the DTA. For this reason, this Court should issue a stay-and-abey order, rather than dismiss this habeas action, while the DTA petition is being litigated.

I.    **It Would Be Premature for This Court to Dismiss Petitioners' Habeas Actions for Lack of Jurisdiction.**

Respondents argue that dismissal of this habeas action is consistent with the established law of this Circuit (*Boumediene I*) as well as the clear intent of Congress as expressed within the MCA. Motion to Dismiss at 1. This argument fails to recognize that holding in *Boumediene I* is neither final nor dispositive of the issues, including jurisdictional questions, raised by Petitioners. The constitutionality of the MCA is still being actively litigated. As a matter of necessary predicate, the Supreme Court has openly invited habeas counsel to exhaust all available remedies in order to re-petition the Court for review. Dismissal at this time would be premature. Until the constitutionality of the MCA has been fully resolved, both facially and as applied to Petitioners, it is more appropriate to maintain the stay of these habeas actions.

A.    ***Boumediene I* Is Not Binding Upon This Court.**

The Court of Appeals has not yet issued its mandate in *Boumediene I*. The *Boumediene* petitioners have asked the court to stay the issuance of its mandate pending

4

the completion of DTA proceedings and the filing of a renewed petition for certiorari to review the court's jurisdictional ruling in *Boumediene I.* The court has not yet acted on the motion.

Moreover, this Court is not obligated to rotely apply the Court of Appeals' conclusions regarding the jurisdictional implications of the MCA. It has long been held that courts have jurisdiction to determine their own jurisdiction. This type of threshold jurisdictional determination, which must be made in each case based on its own facts, is precisely what the Supreme Court did in *Ex parte Milligan,* 71 U.S. 2 (1866). In discussing the authority of the courts to address Milligan's claims that a writ of habeas corpus should issue notwithstanding action that suspended the writ, the Supreme Court stated:

> The suspension of the privilege of the writ of habeas corpus does not suspend the writ itself. The writ issues as a matter of course; and on the return made to it the court decides whether the party applying is denied the right of proceeding any further with it.

*Ex parte Milligan,* 71 U.S. at 130-131. The Court then went on to consider whether the facts showed "that Milligan was a prisoner of war, and, therefore, excluded from the privileges of the statute." *Id.* The Court concluded that Milligan was not a prisoner of war and not covered by the suspension statute; therefore, the Court granted the writ. *Id.* Similarly, in *Duncan v. Kahanamoku,* 327 U.S. 304 (1946), the Court took jurisdiction and determined that the petitioner did not fall within the class of people to whom the Hawaiian martial law declaration applied. *See also United States v. Villato,* 2 U.S. 370 (C.C. Pa. 1797) (where prisoner had not been naturalized, the writ was granted to free him from treason charge). Nothing precludes this Court from conducting its own investigation into the jurisdictional issues involved in Petitioners' claims including a determination whether the review provisions of the DTA

are an adequate alternative remedy to Petitioners' habeas petitions.   For example, if this Court were to find that the Government took steps to interfere with Petitioners' rights to adequately pursue their claims under the DTA, it could, and should, rule that the DTA is not an adequate alternative remedy and therefore the jurisdictional stripping provision of the MCA is unconstitutional. *See* footnote 6, *supra.*   Nothing in *Boumediene I* precludes such a determination.

### B.   The Constitutionality of the MCA Is Currently Being Litigated.

Respondents argue that the law of the circuit is settled, but this is premised upon an incorrect interpretation of *Boumediene I.*     While the Court of Appeals based its decision in *Boumediene I* upon its reading of the MCA, the constitutionality of the MCA itself is still in dispute.   On February 20, 2007, a split panel of the Court of Appeals decided combined cases involving aliens imprisoned at Guantánamo Bay and held that post-*Rasul* statutes deprived courts of jurisdiction over the habeas actions brought by petitioners in those cases.[8]   The *Boumediene* petitioners filed a writ of certiorari and, on April 2, 2007, the Supreme Court denied certiorari, with both a three-Justice dissent and a concurring statement respecting the denial of certiorari.[9]   In their concurrence, however, Justices Kennedy and Stevens held that, given the Court's "practice of requiring the exhaustion of available remedies as a precondition to accepting jurisdiction over applications for the writ of habeas corpus," denial of certiorari was appropriate

---

[8] *Boumediene I*, 476 F.3d at 981.

[9] *Boumediene II*, 127 S. Ct. 1478 (2007).

"*at this time.*" (emphasis added)[10]   It therefore appears that five Justices will give se-

rious consideration to a renewed petition for certiorari seeking review of the decision

in *Boumediene I*, following petitioners' exhaustion of their DTA remedies.   A major-

ity of the Supreme Court, in other words, has left open the possibility that the Court

of Appeals' holding is erroneous and that the petitioners have the right to pursue ha-

beas relief in the district courts.[11]

    While Respondents dismiss this process as a "speculative chain of events,"[12]

in reality, this process is well underway.   Two Supreme Court Justices have ex-

pressly invited an exhaustion of remedies, and the Court of Appeals singled out a

failure to exhaust remedies as a reason for the dismissal of the petition of the

*Boumediene* petitioners.[13]   There is nothing "speculative" about this; both holdings cited

by Respondents as authorities for their motion to dismiss have implied that their holdings

may have been decided differently had petitioners exercised this alternative option.   Un-

til that option has been exhausted by scores of other habeas cases (including this one),

*Boumediene I* should be treated as it is – the first in a series of many decisions involving

distinct allegations and legal theories that may be taken into consideration, but are not

---

[10] *Id.* at 1478.

[11] Indeed, the Supreme Court may reach these questions sooner, as there is a case cur-
rently pending before that Court that directly concerns the MCA jurisdictional hold-
ing of the Court of Appeals.   This case is an original habeas corpus petition in *In re
Ali*, No. 06-1194, which challenges the MCA jurisdictional holding of the Court of
Appeals.   The Supreme Court considered the *Ali* petition sufficiently serious that it
directed the government to respond to the petition by April 16, 2007.

[12] Motion to Dismiss at 5.

[13] *Boumediene I*, 476 F.3d at 994.

binding upon any of the district courts. *See Texas v. Cobb,* 532 U.S. 162, 169 (2001) ("Constitutional rights are not defined by inferences from opinions which did not address the question at issue."); *see also United States v. Booker*, 543 U.S. 220, 239-242 (2005) (limiting *stare decisis* effect of cases where constitutional issue was not raised or resolved).

## II. The Court Has the Discretion to Issue a Stay-and-Abey Order, and Such an Order Is Mandated Where a Procedural Bar May Prevent Future Habeas Review.

Rather that dismissing this case outright, the Court should continue the stay already in effect while Petitioners pursue their independent rights under the DTA and the constitutionality of the jurisdiction stripping provisions of the MCA are resolved.

### A.  The District Court Has Discretion to Enter a Stay.

"The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Air Line Pilots Ass'n v. Miller,* 523 U.S. 866, 879 n. 6 (1998) (quoting *Landis v. North Am. Co.,* 299 U.S. 248, 254-55, 57 S. Ct. 163 (1936)).  This authority includes the "broad discretion to stay all proceedings in an action pending the resolution of independent proceedings elsewhere." *IBT/HERE Employee Rep. Council v. Gate Gourmet Div. Am.*, 402 F. Supp. 2d 289, 292 (D.D.C. 2005) (RMU); *see also Canady v. Erbe Elektromedizin GmbH*, 271 F. Supp. 2d 64, 74 (D.D.C. 2002) (RMU) (same).  Thus, "[a] trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case." *IBT/HERE,*

8

402 F. Supp. 2d at 292 (quoting *Leyva v. Certified Grocers of Cal., Ltd.,* 593 F.2d 857, 863-64 (9th Cir. 1979)).  As this Court has recognized, an outstanding issue concerning the court's jurisdiction is no impediment to the issuance of a stay.  *IBT/HERE,* 402 F. Supp. 2d at 293 (granting stay although "defendants may be correct that the court no longer has jurisdiction over this case").

Indeed, staying this action is fully consistent with Supreme Court directives in the analogous situation when a federal court is presented with unexhausted habeas claims under 28 U.S.C. § 2254.  In *Rhines v. Weber,*[14] the Supreme Court explicitly approved the stay-and-abey procedure requested here by Petitioners in the context of federal habeas corpus proceedings.  The Court held that district courts have the discretion to issue stay-and-abey orders in lieu of dismissal where alternate remedies have yet to be explored in certain habeas actions.  Moreover, where there is (i) just cause, (ii) no intent to delay on the part of the petitioners, and (iii) a likelihood of success, it would be an abuse of discretion for the court *not* to issue a stay-and-abey order.

In *Rhines,* the prisoner filed in federal court a mixed habeas petition, one containing both claims exhausted through the state court system and unexhausted claims.  The Court recited its precedent in *Rose v. Lundy,*[15] in which it imposed a requirement of "total exhaustion" with respect to mixed petitions and, on that basis, had directed the federal

---

[14] *Rhines v. Weber,* 544 U.S. 269 (2005).

[15] *Rose v. Lundy,* 455 U.S. 509 (1982).

9

courts to dismiss mixed petitions without prejudice and instructed affected petitioners to present their unresolved claims in state court.[16]

Yet the *Rhines* Court observed that, at the time of *Lundy*, there was no statute of limitations on the filing of federal habeas corpus petitions, which meant that petitioners could return to federal court following exhaustion of their state claims "with relative ease."[17]   Congress' enactment of a limitations period for federal habeas petitions after the *Lundy* decision meant that the petitioner's federal habeas claim could become procedurally barred, as the petitioner pursued unexhausted state claims following a dismissal without prejudice by federal court.   Recognizing that problem, the *Rhines* Court allowed district courts to issue stay-and-abey orders at their discretion.

As discussed above, this case and other pending habeas actions by Guantánamo prisoners now pending in this Court have a genuine prospect of further Supreme Court review to decide the federal courts' jurisdiction in their cases.   Petitioners' right to proceed by seeking a writ of habeas corpus, to the extent the Supreme Court may decide that right exists, could be impaired if this Court were to dismiss their petition now.   In this way, the situation is comparable to *Rhines*, where it was possible (yet not certain) that an otherwise valid federal habeas claim could be barred as a result of pursuing unexhausted claims in another forum.

Moreover, a stay is unlikely to be required for an inordinate period of time.   A number of detainees are already well on the way towards exhausting their DTA remedy.

---

[16] *Id.* at 522.

[17] *Rhines*, 544 U.S at 274.

10

At the time of the *Boumediene* ruling, there were five DTA matters already pending in the Court of Appeals.   The first DTA case filed in that Court, *Paracha v. Gates*, No. 06-1038 (filed Jan. 24, 2006), has been pending for approximately fifteen months and the Court has scheduled oral argument in September.   In addition, there has already been considerable briefing on various issues relating to the procedures to be employed in such actions.   Oral argument on these matters is scheduled for May 15, 2007.   *Bismullah v. Gates*, No. 06-1197; *Parhat v. Gates*, No. 06-1397.   Thus, substantial progress has already been made towards presenting the Supreme Court with a case in which they may reach the jurisdictional issue on the merits.   Moreover, as noted above, Justices Stevens and Kennedy have left open the possibility of accepting a case even before the DTA remedy is exhausted.   127 S. Ct. at 1478.

**B.   It Would Be an Abuse of Discretion for This Court *Not* to Issue an Order to Stay-and-Abey, Pursuant to *Rhines*.**

Respondents attempt to minimize the significance of *Rhines* by stating that the Guantánamo habeas cases, unlike *Rhines*, do not involve "any temporal bar to a habeas petition," and the "authority of a court to enter a stay is constrained by statute."[18]   However, Respondents fail to note that the constitutionality of the operative statute in *Rhines* (the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")) was not being actively litigated as part of the habeas petition, as it is here.   In fact, in the absence of intentional dilatory tactics by the petitioner, the *Rhines* Court went on to hold that "it would likely be an abuse of discretion to deny a stay and to dismiss" a petition if the petitioner has good cause for the failure to exhaust and the unexhausted claims are potentially

---

[18] Motion to Dismiss at 7.

meritorious.[19]    Petitioners in the present case satisfy all three preconditions – good cause, no deliberate delay, and potentially meritorious claims – under which failure to stay-and-abey would constitute an abuse of discretion.

First, there is good cause for the failure to exhaust.   Where the petitioner in *Rhines* at least had the ability to pursue both modes of relief at the outset of his case, the potential alternative remedy in Petitioners' case did not exist until after their initial habeas corpus petition was filed and did not purport to provide the habeas relief to which Petitioners were entitled at the time the habeas action was filed.   The questions left open in the Supreme Court's decision in *Rasul v. Bush*,[20] which established a right to proceed under § 2241 at the time Petitioners submitted their documents, and the subsequent DTA and MCA have resulted in major complexities that left the legal landscape opaque.   The Court of Appeals required several rounds of briefing over two years before it could issue its decision in February 2007.   Respondents argue that Petitioners could have pursued these petitions any time since the enactment of the DTA;[21] however, it should be noted that as of the *Hamdan* decision,[22] Petitioners had no reason to believe that their habeas petitions would be dismissed and that an alternative remedy would be necessary.   Petitioners thus had excellent reasons for not initiating the DTA procedures until the denial of certiorari in *Boumediene II*.

---

[19]  *Rhines*, 544 U.S. at 278; *accord Pace v. DiGuglielmo*, 544 U.S. 408, 416-17 (2005).

[20]  *Rasul v. Bush*, 542 U.S. 466 (2004).

[21]   Motion to Dismiss at 7.

[22]  *Hamdan v. Rumsfeld*, 126 S. Ct. 2749 (2006).

Second, Petitioners have done nothing to deliberately delay this case. Petitioners were previously included as John Does in the habeas petition brought in the case *John Does Nos. 1-570 v. Bush*, 05-CV-00313 (CKK), filed on February 10, 2005, on behalf of all of the unidentified detainees being held in Guantánamo. Counsel for the petitioners in that case specifically noted that once the names and identifying information for detainees was obtained, counsel would "consult with each detainee, explain his right to file a habeas petition based on his individual circumstances, and determine whether the detainee wants to proceed with the habeas action." Undersigned counsel volunteered to represent Petitioners and, on October 16, 2006, filed the currently pending Petition for *habeas corpus* on their behalf. On October 20, 2006, Petitioners filed a motion for entry of the standard Protective Order that has been entered in the Guantánamo *habeas* cases ("the Protective Order"). The Court entered the Protective Order and concurrently stayed the case. Docket No. 15 at 3-4. The case has remained in abeyance ever since.

Third, the claims raised both in this Court and in the DTA Petition are potentially meritorious. Counsel seek additional factual discovery regarding the circumstances under which statements attributed to Petitioners and other witnesses were made, having reason to believe that they were made in violation of the Department of Defense's own standards and procedures as well as the laws and Constitution of the United States. Counsel further believes that Petitioners have been improperly designated an enemy combatants, as Respondents have not provided any independent evidence suggesting that any of the Petitioners were engaged in or supporting hostile actions against the United States and its coalition allies between September 11, 2001 and the time of their capture.

Respondents argue that Petitioners have no statutory right to have their cases abeyed as they exhaust alternative remedies.[23]   Again, Respondents misinterpret the holding in *Rhines*.   By testing whether the DTA petition to the Court of Appeals provides an adequate substitute for their habeas proceedings in this Court, Petitioners are challenging the constitutionality of the very statute Respondents are citing as the basis for dismissing said proceedings.   Not only is abeyance within this Court's discretion, but given the good cause for delay, absence of dilatory tactics, and potentially meritorious claims, it would be an abuse of that discretion not to issue a stay-and-abey order.

### III.   Maintaining the Status Quo Is Necessary, As Dismissal Would Irreparably Harm Petitioners in Contravention of the Express Instruction of the Supreme Court.

In denying certiorari in *Boumediene II*, Justices Kennedy and Stevens expressly charged courts, including this one, with a watchdog role.   In the event that the government were to "take additional steps to prejudice the position of petitioners in seeking review in this court," courts were tasked with "[acting] promptly to ensure that the office and purposes of the writ of habeas corpus are not compromised."[24]   In their Motion to Dismiss, Respondents seek to have this Court dismiss the Amended Protective Order and all other access-related orders currently in place in this habeas proceeding and establish a brand-new set of procedures at the Court of Appeals level. Such actions could cause irreparable damage to Petitioners' ability to exhaust their alternative remedies.   Were the new protective order proposed by Respondents in *Bis-*

---

[23] Motion to Dismiss at 6.

[24] *Boumediene II*, 127 S. Ct. at 1478 (quoting *Padilla v. Hanft*, 126 S. Ct. 1649, 1650 (2006))

14

*mullah v. Rumsfeld*[25] implemented, it would have a chilling effect upon the attorney-client relationship, in that communications from counsel would no longer be privileged, but subject to screening and redaction by the Department of Defense.   In addition, counsel would be limited to three visits with their clients, after which they would presumably be cut off from ever seeing their clients again.   Negotiating a new protective order that ensured protection of attorney-client privilege and access to Petitioners could drag on for months; meanwhile, in the absence of a protective order, Respondents could deny counsel all access to their clients.   While jurisdictional issues are being settled, it is within the discretion of this Court to maintain the status quo with respect to the protective order and counsel access procedures to ensure that communications between Petitioners and their client are not summarily terminated by a statute whose constitutionality is in the process of being litigated.

###### A.   The Court Should Maintain the Status Quo Pending Resolution of Jurisdictional Issues.

There is a long-established principle that, where the question of jurisdiction is still being settled, the courts have "authority from the necessity of the case to make orders to preserve the existing conditions and subject of the petition." *United States v. United Mine Workers,* 330 U.S. 258, 291 (1947) (quoting *United States v. Shipp*, 203 U.S. 563, 573 (1906)); *see also Kircher v. Putnam Funds Trust*, 126 S.Ct. 2145, 2155

---

[25] Protective Order, *Bismullah v. Rumsfeld,* No. 06-1197 at 36-37 (August 25, 2006) ("Documents marked 'legal mail' by counsel shall be subject to content review and security and contraband screening by the DoD Privilege Team."), p 37 ("Counsel will be notified with respect to legal mail that, upon review, will be redacted or screened out.").

(2006) (a federal court's adjudicatory authority includes "its authority to determine

its own jurisdiction").   This Circuit has not hesitated to apply these principles:

> Of course, whether or not there was jurisdiction to decide the merits,
> until the question of jurisdiction is determined, there was "authority from
> the necessity of the case to make orders to preserve the existing condi-
> tions and the subject of the petition ...." ... Clearly there was "power to
> preserve existing conditions while ... determining [the] authority to
> grant injunctive relief."

*In re President and Directors of Georgetown College,* 331 F.2d 1000, 1005 (D.C. Cir.

1964) (quoting *United States v. United Mine Workers*, 330 U.S. 258, 291 (1947)).

The District Courts have recognized that, regardless of the ultimate resolution of

jurisdictional questions, the courts are authorized to enter orders necessary to the ultimate

litigation. For example, Judge Leon, who found the rights of the prisoners extremely lim-

ited in scope, entered an order on the merits of Respondents' motion for filter team re-

view of attorney-client material, denying the request (*Boumediene v. Bush,* 450 F. Supp.

2d 25 (D.D.C. 2006); Judge Robertson granted the same request on the merits in *Hicks v.

Bush,* 452 F. Supp. 2d 88 (2006). Additionally, counsel in most of the Guantánamo pris-

oner litigation have been operating under the protective order first authorized by the

District Courts in *Al Odah* for almost two years.

### B.  Maintaining the Status Quo is Necessary to Prevent Irreparable Harm to Petitioners' Claims.

Maintaining the status quo is necessary here in order to prevent irreparable

harm.   This Court should carefully protect the status quo by maintaining the orders

entered to date to assure that Petitioners are not prejudiced in their ability to litigate

the DTA action as well as to preserve potential remedies before this Court.   Mainte-

nance of the Protective Order, and the client access provided therein, is absolutely critical

16

for effectively exhausting Petitioners' remedies under the DTA.   Without the Protective Order in place, there is no legal mail channel; there is no privileged communication between attorney and client; base visits would be curtailed or eliminated; and classified documents or other important evidence may be lost.   Absent the protections of the Protective Order, counsel will be unable to provide the Court of Appeals with sufficient factual information to make a balanced and informed decision regarding the merits of their DTA Petition.

Also, Respondents have signaled their intent to dramatically restrict prisoners' access to counsel, proposing a protective order at the Court of Appeals level that would, among other things, require all legal mail from counsel to Petitioners to be first screened and redacted by Department of Defense employees.   Secondly, counsel would be restricted to three visits with their clients.   It is unclear whether counsel who have already visited their clients three times would be permanently barred from ever visiting their clients again.   Third, Department of Defense officials would have unilateral authority to decide whether to permit counsel to see the evidence used to justify a prisoner's enemy combatant designation.

Counsel for Guantánamo prisoners have labored under extraordinary circumstances to cultivate relationships with their clients.   Counsel have had to overcome the government's attempts to bar them completely, well-documented instances of anti-Semitic statements designed to drive wedges between the prisoners and their counsel, and onerous hurdles for traveling to the base.   The proposed protective order is a naked attempt by the government to impede prisoners from challenging the factual bases for their detention and return to a pre-*Rasul* state of the world.

17

Maintenance of the status quo is critical to foreclosing Respondents from prejudicing Petitioners' ability to litigate – at the District Court or Circuit Court level – these issues.    In the event the case is remanded, or if the DTA procedures prove an inadequate substitute for constitutionally-required habeas corpus procedures, this Court should be in position to proceed immediately on the issues raised.    Petitioners have waited nearly three years to enjoy the promise of *Rasul*, and should be spared any further delays that would ensue were it necessary to negotiate a brand new set of protective orders and access procedures.

**CONCLUSION**

For the foregoing reasons, this Court should deny Respondents' Motion to Dismiss and enter an order preserving the status quo by continuing its stay of litigation going to the merits of the pending petition for a writ of habeas corpus and holding such litigation in abeyance pending the outcome of the Petitioners' DTA petitions and the Supreme

Court's determination whether the jurisdiction stripping provisions of the MCA are con-

stitutional and enforceable.

Dated May 3, 2007.

                                             Respectfully submitted,

                                             Counsel for Petitioners and
                                             Co-Petitioner

                                             SCHIFF HARDIN LLP
                                             623 Fifth Avenue
                                             New York, New York
                                             10022
                                             Tel:  (212) 753-5000
                                             Fax:  (212) 753-5044
                                                  *and*
                                             6600 Sears Tower
                                             Chicago, Illinois   60606
                                             Tel:  (312) 258-5500
                                             Fax:  (312) 258-5600

                                             By: _CHR Peters / w permission_
                                             Charles H.R. Peters:

NY\ 5135960.3

19