**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

FILED WITH THE
COURT SECURITY OFFICER
CSO: _____
DATE: _____

MASHOUR ABDULLAH MUQBEL　　　:
ALSABRI *et al.*,　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　　　Petitioners,　　　　　　　:　　Civil Action No.:　　06-1767 (RMU)
　　　　　　　　　　　　　　　　　　:
　　　　　v.　　　　　　　　　　　　:　　Re Document No.:　　1
　　　　　　　　　　　　　　　　　　:
BARACK OBAMA *et al.*,　　　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　　　Respondents.　　　　　　　:

## MEMORANDUM OPINION

### DENYING THE PETITION FOR A WRIT OF HABEAS CORPUS

### I. INTRODUCTION

This matter comes before the court on the petition for a writ of habeas corpus filed by

Mashour Abdullah Muqbel Alsabri (ISN 324) ("the petitioner"), a Yemeni national detained at

the United States Naval Station in Guantanamo Bay, Cuba ("GTMO"). The government

maintains that the petitioner was part of and provided material support to the Taliban, al-Qaida or

associated enemy forces and is therefore lawfully detained. The petitioner asserts that he was

neither part of nor supported those forces and that the court should therefore direct the

government to release him from custody immediately.

In November 2010, the court held a merits hearing addressing the legality of the

petitioner's detention. During the course of that hearing, which spanned four days, the parties

introduced dozens of exhibits concerning the petitioner's alleged role in the Taliban and al-

Qaida, including interrogation reports reflecting statements made by the petitioner and other

GTMO detainees, declarations of intelligence officials and translations of documents purportedly

seized from al-Qaida and Taliban facilities in Afghanistan.

As discussed below, the government has established by a preponderance of the evidence that the petitioner traveled from Yemen to Afghanistan in 2000 to fight with the Taliban, al-Qaida or associated forces, stayed in Taliban and al-Qaida guesthouses, sought out and received military-style training from the Taliban or al-Qaida, traveled to the battle lines in Afghanistan as part of the Taliban or al-Qaida and remained part of those forces at the time of his capture in early 2002. Thus, based on the totality of the evidence, the court is compelled to conclude that the petitioner was part of the Taliban, al-Qaida or associated forces and is therefore lawfully detained. Accordingly, the petition for a writ of habeas corpus must be denied.

## II. BACKGROUND

### A. Factual Overview

The petitioner is a thirty-four year old Yemeni national who was born in Mecca, Saudi Arabia to Yemeni parents. GE 1 at 1; GE 3 at 1.[1] He attended school in Saudi Arabia until approximately the ninth grade, when he dropped out and began working odd jobs, including driving a taxi. GE 1 at 2; GE 3 at 1; GE 10 at 1. During this period, the petitioner became acquainted with a Yemeni man named ███████████ GE 10 at 1; GE 43 at 1, a former mujahaddin in Bosnia, PE 115 at 2, who would later introduce the petitioner to various jihadists and members of al-Qaida, *see infra* Part IV.B.1.a.

In late 1998, Saudi authorities arrested the petitioner for allegedly harboring an individual wanted for passport forgery. GE 1 at 2; GE 3 at 1; GE 9 at 1. After a month-long stay in a Saudi jail, the petitioner was deported to Yemen, his country of citizenship. GE 1 at 2; GE 3 at 2. The

---

[1]     Citations to "GE ___" refer to the exhibits introduced by the government during the merits hearing, while citations to "PE ___" refer to the exhibits introduced by the petitioner during the merits hearing.

~~SECRET~~

petitioner was barred from returning to Saudi Arabia for a period of five years. GE 1 at 2; GE 2 at 2.

After arriving in Sana'a, Yemen from Saudi Arabia, the petitioner contacted and met with ███████ GE 3 at 2-3; GE 10 at 1; GE 43 at 1. The petitioner spent a few days in Sana'a before traveling to the city of Ta'iz, GE 3 at 2-3; GE 10 at 1, where he remained for several weeks, living with extended family and working in the honey trade, GE 1 at 3; GE 3 at 3; GE 10 at 1. While in Ta'iz, the petitioner's uncle taught him how to use an AK-47 and a pistol. GE 3 at 5.

During this period in Ta'iz, the petitioner became acquainted with a twenty-five year old Saudi man named ████████████ GE 1 at 3; GE 10 at 2. ██ had received military training from the Taliban and had fought with the Taliban in Afghanistan two years earlier. GE 1 at 3; GE 10 at 2. The petitioner and ██ discussed various topics, including the local honey trade and the conflict in Afghanistan. GE 1 at 3; GE 10 at 2.

In the summer of 1999, the petitioner returned to Sana'a, purportedly in the hopes of obtaining a visa to return to Saudi Arabia. GE 1 at 3; GE 3 at 3. While his visa application was pending, ███████ arranged for the petitioner to stay at a boardinghouse operated by ██- ███████ brother-in-law, ███████ ("the [1] ██ boardinghouse"). GE 3 at 3-4; GE 43 at 1. The petitioner shared the [1] ██ boardinghouse with at least eight other men. GE 1 at 3-4; GE 3 at 3-5. At the time, the [1] ██ boardinghouse served as the hub of a car theft ring whose aim was to violently free a Yemeni terrorist from a Sana'a prison. GE 1 at 5; GE 2 at 2. Many of the individuals who lived at or were associated with the [1] ██ boardinghouse were veteran jihadists and several would later travel to Afghanistan to fight with the Taliban and al-Qaida. *See infra*

Part IV.B.1.a. One of these men would later be a suicide bomber during al-Qaida's October 2000 attack on the *U.S.S. Cole*.[2]  *See id.*

Approximately two weeks after arriving at the ▮ boardinghouse, the petitioner was arrested by Yemeni authorities, along with other individuals associated with the boardinghouse, on suspicion of involvement in the car theft conspiracy. GE 1 at 4; GE 3 at 5; GE 9 at 1. The petitioner was released from prison in December 1999 and, after briefly visiting his uncle in Ta'iz, returned to the ▮ boardinghouse. GE 1 at 5-6; GE 9 at 2. The petitioner was re-incarcerated for a few days by Yemeni authorities for allegedly providing a cell phone to one of his imprisoned housemates from the ▮ boardinghouse. GE 1 at 5. During this period, the petitioner socialized with ▮, who had also been recently released from prison, and became acquainted with individuals whom the petitioner has admitted were members of al-Qaida. *See infra* Part IV.B.1.a.

Around this time, the petitioner decided to leave Yemen and travel to Afghanistan. GE 1 at 6; GE 3 at 5. The petitioner has stated that his decision to go to Afghanistan was influenced by a fatwa (religious decree) issued by nationally recognized religious scholars encouraging men to travel to Afghanistan to assist the Taliban. GE 3 at 5. The petitioner also stated that he was influenced by ▮ the former Taliban fighter he had met in Ta'iz, who purportedly told the petitioner that he could find work and a better life in Afghanistan. GE 1 at 6; GE 3 at 5; GE 9 at 3. The petitioner did not tell anyone, including his family, that he was planning to go to Afghanistan. GE 1 at 6.

---

[2]     On October 12, 2000, al-Qaida operatives in a small boat laden with explosives attacked the *U.S.S. Cole*, a Navy destroyer docked in the port of Aden in Yemen. PE 33 ("9/11 COMM'N REPORT") at 190. The blast killed seventeen members of the ship's crew and wounded at least forty other crewmembers. *Id.*

In August 2000, following travel instructions provided to him by ▇ the petitioner flew from Sana'a, Yemen through Bahrain to Karachi, Pakistan and then on to Quetta, Pakistan, a city near the Afghan border. GE 1 at 6; GE 3 at 5; GE 6 at 2. In Quetta, the petitioner stayed for three days at the Daftar al-Taliban, a Taliban-run facility which arranged for him and three other men to be transported across the border to Kandahar, Afghanistan. GE 1 at 6; GE 3 at 6; GE 4 at 1; GE 6 at 2. The three men who crossed the border with the petitioner admitted that they were traveling to Afghanistan to become martyrs. GE 10 at 2.

In Kandahar, the petitioner and his companions were taken to a guesthouse known as the Haji Habash guesthouse, which was run by an individual named ▇▇▇. GE 3 at 6; GE 4 at 1; GE 6 at 2; GE 9 at 3. The petitioner stayed at this guesthouse for approximately two weeks. GE 4 at 1; GE 9 at 3. From there, the petitioner traveled to Kabul, where he stayed for a few days at a guesthouse operated by an individual named Hamza al-Ghamdi. GE 3 at 6; GE 4 at 2; GE 9 at 4. The petitioner requested permission from al-Ghamdi to travel to the front lines, but al-Ghamdi denied the request because the petitioner lacked weapons training. GE 9 at 4.

The petitioner then traveled on to Jalalabad, where he allegedly stayed at the home of ▇▇▇, an individual whom ▇ had advised the petitioner to contact once in Afghanistan. GE 4 at 2; GE 9 at 4; GE 10 at 2. After several months, the petitioner returned to the al-Ghamdi guesthouse in Kabul. GE 9 at 5-6. With al-Ghamdi's authorization, the petitioner then traveled to the battle lines manned by Taliban fighters in combat with the Northern Alliance. GE 4 at 2; GE 6 at 2; GE 9 at 6.

After leaving the Taliban battle lines, the petitioner allegedly returned to ▇▇▇ house in Jalalabad. GE 4 at 3; GE 9 at 6. As coalition forces approached the city in late 2001, the petitioner fled Jalalabad for Pakistan. GE 4 at 2; GE 6 at 3. The petitioner was arrested by

Pakistani authorities in early 2002 and transferred to the custody of the United States military.

GE 6 at 3. He was subsequently transferred to GTMO, where he is currently detained. Pet. at 1.

## B. Procedural History

The petitioner commenced this action in October 2006 by filing a petition for a writ of

habeas corpus.[3] *See generally* Pet. In December 2006, the court stayed the case while the

Circuit and the Supreme Court considered whether the federal district courts have jurisdiction

over habeas petitions filed by individuals detained at GTMO. *See* Mem. Order (Dec. 4, 2006) at

2. The Supreme Court resolved this question in *Boumediene v. Bush*, 128 S. Ct. 2229 (2008), in

which the Court held that individuals detained at GTMO were "entitled to the privilege of habeas

corpus to challenge the legality of their detention," *id.* at 2262, and that the federal district courts

have jurisdiction over such challenges, *id.* at 2274.

Although the Supreme Court did not specify what procedures the district courts were to

employ in resolving these habeas petitions, it did emphasize that the "detainees in these cases are

entitled to a prompt habeas corpus hearing." *Id.* at 2275. Toward that end, this court and other

judges in this district agreed to consolidate their cases before Judge Hogan for the purpose of

adopting common procedures for the GTMO detainee litigation. On November 6, 2008, Judge

Hogan issued a Case Management Order ("CMO") to govern these proceedings, which he

amended on December 16, 2008. *See generally* Am. CMO (Dec. 16, 2008). This court adopted

the provisions of the amended CMO, subject to modifications set forth in an Omnibus Order

issued on April 23, 2009. *See generally* Omnibus Order (Apr. 23, 2009).

Meanwhile, having filed its initial Factual Return for the petitioner in April 2007, the

government filed a motion to amend its Factual Return, which Judge Hogan granted in

---

3       The petitioner filed his petition together with another Yemeni detained at Guantanamo Bay,
        Mohammad Al-Zarnouqi (ISN 691). A merits hearing on Al-Zarnouqi's petition is scheduled to
        begin May 2, 2011.

~~SECRET~~

November 2008. *See* Order (Nov. 7, 2008). Following an extensive period of discovery, the court issued an order in February 2010 establishing dates to bring this litigation to completion. Order (Feb. 16, 2010).

On April 29, 2010, the government filed a second motion for leave to amend the factual return, *see generally* Govt's 2d Mot. for Leave to Amend Factual Return, which the court ultimately granted,[4] *see generally* Mem. Order (June 9, 2010). The petitioner filed his traverse on April 30, 2010, *see generally* Traverse, and on June 4, 2010, the government filed its motion for judgment on the record, *see generally* Govt's Mot. for J. on R. The petitioner filed his cross-motion for judgment on the record on June 18, 2010. *See generally* Petr's Cross-Mot. for J. on R. In late August and early September 2010, the parties filed supplements to their cross-motions for judgment on the record addressing recent Circuit rulings concerning the scope of the government's detention authority. *See generally* Govt's Supplemental Mot. for J. on R.; Petr's Supplemental Mot. for J. on R.

On September 16, 2010, the court denied the parties' cross-motions for judgment on the record and scheduled a merits hearing to begin November 8, 2010. Order (Sept. 16, 2010). On October 25, 2010, two weeks before the merits hearing was scheduled to begin, the government filed a motion to supplement the record with additional evidence. *See generally* Govt's Mot. to Supplement Evidence. Following expedited briefing, the court denied the motion and ordered the government to limit its presentation to evidence previously disclosed to the petitioner as part of the factual return. *See generally* Mem. Op. (Nov. 4, 2010).

---

[4]      In granting the government's second motion for leave to amend the factual return, the court offered the parties an opportunity to propose adjustments to the litigation schedule. *See* Mem. Order (June 9, 2010) at 4. The parties elected to retain the deadlines previously imposed by the court. Joint Status Report (June 16, 2010).

The merits hearing began on November 8, 2010 and spanned four days.[5] At the outset of the hearing, the court ruled on the government's motion to admit hearsay evidence with a presumption of accuracy and authenticity. *See generally* Govt's Hearsay Mot. The court held that although the government's evidence would, in appropriate circumstances, be afforded a presumption of authenticity, it was not entitled to a presumption of accuracy.[6] *See infra* Part III.A.

During the course of the merits hearing, the parties presented the court with extensive argument and nearly two hundred exhibits.[7] At the conclusion of the hearing, the parties' submitted proposed findings of fact and conclusions of law. With the record now complete, the court turns to the applicable legal standards and the evidence and argument presented by the parties.

## III. EVIDENTIARY MATTERS

### A. Admissibility and Reliability of Hearsay Evidence

As alluded to above, prior to the merits hearing, the government submitted a motion in which it argued that the court should afford a presumption of accuracy and authenticity to its hearsay evidence. *See generally* Govt's Hearsay Mot. That motion was granted in part and

---

[5]  The merits hearing occurred on November 8, 10, 15 and 16, 2010. Citations to the hearing transcript shall be made by designating the date of the proceedings and, when appropriate, whether the proceedings occurred in the morning or evening.

[6]  At the outset of the hearing, the court also ruled that the government would be permitted to rely on certain exhibits that had been made part of the record as attachments to the government's hearsay motion. Nov. 8 Unclassified Tr. at 5.

[7]  The court greatly appreciates the efforts undertaken by counsel for both the government and the petitioner to present information during the merits hearing in a clear, systematic and easily digestible manner.

denied in part at the outset of the merits hearing. Nov. 8 Unclassified Tr. at 3-4. The reasoning underlying the court's ruling is set forth in greater detail below.

This court has previously held, in another GTMO habeas case, that although hearsay evidence is always admissible in these habeas proceedings, the court must make individualized determinations about the reliability and accuracy of that evidence and the weight it is to be afforded. *Hatim v. Obama*, 677 F. Supp. 2d 1, 10 (D.D.C. 2009). The court further stated that based on the principles underlying Federal Rule of Evidence 803(6), which sets forth the hearsay exception for reports of regularly conducted activity, the government's interrogation reports and intelligence reports were entitled to a presumption of authenticity. *Id.* The court declined, however, to presume the accuracy of the government's exhibits, noting that there was ample reason not to afford such a presumption to those exhibits, many of which contained two or three levels of hearsay. *Id.*

This Circuit has since issued a number of decisions consistent with this approach to hearsay evidence. The Circuit has made clear that although "hearsay evidence is always admissible in Guantanamo habeas proceedings, such evidence must be accorded weight only in proportion to its reliability." *Barhoumi v. Obama*, 609 F.3d 416, 428 (D.C. Cir. 2010); *accord Al Bihani v. Obama*, 590 F.3d 866, 879 (D.C. Cir. 2010) (observing that "the question a habeas court must ask when presented with hearsay is not whether it is admissible – it is always admissible – but what probative weight to ascribe to whatever indicia of reliability it exhibits"). Nothing in these Circuit decisions suggests that the court should presume the accuracy or reliability of the government's exhibits; to the contrary, the Circuit has stated that before relying on any piece of evidence, the district court must make a threshold determination that it is

sufficiently reliable and probative.[8] *Bensayah v. Obama*, 610 F.3d 718, 725 (D.C. Cir. 2010)

(citing *Parhat v. Gates*, 532 F.3d 834, 847 (D.C. Cir. 2008)); *cf. Al Odah v. Obama*, 611 F.3d 8,

14 (D.C. Cir. 2010) (holding that the district court did not err in relying on hearsay evidence

where "[t]he government offered reasons why its hearsay evidence had indicia of reliability, and

the court considered the reliability of the evidence in deciding the weight to give the hearsay

evidence").

Accordingly, at the outset of the merits hearing in this case, the court ruled that hearsay

evidence would be admissible and that the court would presume the authenticity but not the

accuracy of the government's intelligence reports and interrogation reports.[9] Nov. 8 Unclassified

Tr. at 3-4. The court further ruled that it would make individualized determinations regarding

the reliability of any hearsay evidence presented by the parties. *Id.*

### B. Assessment of the Evidence

As noted, before the court may consider whether the government has shown by a

preponderance of the evidence that the petitioner is lawfully detained, the court "must evaluate

the raw evidence, finding it to be sufficiently reliable and sufficiently probative to demonstrate

the truth of the asserted proposition with the requisite degree of certainty." *Parhat*, 532 F.3d at

847 (quoting *Concrete Pipe & Prods., Inc. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 622

---

[8] The approach to hearsay articulated by this court in *Hatim* is also consistent with positions taken by other judges in this district since the Circuit's ruling in *Al Bihani*. *See, e.g.*, *Almerfedi v. Obama*, 2010 WL 691944, at *1 (D.D.C. Mar. 1, 2010) (concluding that all of the government's hearsay evidence was admissible and that any evidence created and maintained by the government in the ordinary course of business was entitled to a rebuttable presumption of authenticity but rejecting the government's argument that its evidence should be afforded a presumption of accuracy); *see also Al Kandari v. Obama*, 2010 WL 3927309, at *5-6 (D.D.C. Sept. 15, 2010) (declining to afford a presumption of authenticity or accuracy to the government's evidence).

[9] During the merits hearing, the petitioner did not challenge the authenticity of any of the intelligence reports or interrogation reports relied on by the government.

(1993)). Thus, before relying on any piece of evidence in these GTMO habeas proceedings, the court must examine that evidence to "determine whether the evidence is in fact sufficiently reliable to be used as a justification for detention." *Khan v. Obama*, 646 F. Supp. 2d 6, 12 (D.D.C. 2009); *see also Naji al Warafi v. Obama*, 704 F. Supp. 2d 32, 38 (D.D.C. 2010) (observing that "[i]n Guantanamo habeas proceedings, the Court must assess the accuracy, reliability, and credibility of each piece of evidence presented by the parties in the context of the evidence as a whole" (internal quotation marks omitted)).

The reliability of hearsay evidence may be established by the intrinsic characteristics of the evidence, such as the nature and consistency of the details contained in the hearsay, *Barhoumi*, 609 F.3d at 428-29, as well as through corroboration by other evidence in the record, *id.* at 429 (noting that "an intelligence report's reliability can be assessed by comparison to 'exogenous information'"); *Bensayah*, 610 F.3d at 725-26 (citing *Parhat*, 532 F.3d at 849). Two pieces of evidence, "each unreliable when viewed alone," can corroborate each other and mutually establish their reliability. *Bensayah*, 610 F.3d at 726 (citing *United States v. Laws*, 808 F.2d 92, 100-03 (D.C. Cir. 1986)).

In this case, the government has based its case principally on interrogation reports reflecting statements allegedly made by the petitioner. *See generally* GE 1-6, 8-10, 24, 27, 36, 40-41, 43. These statements, which the government relies on to establish the petitioner's actions and intentions before his apprehension, plainly constitute hearsay. *See* FED. R. EVID. 801(c). The court has carefully reviewed each report to ensure that the statements contained therein are sufficiently reliable for use in assessing the lawfulness of the petitioner's detention.

At the outset, the court notes that the petitioner's statements to interrogators are recorded in standard reporting forms, such as FD-302s, Summary Interrogation Reports ("SIRs") and

Intelligence Information Reports ("IIRs"). *See generally, e.g.*, GE 1, 2, 24. These reports are prepared by intelligence and law enforcement agents in the normal course of their duties to memorialize intelligence gathered from various sources, including interviews of detainees. *See* GE 30 (Decl. of ███████████████████████ Decl. II"))[10] at 6-7. The fact that these reports were prepared by government agents in the course of their normal intelligence gathering duties provides a degree of support for their reliability.

Moreover, the court finds ample evidence in the content of these interrogation reports to support their reliability. With few exceptions (on which the court does not rely), the statements reflected in these interrogation reports concern information about which the petitioner had personal knowledge. Furthermore, these statements are replete with specific details, lending further support to their reliability. The court has been presented with no evidence that any of the statements were elicited through undue coercion. Moreover, although the details sometimes differ, the accounts of the petitioner's actions in these different interrogation reports are remarkably consistent. Indeed, as evidenced in the following sections, many of the statements that the court relies on in its analysis are repeated by the petitioner in multiple interrogations and corroborated by the statements of third-party detainees. *See infra* Part IV.B.1-5.

Although the petitioner challenges the accuracy of the translation and transcription of certain statements that the reports attribute to him, nothing about these purported errors calls into question the inherent reliability of the reports. *See Al-Warafi*, 704 F. Supp. 2d at 39 ("[T]hat the [petitioner's] statements were translated does not render them unreliable or incredible.

---

[10]     At the time he made the declaration, ███ 

████████████████████████████████████

*Id.* The court considers his declaration, which is based on his personal knowledge and experience, to be reliable.

Petitioner's reservations about the accuracy of the translations of the statements goes to the

weight . . . the Court should afford the statements, not their reliability."). Thus, although the

court must, in the course of its analysis, address the parties' disagreements regarding the

probative value of various portions of these interrogations reports, the court concludes that the

reports are sufficiently reliable to be considered in its assessment of the lawfulness of the

petitioner's detention.

The government also relies on other types of evidence, such as interrogation reports

containing statements made by third-party detainees, *see, e.g.*, GE 7, 8, 12, 13, declarations of

intelligence officers and subject-matter experts, *see, e.g.*, GE 14, 19, and intelligence reports

regarding materials captured from al-Qaida and Taliban forces, *see, e.g.*, GE 25, 29. The

reliability of each of these exhibits is assessed individually in the course of the analysis. *See*

*infra* Part IV.B.1-5.

## IV. ANALYSIS

### A. The Scope of the Government's Detention Authority

The government's authority to detain individuals at GTMO derives from the

Authorization for the Use of Military Force ("AUMF"), which provides that

> the President is authorized to use all necessary and appropriate force against
> those nations, organizations, or persons he determines planned, authorized,
> committed, or aided the terrorist attack that occurred on September 11, 2001, or
> harbored such organizations or persons, in order to prevent any future acts of
> international terrorism against the United States by such nations, organizations,
> or persons.

Pub. L. No. 107-40, 115 Stat. 224 (2001)

This Circuit has stated that the AUMF authorizes the government to detain two categories

of persons: (1) individuals "part of" forces associated with al-Qaida or the Taliban and (2)

~~SECRET~~

individuals who purposefully and materially support such forces in hostilities against the United States. *Al Bihani*, 590 F.3d at 872. To justify its detention of an individual, the government must prove by a preponderance of the evidence that the individual falls within one of these categories of detainable persons.[11] *See Awad v. Obama*, 608 F.3d 1, 10 (D.C. Cir. 2010) (stating that "a preponderance of the evidence standard satisfies constitutional requirements in considering a habeas petition from a detainee held pursuant to the AUMF"); *accord Al Bihani*, 590 F.3d at 878.

In this case, the government's principal contention is that the petitioner is lawfully detained because he was "part of" the Taliban, al-Qaida or associated forces.[12] The Circuit has observed that because al-Qaida's organizational structure is amorphous, "it is impossible to provide an exhaustive list of criteria for determining whether an individual is 'part of' al Qaeda." *Bensayah*, 610 F.3d at 725. Accordingly, the district courts must determine whether an individual is "part of" al-Qaida or associated forces on a "case-by-case basis" employing a "functional rather than a formal approach and by focusing upon the actions of the individual in relation to the organization." *Id.*

---

[11]  The Circuit has expressly left open the question of whether a lower evidentiary standard would be constitutionally permissible. *See Al-Adahi v. Obama*, 613 F.3d 1102, 1103 (D.C. Cir. 2010).

[12]  Although the government also asserted during the merits hearing that the petitioner "purposefully and materially supported" al-Qaida, the Taliban or associated forces, Nov. 8 Unclassified Tr. at 8, it offered scant evidence or argument on this issue. At any rate, because the government demonstrated that the petitioner was "part of" the Taliban, al-Qaida or associated forces, the court need not address whether the government satisfied the second prong of the detention standard. *See Al-Bihani v. Obama*, 590 F.3d 866, 874 (D.C. Cir. 2010) (observing that "both prongs [of the detention standard] are valid criteria that are independently sufficient to satisfy the standard").

~~SECRET~~

"That an individual operates within al Qaeda's formal command structure is surely sufficient but is not necessary to show that he is 'part of' the organization."[13] *Id.*; *see also Awad*, 608 F.3d at 11 ("If the government can establish by a preponderance of the evidence that a detainee was part of the 'command structure' of al Qaeda, this satisfies the requirement to show that he was 'part of' al Qaeda. But there are ways other than making a 'command structure' showing to prove that a detainee is 'part of' al Qaeda."). On the other hand, "the purely independent conduct of a freelancer is not enough" to show that an individual is detainable as "part of" of those enemy forces. *Bensayah*, 610 F.3d at 725; *see also Salahi v. Obama*, 625 F.3d 745, 752 (D.C. Cir. 2010) (noting that "the government's failure to prove that an individual was acting under orders from al-Qaida may be *relevant* to the question of whether the individual was 'part of' the organization when captured").

The government's "authority to detain an enemy combatant is not dependent on whether an individual would pose a threat to the United States or its allies if released." *Awad*, 608 F.3d at 11. The government must prove, however, that the petitioner was "part of" the Taliban, al-Qaida or associated forces at the time of his capture to demonstrate that his detention is lawful under the first prong of the standard. *See Salahi*, 625 F.3d at 751 (observing that "the relevant inquiry is whether [the petitioner] was 'part of' al-Qaida when captured"); *Gherebi v. Obama*, 609 F. Supp. 2d 43, 71 (D.D.C. 2009).

In assessing whether the government has met its burden, the court may not view each piece of evidence in isolation, but must consider the totality of the evidence. *See Al-Adahi v. Obama*, 613 F.3d 1102, 1105-06 (D.C. Cir. 2010). Even if no individual piece of evidence

---

[13]    Prior to these Circuit decisions, many district court judges had held that an individual was a "part of" al-Qaida or associated forces only if he operated within the organization's formal command structure. *See, e.g., Hatim v. Obama*, 677 F. Supp. 2d 1, 16 (D.D.C. 2010); *Gherebi v. Obama*, 609 F. Supp. 2d 43, 69 (D.D.C. 2009); *Hamlily v. Obama*, 616 F. Supp. 2d 63, 75 (D.D.C. 2009).

would, by itself, justify the petitioner's detention, the evidence may, when considered as a whole and in context, nonetheless demand the conclusion that the petitioner was more likely than not "part of" the Taliban or al-Qaida or purposefully and materially supported such forces. *Id.* (concluding that the district court erred in "requir[ing] each piece of the government's evidence to bear weight without regard to all (or indeed any) other evidence in the case"); *cf. Bourjaily v. United States*, 483 U.S. 171, 179-80 (1987) (observing that "individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it" because the "sum of an evidentiary presentation may well be greater than its constituent parts").

### B. The Petitioner Is Lawfully Detained

During the course of the merits hearing, the parties presented evidence and argument on the following five disputed material issues:[14]

1.   The government's allegation that the petitioner went to Afghanistan to receive military-style training from and fight for al-Qaida, the Taliban or other associated forces.

2.   The government's allegation that the petitioner stayed at guesthouses in Pakistan and Afghanistan associated with al-Qaida, the Taliban or other associated forces.

3.   The government's allegation that the petitioner attended a training camp or training camps operated by or associated with al-Qaeda, the Taliban or other associated forces.

4.   The government's allegation that the petitioner traveled to the battle lines in Afghanistan as part of al-Qaida, the Taliban or other associated forces.

5.   The government's allegation that the petitioner was part of al-Qaida, the Taliban or other associated forces at the time of his capture.

---

[14]   Over the government's objection, the petitioner requested that the court address a sixth contested issue during the merits hearing: the government's assertion that its evidence is generally reliable. Petr's Supplement to List of Contested Issues. Although the court granted the petitioner's request, during the merits hearing, the petitioner incorporated the elements of his presentation on this issue into his presentations on the five jointly identified issues and elected not to give a separate presentation on his proposed sixth issue.

SECRET

Joint List of Contested Issues (Oct. 15, 2010). The court considers these disputed issues in turn.

### 1. The Petitioner Traveled to Afghanistan to Fight for the Taliban, al-Qaida or Associated Enemy Forces

During the merits hearing, the parties devoted substantial time and effort addressing the first material disputed issue: whether the petitioner traveled to Afghanistan to fight for the Taliban, al-Qaida or associated enemy forces. Nov. 8 Tr. at 32 – 154; Nov. 10 (a.m.) Tr. at 4-100. Their attentiveness to this issue was well warranted. The Circuit has observed that although an "intention to fight is inadequate by itself to make someone 'part of' al Qaeda . . . it is nonetheless compelling evidence when . . . it accompanies additional evidence of conduct consistent with the effectuation of that intent." *Awad*, 608 F.3d at 9.

The government bases its contention that the petitioner traveled to Afghanistan to fight with the Taliban, al-Qaida or associated forces on: (1) the petitioner's association with the███ boardinghouse; (2) the influence and assistance of████████ (including the implausibility of the petitioner's account of how██ convinced him to go to Afghanistan); (3) the influence of the religious fatwa that the petitioner encountered in Yemen; and (4) the petitioner's travel route and travel companions. The court considers these matters below.

### a. The Petitioner's Association With the███ Boardinghouse

The government contends that the petitioner's association with individuals at the███ boardinghouse supports the inference that he went to Afghanistan to engage in jihad and, in fact, shows that he was a "part of" al-Qaida, the Taliban or associated forces even before he left Yemen for Afghanistan in the summer of 2000. Nov. 8 Tr. at 61-143. The petitioner responds that his fleeting association with these individuals establishes nothing and does not support the government's contention that he traveled to Afghanistan to fight for the Taliban, al-Qaida or associated forces. Nov. 10 (a.m.) Tr. at 41-54.

SECRET

As noted in the factual overview, in the summer of 1999, the petitioner traveled from Ta'iz to Sana'a and stayed at the ▮ boardinghouse while purportedly attempting to obtain a visa to return to Yemen. GE 1 at 3; GE 3 at 3. Approximately two weeks after his arrival, Yemeni authorities arrested the petitioner and several other individuals associated with the boardinghouse on suspicion of belonging to a car theft ring. GE 1 at 5; GE 2 at 2. According to the petitioner, the car theft conspiracy centered on a plot to steal cars in order to purchase arms, which they would then use to violently free an individual named ▮ who was held in a Sana'a prison. GE 1 at 5; GE 9 at 3. ▮ had been convicted of kidnapping and murdering four western tourists as part of a plot to free an imprisoned sheikh associated with a South Yemen Islamist group. GE 1 at 5; GE 9 at 3. According to the petitioner, the conspirators also considered using the stolen vehicles to kidnap tourists, whom they would use to negotiate the release of ▮ GE 1 at 5.

Many of the individuals associated with the ▮ boardinghouse during this period were experienced jihadists. According to Abdu Ali al Hajj Sharqawi, a veteran jihadist whom the petitioner asserts is a reliable source,[15] *see* Petr's Proposed Findings of Fact ¶ 16, ▮ ▮ the individual who introduced the petitioner to the ▮ boardinghouse, "was a mujahaddin in Bosnia and . . . was a well-known person." PE 115 at 1. Likewise, Sharqawi states that Issam al-Maklahfi, the leader of the car theft ring, and Ahmed al Khadr al-Bidani, another member of the conspiracy, were also veterans of Bosnian jihad. *Id.* at 2. Sharqawi also

---

[15]     Sharqawi, a GTMO detainee, had an extensive history of involvement in jihadist causes, spanning a number of countries and beginning as early as 1995. *See generally* PE 79; PE 80. Since his capture, Sharqawi has cooperated with investigators ▮ ▮ PE 8 at 8; PE 11 at 2. Furthermore, Sharqawi's statements about the ▮ boardinghouse are based on his personal knowledge. PE 115 at 1. There is no evidence that Sharqawi's statements were the result of torture and, in fact, the petitioner himself relies on Sharqawi's interrogation report in support of his case. Petr's Proposed Findings of Fact ¶¶ 13-22. Accordingly, Sharqawi's interrogation report is sufficiently reliable for the court's consideration.

states that Fawaz al-Rabia'i lived at the ▮boardinghouse and was an al-Qaida operative at the time he was imprisoned by Yemeni authorities. PE 115 at 3; *see also* GE 8 at 1 (GTMO intelligence report indicating that al-Rabia'i was a known al-Qaida associate).

The petitioner himself admits that housemates ▮▮▮▮ and ▮▮▮▮ had received jihadist training in Afghanistan. GE 3 at 5. Another housemate ▮▮▮▮ ▮▮▮ had, according to the petitioner, trained at the Khalden camp near Jalalabad, Afghanistan, GE 3 at 4, a jihadist training camp affiliated with al-Qaida and the Taliban, GE 19 (Decl. of ▮▮▮▮▮▮▮▮▮▮▮[16] at 7-8. Likewise, the petitioner admits that ▮▮▮▮ an individual who resided at the boardinghouse during the petitioner's stay, had fought and trained with the Taliban in Afghanistan. GE 1 at 4; GE 3 at 4; GE 43 at 2. ▮▮▮▮ would later be one of the suicide bombers in the October 2000 attack on the *U.S.S. Cole*. GE 2 at 3; GE 4 at 3; GE 5 at 2; GE 6 a 3; GE 9 at 5; GE 43 at 2.

During the period that the petitioner lived there, the ▮boardinghouse served as a hub for the individuals involved in a car theft ring whose aim was to free ▮▮▮from prison. GE 1 at 4-5; GE 9 at 3; *see also* PE 115 at 1 (interrogation report in which Sharqawi stated to interrogators that residents of the boardinghouse were involved in a plot to steal cars and that this group "wanted to get rid of the Yemeni Government because the Yemeni Government killed Abu Hassain al Miktar, a famous mujahaddin"). The petitioner has acknowledged that ▮ ▮▮▮ the leader of the plot, and ▮▮▮ visited the ▮boardinghouse while the



---

[16]  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮ *Id.* The court considers the statements made in his declaration, which are based on his personal knowledge and analysis, to be credible.

petitioner was there.[17]  GE 1 at 4-5; GE 3 at 5; GE 9 at 2.  The petitioner also admitted that

██████████ his roommate and closest friend at the boardinghouse, GE 3 at 4, served as a

driver in the car theft plot, GE 1 at 4-5; GE 9 at 1, and that bin Attash, his housemate and a

veteran jihadist, was arrested with the petitioner and formally charged in the conspiracy, GE 8 at

2.  In total, the petitioner identified more than half a dozen individuals who resided at or visited

the ██ boardinghouse while he first lived there who were involved in the car theft plot

designed to free ████████

The petitioner claims that he had no real association with these individuals, noting that he

stayed at the ██ boardinghouse for less than two weeks before he was arrested.  Nov. 10

(a.m.) Tr. at 41.  As described above, however, the petitioner revealed to interrogators detailed

knowledge about the biographies of these men, suggesting that his relationships with these

individuals were more than fleeting.  *See Al-Adahi*, 613 F.3d at 1109 (observing that the

petitioner's detailed knowledge of personal information about a group of al-Qaida operatives,

including where they had fought and what languages they could speak, tended to show that the

petitioner had close relationships with these individuals and strengthened the probability that that

he was part of al-Qaida).

Moreover, it is the timing, rather than the duration, of the petitioner's initial stay at the

██ boardinghouse that is particularly telling.  The fact that a group of veteran jihadists

permitted the petitioner to live at the ██ boardinghouse while the location was used as a hub

for an active terrorist conspiracy suggests that they considered the petitioner an individual they

could trust.  It is highly unlikely that these men would allow an individual into their living and

meeting space, even if only for two weeks, during such a sensitive period without some

---

[17]     The petitioner states that he believes that ████████ had been surveilled to the ██
boardinghouse, which led to the arrest of the boardinghouse residents.  GE 1 at 4; GE 9 at 1-2.

SECRET

assurance that the individual shared some allegiance with them and would not undermine their plot.[18] Although this evidence hardly establishes that the petitioner was "part of" al-Qaida at this time, it does support the government's contention that the petitioner had associations with known terrorists and had gained their confidence prior to his departure for Afghanistan.

The petitioner has also stated that when he first went to live at the ▆ boardinghouse, he had no idea that anyone associated with the boardinghouse was involved in any criminal activity. GE 1 at 5; GE 2 at 2; GE 9 at 2. According to the petitioner, he first learned about the details of the plot during his period of incarceration when ▆▆▆▆, the head of the conspiracy, was released from solitary confinement.[19] GE 9 at 2.

Even if the court were to credit the petitioner's version of events, it would not dramatically alter the court's assessment of his associations with members of the ▆ boardinghouse conspiracy. It seems unlikely that a veteran jihadist like ▆▆▆ would have revealed the details of the plot to the petitioner, while they were still in custody and the information could plainly be used against them, unless he had reason to believe that the petitioner would not reveal this information to Yemeni authorities. Moreover, rather than distancing himself from the conspirators following his arrest, the petitioner continued to associate with members of the terrorist conspiracy during his months of incarceration and

---

[18]  The petitioner notes that at his invitation, an acquaintance from Saudi Arabia, ▆▆▆▆▆ stayed at the ▆ boardinghouse the night before Yemeni authorities raided the boardinghouse. GE 3 at 4. Because the government has not supplied any evidence that ▆▆▆▆ had any terrorist or criminal involvement, the petitioner argues, the fact that he was permitted to stay at the ▆ boardinghouse undermines the government's theory that only trusted individuals were permitted to stay at the boardinghouse. It is, however, far from clear that ▆▆▆ lacked terrorist affiliations; as discussed below, ▆▆▆▆ attended the wedding of ▆▆▆▆▆, a veteran Afghan mujahaddin, to the daughter of a family with known terrorist connections. GE 9 at 2-3. Furthermore, it is unclear that ▆▆▆▆ was "permitted" to stay at the boardinghouse, as he stayed there only one night and there is no evidence that leaders of the car theft conspiracy were aware of his presence.

[19]  The petitioner stated that ▆▆▆▆ was held in solitary confinement for approximately twenty days after their arrest. GE 9 at 2.

~~SECRET~~

became lasting friends with several members of the group. GE 1 at 5-6; GE 3 at 3-5; GE 9 at 1-2. Thus, the evidence indicates that even if the petitioner was not considered an ally at the time he first went to the █ boardinghouse, he became one during his months in prison.[20]

Indeed, even after he was released from prison in late 1999, the petitioner maintained his associations with members of the █ boardinghouse. According to the petitioner, Yemeni authorities released him from prison at the same time as two of his former housemates, █████ █████ and █████████ GE 9 at 2. The petitioner has admitted that upon his release, he chose to return to the █ boardinghouse with these men, both of whom were veteran jihadists.[21] GE 1 at 5-6; GE 9 at 2. Shortly after their return to the █ boardinghouse, the petitioner and █████ attended al-Ansari's wedding to a daughter of an individual named █████████ GE 9 at 2. Another of █████ sons-in-law was 9/11 hijacker Khalid al-Mihdhar. *Id.* at 3.

---

[20]    The petitioner points out that Sharqawi stated to interrogators that the █ boardinghouse "was a place only for sleeping" and that the petitioner was not associated with the individuals who resided there. PE 115 at 1-2. Sharqawi did, however, acknowledge in the same interrogation that the individuals at the █ boardinghouse were involved in a car theft ring, that residents of the house desired to overthrow the Yemeni government because it had killed a famous Yemeni mujahaddin and that numerous individuals who resided at or were associated with the boardinghouse were veteran mujahaddin. *Id.* at 1-3. Moreover, Sharqawi's assertion that the petitioner had no associations with these individuals is belied by the petitioner's own admissions that he maintained his associations with individuals he had met in prison and through the █ boardinghouse after he was released and even into Afghanistan.

[21]    The petitioner contends that his decision to return to the █ boardinghouse following his release from prison does not indicate any continuing relationship with members of the boardinghouse, as the other members of the car theft ring were still imprisoned. This contention, however, is undermined by the petitioner's own admissions that he returned to the boardinghouse with other individuals who had been imprisoned based on their relationship with the boardinghouse, GE 9 at 2, and that he maintained a close relationship with █████████ whom the petitioner has acknowledged was a member of the car theft plot, GE 1 at 4-5; GE 9 at 1.

~~SECRET~~

Although the petitioner states in one interrogation that he only stayed at the █ boardinghouse for a week after his return from prison, GE 1 at 5-6,[22] the fact that the petitioner chose to return to the boardinghouse at all following his release from prison, at which point he clearly knew about the car theft conspiracy, supports the notion that the petitioner's associations with the individuals at the █ boardinghouse were meaningful. The petitioner's attendance at ███ wedding further indicates that the petitioner had become accepted in the jihadist circle that he encountered at the █ boardinghouse.

Following his release from prison, the petitioner also maintained a relationship with ███ one of the drivers in the car theft plot. GE 1 at 4-5; GE 9 at 1. The petitioner attended ███ court appearances and smuggled a cell phone to ███ in prison, an act which resulted in the petitioner's brief re-imprisonment. GE 1 at 5. The fact that the petitioner would take such a risk for ███ undermines the petitioner's contention that his associations with all the members of the car theft ring were fleeting and insignificant.

In fact, the petitioner's associations with individuals at the █ boardinghouse survived his journey to Afghanistan. For instance, one of the individuals the petitioner met at the █ boardinghouse was ███ also known as ███ GE 5 at 1. According to the petitioner, after ███ was released from prison, he went to the front lines in Afghanistan to fight with the Taliban against the Northern Alliance. *Id.* While staying at an al-Qaida guesthouse in Kabul, *see infra* Part IV.B.2.c, the petitioner inquired as to the whereabouts ███ and was told that ███ was at the frontlines and would

---

[22]   According to another interrogation report, the petitioner stated that he "socialized at ███ several times a week after his arrest," GE 3 at 5, indicating a longer affiliation with ███ and the █ boardinghouse following the petitioner's release from prison.

~~SECRET~~

come to visit him at a later time.[23] GE 6 at 2-3. The incident demonstrates not only that the petitioner had a continuing association with ▆▆▆▆ in Afghanistan, but also that the petitioner was sufficiently integrated into the al-Qaida/Taliban structure such that he was able to send and receive messages through its military apparatus.[24]

While in Afghanistan, the petitioner also maintained his relationship with ▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ The petitioner had met ▆▆▆▆
after his release from prison while socializing at ▆▆▆▆ home in Sana'a. GE 3 at 5. The petitioner has acknowledged that ▆▆▆▆ was a member of al-Qaida, who trained at the al-Farouq training camp and possibly the Abu Obeida training camp, both of which are al-Qaida training camps in Afghanistan. GE 36 at 3; GE 41 at 2. The petitioner states that ▆▆▆▆ visited him while he was in Jalalabad and that ▆▆▆▆ and ▆▆▆▆ were the only people in Afghanistan who knew him by his real name rather than his *kunya*. GE 9 at 4-5. In fact, once in Afghanistan, the petitioner listed ▆▆▆▆ as his reference on an application to attend a terrorist training camp. GE 25 at 4; *infra* Part IV.B.3.b.

The purpose of this discussion is not to condemn the petitioner on the basis of his associations. Indeed, the petitioner's relationships with individuals associated with the ▆

---

[23]  According to Salim Hamdan, a former driver for Usama bin Ladin, ▆▆▆▆ later acted as a bodyguard for bin Ladin. PE 27 at 7, 14.

[24]  The court does not, however, credit the government's contention that ▆▆▆▆ an individual who accompanied the petitioner on his journey from Yemen to Afghanistan, *see infra* Part IV.B.1.d, was an associate from the ▆ boardinghouse. The government bases this contention on the fact ▆▆▆▆ name is included in one interrogation report in which the petitioner lists the individuals associated with the ▆ boardinghouse. GE 3 at 4. That report, however, includes no information about ▆▆▆▆ other than his name, whereas it contains detailed information regarding other individuals associated with the boardinghouse. *See id.* Furthermore ▆▆▆▆ not mentioned in any of the other interrogation reports in which the petitioner discusses the ▆ boardinghouse. GE 1 at 3-5; GE 5 at 1-2; GE 9 at 2-3. In fact, another interrogation report indicates that the petitioner stated that he "had no previous contact with ▆ prior to meeting him one week before they left for Afghanistan and the only thing he knew about him was that he was from Taiz, Yemen." GE 9 at 3. Accordingly, the court concludes that ▆▆▆▆ was not associated with the ▆ boardinghouse.

boardinghouse, standing alone, likely would not demonstrate that the petitioner was "part of" al-Qaida during his time in Yemen. The evidence does establish, however, that by the time the petitioner chose to travel to Afghanistan, he had developed significant and lasting relationships with veteran jihadists, who accepted him into their midst while they were involved in an active terrorist conspiracy. Many of the individuals associated with the boardinghouse would go on to become active al-Qaida associates and fight on the front lines in Afghanistan, and the petitioner maintained his relationships with these individuals as well. The fact that the petitioner had enduring relationships with known jihadists prior to his decision to go to Afghanistan supports the contention that he traveled to Afghanistan to train and fight with al-Qaida, the Taliban or associated forces.

**b. ███████████ Influence and Assistance**

The petitioner has stated that one of the principal influences on his decision to go to Afghanistan was an individual he met in Ta'iz named ███████████ GE 9 at 3. The government contends that ██ was a Taliban facilitator and that his influence on the petitioner's decision to travel to Afghanistan supports its allegation that the petitioner went there to receive training and fight for the Taliban and al-Qaida. Nov. 8 Tr. at 142, 150; Nov. 10 (a.m.) Tr. at 17-20. The petitioner contends that there is no evidence that ██ was a Taliban facilitator and that ██ merely encouraged the petitioner to travel to Afghanistan to seek out a better life. Nov. 10 (a.m.) Tr. at 57-62.

There is no dispute that ██ had a significant influence on the petitioner's decision to travel to Afghanistan. The petitioner has stated that ██ "was the person who had the most influence on [him] going to Afghanistan, although he admitted that he was also influenced by a fatwa issued by the sheikhs in Yemen." GE 9 at 3. Nor is there any dispute that two years

before they met, ▮ had received military training in Afghanistan and had fought for the Taliban. GE 1 at 3; GE 10 at 2.

There is, however, no evidence that at the time ▮ encouraged the petitioner to go to Afghanistan, he was acting as a Taliban recruiter or facilitator, at least in any formal capacity. The government has provided no evidence that ▮ influenced any other individuals to travel to Afghanistan or that he had any formal relationship with the Taliban or al-Qaida. *See Bensayah,* 610 F.3d at 726 (concluding that the government failed to establish that the petitioner was an al-Qaida facilitator in the absence of reliable evidence that the petitioner had links to al-Qaida or facilitated the travel of al-Qaida members). Indeed, the petitioner has stated that when they first met, ▮ encouraged him to enter into the honey trading business in Ta'iz, GE 1 at 3; GE 3 at 3, and the government has offered nothing to discredit that account. Furthermore, the petitioner paid his own way to Afghanistan, GE 3 at 6, a fact inconsistent with Taliban recruitment. Accordingly, the government has not established that ▮ was a Taliban facilitator.

Nonetheless, the evidence does not support the petitioner's contention that ▮ influence was entirely benign. The petitioner has admitted that he and ▮ discussed ▮ military training in Afghanistan and his experience fighting for the Taliban:

> Al-Sabri met a Yemeni named ▮▮▮▮▮ age 25 in Taiz. ▮ had previously traveled to Afghanistan for military training and to fight for the Taliban. Al-Sabri became interested in this discussion and inquired about receiving military training.

GE 1 at 3. Whether, as the government suggests, the petitioner was expressing an interest in obtaining military training or, as the petitioner has argued, expressing an interest in hearing about the military training that ▮ had received in Afghanistan, it is clear that ▮ and the petitioner discussed the military training available in Afghanistan and fighting with the Taliban. *See id.*

Indeed, the petitioner states that it was during this period in Ta'iz, when he met███ that the petitioner first began thinking about going to Afghanistan.[25] GE 9 at 3.

Moreover, the travel route that the petitioner took into Afghanistan, which was furnished by███ GE 3 at 5-6; GE 9 at 3; GE 10 at 2, suggests that███ was assisting the petitioner join with Taliban and al-Qaida fighting forces in Afghanistan. As discussed below, the route that███ instructed the petitioner to take from Sana'a through Bahrain and eventually to Quetta, Pakistan, is the same path used by foreign mujahaddin traveling to Afghanistan to engage in jihad. *See infra* Part IV.B.1.d. Indeed,███ specifically instructed the petitioner to visit the Taliban offices in Quetta, Pakistan, GE 3 at 6, which, as discussed below, facilitated the travel of fighters to al-Qaida and Taliban guesthouses and camps in Afghanistan, *see infra* Part IV.B.2.a; *see also* GE 3 at 5 ("███ told [the petitioner] that the Taliban would assist him in getting from Pakistan into Afghanistan because he was Arabic.").

Finally, the petitioner's account of how███ lured him to Afghanistan is not plausible. According to the petitioner,███ told him "that there was security and peace in Afghanistan," GE 9 at 3, and that "he should move to Afghanistan as work was easier to find there," GE 3 at 5. The petitioner stated that███ "convinced him to travel to Afghanistan for a better life and find a wife." GE 1 at 6.

Yet before the petitioner left for Afghanistan, he had spent months with veteran jihadists associated with the███ boardinghouse, some of whom had trained and fought in Afghanistan. *See supra* Part IV.B.1.a. The petitioner had also had conversations with███ about his own experiences fighting in Afghanistan just two years earlier. GE 1 at 3. Furthermore, as discussed

---

[25]  The petitioner's admission that he began thinking of going to Afghanistan soon after his deportation to Yemen, *see* GE 6 at 1, casts doubt on his assertion that he went to Afghanistan only as a last resort, after his efforts to obtain entry to other Arab countries failed, *see* Nov. 10 (a.m.) Tr. at 58-59.

SECRET

below, the petitioner admits that he encountered at least one fatwa that encouraged men to go to Afghanistan to assist the Taliban. *See infra* Part IV.B.1.c. As the petitioner must have been aware that there was ongoing conflict in Afghanistan, it is difficult to believe that he truly would have believed that Afghanistan offered security and peace.

The petitioner's conduct once in Afghanistan also undermines his account of how ■ convinced him to travel there. Although the petitioner contends that ■ lured him to Afghanistan with promises of work opportunities, there is no evidence that the petitioner made any effort to secure employment once he was in Afghanistan.[26] *See Sulayman v. Obama,* 2010 WL 3069568, at *13-14 (D.D.C. July 20, 2010) (declining to credit the petitioner's claim that he traveled to Afghanistan to find a job, a wife and a home because he admitted to interrogators that he "never really looked" for a job or a wife and that "he wasn't really that interested in trying to find a job"). Indeed, as the petitioner must have known, any efforts to secure employment would have been complicated by the fact that he spoke only Arabic.[27] GE 3 at 1.

Although the petitioner told interrogators that he had marriage prospects while in Afghanistan, these accounts are contradictory and not credible. For instance, the petitioner stated in one interrogation that the sister-in-law of ■ an individual he met in Jalalabad, had introduced him to a young Moroccan woman for the purposes of marriage but that the plans

---

[26]     To bolster his claim that he went to Afghanistan for benign purposes, the petitioner offers a declaration from Professor Sheila Carapico, who states that the poverty and lack of opportunities in Yemen in the late 1990s and early 2000s led many young Yemeni men to travel to Pakistan and Afghanistan for economic reasons. *See generally* PE 30 (Decl. of Dr. Sheila Carapico, ("Carapico Decl.")); *see also* Nov. 10 (a.m.) Tr. at 59-60. There is, however, no evidence that this petitioner made any efforts whatsoever to obtain employment while he was in Afghanistan, suggesting that economic factors were not a major consideration underlying his decision to go to Afghanistan.

[27]     Although the petitioner has offered evidence that Yemeni Arabic speakers might be able to find work in Afghanistan teaching Quran, as the Yemeni dialect is closest to the classical language of the Quran, Carapico Decl. ¶ 16(f), there is no evidence that the petitioner, who had limited formal education, had any training in the Quran or was motivated by such opportunities.

~~SECRET~~

had fallen through due to the chaos following September 11. GE 3 at 6. In another interview, the petitioner stated that ████████████ the man with whom he lived in Jalalabad, had arranged for the petitioner to marry his wife's sister who lived in Morocco. GE 9 at 4. In yet a third interrogation, the petitioner stated that he was arranged to marry ████████ sister. GE 6 at 3. The inconsistencies of these accounts cast doubt on the petitioner's claim that finding a wife was one of the principal reasons he went to Afghanistan.

Finally, if the petitioner went to Afghanistan merely for the benign purposes that █ had purportedly discussed with him, it is difficult to understand why the petitioner chose not to inform anyone, including his family in Saudi Arabia or Yemen, of his decision to relocate. GE 1 at 6. The fact that the petitioner hid his plans from his family further undermines the contention that █ persuaded him to go to Afghanistan with promises of work, a wife and a better, more secure life. The petitioner also admitted to interrogators that he assumed a *kunya* while he was in Afghanistan, GE 10 at 2; *see infra* Part IV.B.3, and that only two or three individuals (all with ties to al-Qaida or the Taliban) knew his real name, GE 9 at 4. That the petitioner concealed his true identity in Afghanistan is also not consistent with his stated intention of traveling to Afghanistan for benign reasons.

In sum, although the government has not established that █ had any formal relationship with the Taliban, the evidence, viewed as a whole, indicates that █ discussed with the petitioner his experiences training and fighting with the Taliban in Afghanistan and provided the petitioner a route to Afghanistan designed to funnel him into Taliban and al-Qaida fighting forces. Thus, the evidence concerning █ bolsters the contention that the petitioner traveled to Afghanistan to train and fight with the Taliban, al-Qaida or associated enemy forces.

### c. Influence of the Fatwa Issued by Religious Clerics

In addition to his discussions with ▮ the petitioner has stated that he was influenced to

go to Afghanistan by a fatwa issued by two Saudi religious scholars, Hammoud al-Aqla and

Abdulla al-Jibreen. GE 3 at 2, 5; GE 9 at 3. According to the petitioner, the fatwa "was

encouraging men to go to Afghanistan to assist the Taliban." GE 3 at 5. The government

contends that the influence of the fatwa indicates that the petitioner went to Afghanistan to

engage in jihad. Nov. 8 Tr. at 148-52. The petitioner responds that there is no evidence that the

fatwa advocated taking up arms on behalf of the Taliban. Nov. 10 (a.m.) Tr. at 62-65.

Although the exact fatwa that influenced the petitioner is unknown, another fatwa

authored by al-Aqla in 2000 included the following language:

> At this time, the Taliban Regime remains in a state of warfare against its
> opposition, the Northern Alliance, so Jihad with it is ordained by the Shariah
> because Jihad with the Taliban is against the Northern Alliance which is being
> funded by the forces of Disbelief like America, Britain, and Russia and others
> who are calling for a broad-based government in Afghanistan established upon a
> Western legislative system. Since the situation is like this, then indeed it is
> obligatory to assist the Taliban Regime and to make Jihad with it in order to
> bring victory to Islam.

Govt's Mot. for J. on the R. at 12-13; *see also* Nov. 8 Tr. at 152-53.

Indeed, one detainee described al-Aqla as "a well known religious leader [who] claimed

to have sent 11,000 Saudis to various training camps in Afghanistan, Pakistan, Chechnya and the

Philippines." GE 12 at 1. The detainee stated that in his fatwas, al-Aqla "preach[ed] . . . that it

was the duty of all Muslim men to prepare themselves for jihad." *Id.* Another detainee has

stated that al-Aqla "encouraged young men to travel to [Afghanistan] and fight against Massoud,

who was killing a lot of Muslims. Al Aqla, who issued the fatwa, told his audience that if they did not follow this fatwa they would go to hell." GE 13 at 1.[28]

Likewise, at least one GTMO detainee has admitted that his decision to go to Afghanistan and fight for the Taliban was influenced by a fatwa issued by al-Jibreen, the other author of the fatwa that influenced the petitioner in this case. *See* GE 11 at 2. The detainee stated that

> he listened to 2 Fatwas that were issued, one by Sheikh Mohammed al Imam and another by *Sheikh Bin Gibrin*. The Fatwas were read at the Jamal Al Din Mosque and were about going to Afghanistan to assist the Taliban against the Northern Alliance. The Fatwas had vers[es] from the Koran and talked about the Taliban and its victories. One of the Fatwas further explained how to travel to Quetta and get to a large Taliban center where the Taliban would take people to Afghanistan. [The detainee] decided, on his own, to go to Afghanistan and assist the Taliban based on the Fatwas.

*Id.* (emphasis added).[29]

In light of al-Aqla's and al-Jibreen's documented history of issuing fatwas encouraging men to travel to Afghanistan to fight with the Taliban, it is more likely than not that the fatwa

---

[28]     Government's Exhibit 12 is an interrogation report reflecting statements made by GTMO detainee Mukhtar Yahya Naji al-Warafi, while Government's Exhibit 13 is an interrogation report reflecting statements made by GTMO detainee Hamud Dakhil al-Jadani. *See generally* GE 12; GE 13. Their descriptions of the fatwas issued by al-Aqla are based on their personal knowledge, highly detailed and corroborated by one another. Furthermore, there is no evidence that these statements were elicited through undue coercion. Although the petitioner has pointed out that al-Jadani was offered inducements to cooperate with interrogators and that his statements regarding the *U.S.S. Cole* bombing are not credible, Nov. 10 (a.m.) Tr. at 67-91 (indeed, the court declines to rely on those statements), the court shall assess the reliability of each piece of information provided by al-Jadani rather than making generalized conclusions about his credibility, *see Almerfedi v. Obama*, 725 F. Supp. 2d 18, 23 (D.D.C. 2010) ("Rather than draw a general conclusion as to the credibility of [al-Jadani], the Court has examined in detail each of the six reports relied upon by the government to determine whether the particular information in each should be credited."). In this case, the court concludes that his statements regarding the fatwas issued by al-Aqla, like the statements of al-Warafi, are sufficiently reliable for the court's consideration.

[29]     Government's Exhibit 11 is an interrogation report reflecting statements made by detainee al-Warafi. *See generally* GE 11. There is no evidence that his statements were elicited through inducements or undue coercion. Moreover, the petitioner provides a detailed account of both the circumstances under which he heard the fatwas as well as the actual content of the fatwas. *See* GE 11 at 2. Accordingly, these statements are sufficiently reliable for the court's consideration.

that influenced the petitioner to go to Afghanistan called for Muslim men to "assist the Taliban" by taking up arms against the Northern Alliance.[30] Furthermore, given the petitioner's documented awareness of the conflict in Afghanistan, it is not plausible that the petitioner could have understood the fatwa's call to "assist the Taliban" as anything other than a call to take up arms. This evidence therefore provides additional support for the government's contention that the petitioner traveled to Afghanistan to engage in jihad.

### d. The Petitioner's Travel Route and Travel Companions

The government asserts that the route the petitioner followed to Afghanistan is the same route used by other foreign mujahaddin entering Afghanistan to fight with the Taliban. Nov. 10 (a.m.) Tr. at 12-29. The government also notes that the petitioner has admitted that his traveling companions professed to him that they were going to Afghanistan to become martyrs. *Id.* at 19. These facts, the government argues, strongly indicate that the petitioner too traveled to Afghanistan to engage in jihad. *Id.* at 12-29. According to the petitioner, there is no evidence that the route he followed is different from the route any Arab man of limited means would have taken into Afghanistan. *Id.* at 65. Furthermore, the petitioner argues, the fact that he traveled to Afghanistan with self-professed jihadists does not mean that he was a jihadist. *Id.* at 64-65.

The petitioner left Yemen for Afghanistan in the late summer or early fall of 2000. GE 1 at 6. During the initial leg of his journey, he was joined by an individual named ███████████ whom he had met approximately one week before. GE 9 at 3. The petitioner and ████ flew from Sana'a through the United Arab Emirates and on to Karachi, Pakistan before eventually

---

[30]    The petitioner contends that the fatwas cited by the government are distinguishable because they were issued at different times or in a different form than the fatwa that influenced the petitioner. Nov. 10 (a.m.) Tr. at 63-64. These differences, however, do not significantly undermine the probative value of the fatwas cited by the government, which were written by the same clerics about the same conflict during roughly the same time period. Furthermore, the petitioner has not presented the court with evidence of any other fatwa issued around this period that called for Muslim men to go to Afghanistan but did not advocate taking up arms.

arriving in Quetta, Pakistan, a city near the Afghanistan border. GE 1 at 6; GE 3 at 6. Once in Quetta, the two took a taxi to the Daftar al-Taliban, a Taliban-run office and guesthouse, as instructed by █████ GE 1 at 6; GE 6 at 2. After spending two or three days at the Daftar al-Taliban, the petitioner left for the border along with █████ and two other men, whom he knew as █████ and █████ GE 1 a 6; GE 3 at 5-6; GE 10 at 2. █████ told the petitioner that he was going to Afghanistan for jihad, and █████████████ all told the petitioner that they wanted to be martyrs. GE 9 at 3; GE 10 at 2.

The four men were driven by taxi from the Daftar al-Taliban to the border town of Spin Boldak. GE 1 at 6; GE 3 at 5-6; GE 4 at 1. When they reached the border, the men exited the taxi and crossed the border on motorcycles. GE 3 at 6; GE 4 at 1. According to the petitioner, motorcycles were not required to stop at the border. GE 4 at 1. After crossing the border, the men were picked up by the same taxi and carried on to Kandahar, GE 3 at 6; GE 4 at 1, where, as discussed below, they were taken to an al-Qaida guesthouse, *see infra* Part IV.B.2.b.

The petitioner's travel route – flying from a Persian Gulf state through the United Arab Emirates to Karachi and then to the Taliban offices in Quetta, Pakistan – was common among jihadists traveling to Afghanistan to train and fight with the Taliban or al-Qaida. *See, e.g., Al Odah v. United States*, 648 F. Supp. 2d 1, 8-9 (D.D.C. 2009) (concluding that the petitioner's travel route from Dubai to Karachi and then Quetta before crossing the border into Afghanistan supported the inference that he traveled to Afghanistan to engage in jihad), *aff'd*, 611 F.3d 8 (D.C. Cir. 2010). The petitioner contends that the government has not demonstrated that this route differed from the route taken by any other individuals with limited means traveling to Afghanistan. Nov. 10 (a.m.) Tr. at 64-65. Indeed, viewed in isolation, evidence that the

petitioner utilized a travel route frequented by foreign jihadists may not be particularly probative of the petitioner's intentions.

In this case, however, there are additional facts that color the court's assessment of the significance of the petitioner's travel route. First of all, the elaborate arrangements made by the Taliban office in Quetta to ferry the petitioner across the border without detection by border patrol calls into question the legitimacy of the petitioner's motives.[31] The fact that the petitioner traveled along this route with individuals whom he knew to be jihadists also casts doubt on his motivations for going to Afghanistan. Finally, there is the fact, discussed below, that the end point of the petitioner's travel route was an al-Qaida guesthouse in Kandahar, Afghanistan. *See infra* Part IV.B.2.b.

Thus, the evidence that the petitioner followed travel routes frequented by the foreign jihadists entering Afghanistan and traveled with individuals who admitted to the petitioner that they intended to become martyrs provides additional support for the government's allegation that the petitioner traveled to Afghanistan to fight with the Taliban or al-Qaida.

### e. Conclusion

In summary, the evidence indicates that before the petitioner left for Afghanistan, he developed significant and meaningful relationships with both veteran and future jihadists in Yemen. The evidence also indicates that the petitioner was influenced to travel to Afghanistan by ▮ a veteran Taliban fighter who told the petitioner about training and fighting with the

---

[31]    The petitioner has suggested that these border-crossing measures may have been motivated by concerns about efficiency. Nov. 10 (p.m.) Tr. at 71-72; *see also* Petr's Proposed Findings of Fact ¶ 131. Yet the petitioner stated that after he and his fellow companions were taken across the border on motorcycles, they rejoined the taxi that had brought them to the border. GE 3 at 6; GE 4 at 1. Given that the taxi too crossed the border, it is unclear why logic or efficiency would dictate leaving the taxi for the border crossing and then rejoining it after the crossing was completed. Instead, the more reasonable inference is that the petitioner and his companions exited the taxi at the border to escape detection by border patrol guards, who, according to the petitioner, did not stop motorcycles crossing the border. GE 4 at 1.

Taliban and who provided the petitioner a route to Afghanistan that funneled him into the al-Qaida/Taliban military apparatus. Furthermore, the petitioner admits that he was influenced to go to Afghanistan by a religious fatwa that likely called for him to go to Afghanistan to fight with the Taliban. Finally, the petitioner traveled to Afghanistan along a route used by jihadists and traveled with individuals who admitted that they were going to engage in jihad and become martyrs. Based on this evidence, the court concludes that it is more likely than not that the petitioner traveled to Afghanistan in order to fight with the Taliban, al-Qaida or associated enemy forces.

### 2. The Petitioner Stayed at al-Qaida and Taliban Guesthouses

The government contends that the petitioner stayed at numerous al-Qaida and Taliban guesthouses during his time in Afghanistan. Nov. 10 (p.m.) Tr. at 2-68. The government asserts that this fact strongly supports its contention that the petitioner was "part of" Taliban or al-Qaida forces. *Id.*; Nov. 15 (a.m.) Tr. at 30-62. Although the petitioner does not dispute that he stayed at guesthouses in Afghanistan, he denies that these guesthouses were necessarily affiliated with al-Qaida or the Taliban and contends that the fact that he stayed at these guesthouses provides no support for the government's allegation that he was part of al-Qaida or the Taliban. Nov. 10 (p.m.) Tr. at 69-74; Nov. 15 (a.m.) Tr. at 3-27

This Circuit has stated that evidence supporting a reasonable belief that an individual attended al-Qaida training camps or stayed at al-Qaida guesthouses in Afghanistan is powerful evidence that the detainee was "part of" the Taliban, al-Qaida or associated forces. *Al-Bihani*, 590 F.3d at 873 n.2 (observing that "evidence supporting the military's reasonable belief of either of those two facts with respect to a non-citizen seized abroad during the ongoing war on terror would seem to overwhelmingly, if not definitively, justify the government's detention of

such a non-citizen"); *see also Al-Adahi*, 613 F.3d at 1108 (observing that the petitioner's

"voluntary decision to move to an al-Qaida guesthouse . . . makes it more likely – indeed, very

likely – that [the petitioner] was himself a recruit."); *Sulayman*, 2010 WL 3069568, at *14-15

(observing that the petitioner's presence at Taliban-affiliated guesthouses supported the legality

of his detention).

The government contends that the petitioner stayed at the following al-Qaida or Taliban-

affiliated guesthouses prior to his capture: (1) the Daftar al-Taliban in Quetta in Quetta, Pakistan;

(2) the Haji Habash guesthouse in Kandahar, Afghanistan; (3) the al-Ghamdi guesthouse in

Kabul, Afghanistan; (4) the home of             in Jalalabad, Afghanistan; and (5)

guesthouses near the Taliban battle lines.  The court considers the evidence supporting these

contentions below.

### a. Daftar al-Taliban in Quetta, Pakistan

As previously noted, the launching point for the petitioner's journey into Afghanistan

was the Daftar al-Taliban in Quetta, Pakistan, which arranged for his entry into Afghanistan and

where the petitioner stayed for two to three days before his border crossing. *See supra* Part

IV.B.1.d.  The petitioner acknowledged to interrogators that he understood that the Daftar al-

Taliban operated as a Taliban-run guesthouse, GE 1 at 6; GE 3 at 5-6, a characterization

consistent with the account of at least one other GTMO detainee, *see, e.g.*, GE 13 at 2

(interrogation report in which the detainee describes a fatwa that "explained how to travel to

Quetta and get to a large Taliban center where the Taliban would take people to Afghanistan").[32]

Indeed, according to the petitioner, the three other individuals whose journey into Afghanistan

---

[32]     As previously noted, Government's Exhibit 13 is an interrogation report reflecting statements
made by GTMO detainee al-Jadani. *See generally* GE 13.  Al-Jadani's description of the Taliban
office in Quetta, Pakistan corresponds closely with the petitioner's account, and this
corroboration supports the reliability of both accounts.

was also facilitated by the Daftar al-Taliban admitted that they intended to become martyrs. GE 10 at 2.

The petitioner has suggested that the Daftar al-Taliban simply acted as a travel agency for individuals seeking to enter Afghanistan. Nov. 10 (p.m.) Tr. at 70-71; Nov. 15 (a.m.) Tr. at 12-13. His only support for this assertion, however, is the fact that most taxi drivers in Quetta knew the location of the facility and that the Daftar al-Taliban sometimes charged a fee. Nov. 10 (p.m.) Tr. at 70-71; Nov. 15 (a.m.) Tr. at 13; *see also* GE 15 at 1. This evidence, however, is not necessarily inconsistent with, and hardly overcomes the weight of, the evidence that the Daftar al-Taliban served as a Taliban-run waystation for foreign fighters seeking entry to Afghanistan. *See* GE 1 at 6; GE 3 at 5-6; GE 13 at 2. Thus, the court concludes that the Daftar al-Taliban functioned as a Taliban guesthouse and facilitation hub and that the petitioner knew that these were the functions of the Daftar al-Taliban at the time he stayed there.

### b. Haji Habash Guesthouse in Kandahar, Afghanistan

After arriving in Kandahar, the petitioner stayed for two weeks at the Haji Habash guesthouse. GE 3 at 6; GE 6 at 2. As described in the declaration of[3]

> the Arab House, also known as the Haji Habash House, functioned as a Taliban-sponsored guesthouse for Arab mujahedeen in Kandahar . . . . [T]he Arab House was used as a transition point and in-processing location for individuals going to train at various training camps, including al-Farouq. Additionally, all personnel staying at the Arab House were required to turn over their luggage, passports, and any money they possessed.

[3]        Decl. at 3.

Although the petitioner likens the Haji Habash guesthouse to a youth hostel, Nov. 10 (p.m.) Tr. at 72-74, the petitioner's own statements belie this characterization. The petitioner acknowledged to interrogators that the Haji Habash guesthouse was a Taliban guesthouse, GE 6 at 2, operated by an individual named            *id.*; GE 2 at 3; GE 3 at 6. The petitioner also

acknowledged that he knew████████ was a member of al-Qaida.  GE 2 at 3 ("When he was

asked about al-Qaida members he knows, al Sabri said that he only knew one al-Qa'ida member,

a man named████████ . . . .  He said he met him in Kandahar, at the al-Ansar guesthouse.").

Indeed,████████ well-documented affiliation with al-Qaida has been noted by other

members of this court.  *See, e.g.*, *Abdah v. Obama*, 2010 WL 3270761, at *3 (D.D.C. Aug. 16,

2010) (describing████████ role as an al-Qaida facilitator); *Abdah  v. Obama*, 709 F. Supp.

2d 25, 35-36 (D.D.C. 2010) (noting that████████ was a member of al-Qaida and that the Haji

Habash guesthouse he ran was affiliated with al-Qaida).

     The petitioner also stated to interrogators that "[t]here were many people from different

nations at the [Haji Habash] guesthouse, and they were there waiting to go on training missions

at either Al Farouq or Abu Baida."[33]  GE 6 at 2.  The petitioner stated that when he arrived at the

Haji Habash guesthouse, he turned over his passport to Abu Khloud.  GE 6 at 2; *see also*[3]████

Decl. at 3 (noting that collecting passports gave training camp and guesthouse administrators

greater control over trainees and prevented them from easily leaving without approval).  Another

detainee████████ has stated that the Haji Habash guesthouse was surrounded by

walls that were approximately four meters high and that the front entrance was guarded by a

Taliban guard armed with a Kalashnikov rifle who searched persons entering the house.[34]  GE 13

at 2.  These descriptions of the facility simply do not correspond with the type of guesthouses

---

[33]    Indeed, the petitioner acknowledged that during the two weeks he stayed at the Haji Habash guesthouse, he was approached by an individual who tried to convince him to train at the al-Farouq camp.  GE 9 at 3.

[34]    The level of detail contained in al-Jadani's description of the Haji Habash guesthouse (he describes the guesthouse's precise location, the surrounding buildings and the layout of the facility, and gives a detailed physical description of the guard who provided security to the guesthouse), *see* GE 13 at 2, coupled with the absence of any evidence of undue coercion, persuades the court to rely on the detainee's account.

that the petitioner's expert has stated are "most closely comparable to the old-fashioned Western concept of a non-profit youth hostel or YMCA." Carapico Decl. ¶ 18(c).

The petitioner maintains that even if the Haji Habash guesthouse was affiliated with the Taliban or al-Qaida, not everyone who stayed there was necessarily affiliated with those forces. Nov. 10 (p.m.) Tr. at 72-74; *see also* PE 32 ¶ 6.0; PE 35 at 1; PE 115 at 2. The evidence, however, does not support the notion that the petitioner was one of these unaffiliated wayward travelers. For instance, the petitioner stated to interrogators that during the two weeks he stayed at the Haji Habash guesthouse, he visited the Islamic Institute across the street daily. GE 3 at 6; GE 4 at 1. According to other GTMO detainees, this Institute was headed by Abu Hafs al-Mauritania, a senior al-Qaida leader who associated with high-ranking Taliban and al-Qaida leaders. GE 7 at 1; GE 48 at 1-2.[35] One detainee reported that "the mission of the Institute was to issue religious fatwa[s], teach the Koran and the Hadith, and to indoctrinate the young students about going to paradise if they give their lives for the Muslim cause." GE 48 at 1-2. This account has been found credible by another judge in this district, who has remarked that "the Institute was sponsored and led by key Al Qaeda figures" and that "students there were taught Islamic doctrine in a manner twisted to serve the purposes of Al Qaeda" and that "attendance at the Institute is certainly consistent with becoming a part of Al Qaeda." *Abdah*, 709 F. Supp. 2d at 44.

---

[35]     Government's Exhibit 7 is an interrogation report containing statements made by GTMO detainee Ahmed Abdel Aziz. *See generally* GE 7. Aziz admitted to working for Abu Hafs al-Mauritania at the Islamic Institute in Kandahar, *id.* at 1, and provided detailed information about numerous suspected jihadists, *id.* at 1-4. His account of al-Mauritania's affiliation with the Islamic Institute is corroborated by al-Jadani, who provides detailed information about Abu Hafs, his family and the physical layout of the institute. GE 48 at 1-2. The court has been presented with no evidence that these descriptions were elicited through undue coercion. The court therefore considers both accounts sufficiently reliable for this analysis.

SECRET

At any rate, the government need not establish that every person who stayed at the Haji Habash guesthouse (or any other guesthouse) was a member of al-Qaida. Rather, the government's burden is to prove that it is more likely than not that the petitioner was "part of" al-Qaida, and evidence that the petitioner knowingly stayed at a guesthouse affiliated with al-Qaida or the Taliban, even if not dispositive, is undoubtedly probative in this regard. *See Al-Bihani*, 590 F.3d at 873 n.2; *Al-Adahi*, 613 F.3d at 1108.

Based on the overwhelming weight of the evidence, the court concludes that the Haji Habash guesthouse was a Taliban or al-Qaida affiliated guesthouse. The court further concludes that the petitioner knew the guesthouse was affiliated with the Taliban and al-Qaida at the time he stayed there. This evidence strongly supports the government's assertion that the petitioner was "part of" al-Qaida at the time.

### c. Hamza al-Ghamdi's Guesthouse in Kabul, Afghanistan

After spending two weeks at the Haji Habash guesthouse, the petitioner received permission from      to journey to Jalalabad. GE 3 at 6. The petitioner traveled with another guesthouse resident, a Moroccan named      GE 3 at 6; GE 4 at 2; GE 9 at 4. En route to Jalalabad, the petitioner spent two nights at a guesthouse in Kabul operated by an individual named Hamza al-Ghamdi. GE 3 at 6; GE 4 at 2; GE 9 at 4.

Other detainees have acknowledged that al-Ghamdi was a member of al-Qaida. One detainee described al-Ghamdi as "one of Usama bin Laden's main [lieutenants]." GE 20 at 2. The detainee stated that al-Ghamdi "[was] one of the planners for al-Qaida special operations in Afghanistan and maybe for other countries." *Id.* Another detainee stated that "Al-Ghamdi decided what training a person received and where they went for training" and that "if anyone wanted to go somewhere such as Kandahar . . . or the front line, al-Ghamdi would arrange to get

them there." GE 22 at 1.[36]   Indeed, when asked by interrogators, the petitioner did not deny that al-Ghamdi was a member of al-Qaida. GE 24 at 1.

The petitioner told interrogators that during this stay at the al-Ghamdi guesthouse, he asked al-Ghamdi for permission to go to the front lines. GE 9 at 4. According to the petitioner, al-Ghamdi denied the request "since he did not have any weapons training." *Id.* This account is consistent with that of another detainee, who stated that he too requested permission from al-Ghamdi to travel to the front, but that this request was denied because "Al-Ghamdi told him that he needed refresher training." GE 22 at 2.

The petitioner spent two days at the al-Ghamdi guesthouse before traveling on to Jalalabad. GE 4 at 2; GE 9 at 4. After several months, the petitioner "decided to return to Al Ghamdi's Arab house in Kabul to try and get to the fighting at the front line." GE 9 at 5. During this second stay, which lasted approximately one week, GE 24 at 1, Al-Ghamdi granted the petitioner's request and "finally authorized [the petitioner] to go to the 2nd line of defense near Bagram," GE 9 at 6. The petitioner told interrogators that he "receive[ed] instructions from [al-Ghamdi] on training sites and front lines." GE 24 at 1.

Before the petitioner departed the al-Ghamdi guesthouse for the front, he observed an individual named                          visit the guesthouse. GE 9 at 5.            was a coordinator for the September 11 terrorist attacks. 9/11 COMMISSION REPORT at 434. According

---

[36]   Government's Exhibit 20 is an interrogation report containing statements made by GTMO detainee Ghaleb Nassar al-Bihani, who provides detailed information regarding al-Ghamdi's history of affiliation with al-Qaida, as well as his role within the organization. GE 20 at 1-2. There is no evidence that these statements were elicited through undue coercion. Moreover, al-Bihani's account is consistent with the account provided by al-Jadani, who described al-Ghamdi's role in facilitating the movement of fighters to and from the front lines. GE 22 at 1. Al-Jadani's description of al-Ghamdi's responsibilities is corroborated by the petitioner, who also acknowledges al-Ghamdi's authorization was necessary to get to the front lines. GE 9 at 6; GE 24 at 1.

to the petitioner,         would come to the house and greet people before going upstairs to the private offices. GE 9 at 5-6.

In light of the above, there is overwhelming evidence that the al-Ghamdi guesthouse was a Taliban or al-Qaida affiliated guesthouse. Furthermore, the petitioner plainly knew that the guesthouse had these affiliations, as he understood that al-Ghamdi was a member of al-Qaida, knew that al-Ghamdi associated with senior members of al-Qaida, asked al-Ghamdi twice for permission to travel to the front and returned to the al-Ghamdi guesthouse for the express purpose of reaching the front.

### d.         House in Jalalabad, Afghanistan

The petitioner stated to interrogators that after spending two days at the al-Ghamdi guesthouse, he traveled to Jalalabad with         , who had accompanied him on his journey from the Haji Habash guesthouse to the al-Ghamdi guesthouse in Kabul. GE 4 at 2; GE 10 at 2. In Jalalabad, the petitioner contacted     friend,                 GE 4 at 2; GE 10 at 2. According to the petitioner,    and         had fought together with the Taliban and remained very close. GE 9 at 4; GE 10 at 2. The petitioner stated to interrogators that he lived with         for several months before returning to the al-Ghamdi guesthouse in an effort to get to the front. GE 4 at 2; GE 9 at 4.; GE 10 at 2.

Although the government contends that         house was "just another al-Qaeda and Taliban guesthouse," Nov. 10 (p.m.) Tr. at 43-50, they have offered little to support that assertion. The government has provided no evidence that other Taliban or al-Qaida fighters stayed at         house during the time that the petitioner was there. *See*[3]   Decl. at 1 (noting that most guesthouses "functioned as bed-down locations" for jihadist fighters). Nor is there any evidence that         house served as a training camp facilitation hub, meeting

place for al-Qaida leaders or waystation for fighters on their way to the frontlines. *See id.* (describing other functions served by al-Qaida guesthouses). Accordingly, the government has not established that ▌ house was a Taliban or al-Qaida guesthouse.

The significance of this finding, however, is tempered by two additional findings. First, as discussed below, the evidence indicates that during at least part of the period that the petitioner claims to have been living with ▌ the petitioner was, in fact, receiving military training at an al-Qaida training camp. *See infra* Part IV.B.3. Indeed, despite his demonstrated ability to recall minute details about other aspects of his time in Yemen and Afghanistan,[37] the petitioner appears to have provided little information about the many months he allegedly spent with ▌. *See, e.g.*, GE 4 at 2 (the petitioner stated that he "did not work or receive any training while living with ▌

Furthermore, for whatever time he did spend at ▌ house, the petitioner remained intimately associated with jihadist forces. ▌ was himself a former Taliban fighter, GE 10 at 2, whose principal activity was, according to the petitioner, disbursing funds that he received from Saudi Arabia, GE 9 at 5; GE 41 at 2. Although the petitioner stated that these funds were distributed to orphanages and the parents of children studying Quran, GE 6 at 2; GE 41 at 2, he stated that those funds may have gone to other sources as well, GE 41 at 2. Indeed, while describing ▌ distribution of funds during one interrogation, the petitioner acknowledged, "I do not know if ▌ is a member of al Qa'ida." GE 41 at 2.

---

[37] *See, e.g.*, GE 1 at 2-3 (petitioner recalled the name of the two individuals who flew with him from Saudi Arabia to Sana'a, the name of the hotel where he stayed in Sana'a and the amount of money he paid the taxi to drive him to Ta'iz); GE 3 at 4-5 (petitioner recalled detailed biographical information about numerous members of the Jamil boardinghouse); GE 9 at 4-5 (petitioner provided a detailed description of the physical layout of the al-Ghamdi guesthouse and surrounding grounds, including its location, the placement of vehicles and guards, despite the fact that he stayed there less than two weeks).

~~SECRET~~

Regardless of whether ▓▓▓ was a member of the Taliban or al-Qaida, there is evidence that ▓▓▓ had ongoing relationships with jihadists. The petitioner recalled that on one occasion while he was living there, ▓▓▓ was visited by four Tunisians who "were in Jalalabad for Jihad." GE 6 at 2. One of these Tunisians was a small arms dealer named ▓▓▓ ▓▓▓ *Id.*; GE 4 at 2. According to the petitioner, he purchased a pistol from al-Tunisi and he, ▓▓▓ and ▓▓▓ "would travel to an area called Negim al-Jihad located between eight (8) and ten (10) kilometers from Jalalabad" where there was a public shooting range. GE 4 at 2-3.

During this period, the petitioner was also visited by an associate from Sana'a, ▓▓▓ ▓▓▓ who was accompanied by an individual named ▓▓▓ GE 3 at 7; GE 9 at 5. ▓▓▓ ▓▓▓ whom the petitioner had met once in Sana'a through ▓▓▓ collected funds for the jihad in Chechnya. GE 3 at 7; GE 9 at 5. As previously noted, the petitioner has acknowledged that ▓▓▓ was a member of al-Qaida. GE 36 at 3; GE 41 at 2. ▓▓▓ informed the petitioner that his former housemate, al-Khamri, had been one of the suicide bombers during the *Cole* attack. GE 4 at 3; GE 9 at 5.

Lastly, the court notes that after allegedly spending several months with ▓▓▓ the petitioner returned to al-Ghamdi's guesthouse in Kabul, at which time he received authorization to travel to the front. GE 9 at 5-6. Had the petitioner truly dissociated himself from the Taliban and al-Qaida during the months when he was allegedly living with ▓▓▓ and failed to address the lack of training that had previously prevented him from going to the front, it seems unlikely that al-Ghamdi would have immediately welcomed him back to the guesthouse and authorized him to go to the Taliban battle lines.

Accordingly, even if████████ house was not a formal al-Qaida or Taliban guesthouse, the time the petitioner spent there does not constitute time when he was dissociated from al-Qaida or the Taliban. To the contrary, it appears that during this time, he remained very much a part of the al-Qaida and Taliban apparatus, continuing his interactions with established jihadists before eventually returning to the al-Ghamdi guesthouse in an effort to get to the front.

### e. ████████ Guesthouse Near the Frontlines

As noted, the petitioner has stated that after spending several months in Jalalabad, he returned to the al-Ghamdi guesthouse, at which time he received authorization to the Taliban battle lines. GE 9 at 2. The details of the petitioner's accounts of his time at the front are not entirely consistent. *See* GE 4 at 2; GE 6 at 2; GE 9 at 6. These accounts do, however, suggest that after he returned to the al-Ghamdi guesthouse, he stayed in at least one other Taliban and al-Qaida guesthouse near the front. *See* GE 6 at 2 ("[The petitioner] traveled to Kabul via taxi and stayed at a guesthouse for seven (7) days. Afterwards, [the petitioner] ventured to another guesthouse located near the thirdlines for ten (10) days."); GE 4 at 2 (interrogation report in which the petitioner states that on his way to the front, he stayed at a guesthouse operated by an individual named████████ a Taliban fighter who had been in charge of a defense fighting line outside Bagram). Accordingly, the evidence indicates that even after his extended stay in Jalalabad, the petitioner stayed at additional Taliban and al-Qaida affiliated guesthouses in his effort to get to the frontline.

### f. Conclusion

In sum, the evidence indicates that throughout his time in Afghanistan, the petitioner stayed at multiple guesthouses that he knew were affiliated with al-Qaida and the Taliban. The fact that one of the houses he stayed at may not have been a formal al-Qaida guesthouse hardly

indicates that he had dissociated himself from the Taliban or al-Qaida. This evidence strongly indicates that the petitioner was "part of" al-Qaida during this period.

### 3. The Petitioner Sought Out and Received Military-Style Training in Afghanistan

The government contends that the petitioner applied for and received military-style training from the Taliban or al-Qaida during his time in Afghanistan. Nov. 15 (a.m.) Tr. at 63-79; Nov. 15 (p.m.) Tr. at 3-20, 36-51. This evidence, the government contends, provides further support for the government's allegation that the petitioner was "part of" the Taliban, al-Qaida or associated enemy forces. Nov. 15 (a.m.) Tr. at 63-79; Nov. 15 (p.m.) Tr. at 3-20, 36-51. The petitioner responds that the government has not proven that he received any military training. Nov. 15 (p.m.) Tr. at 20-35. The petitioner further contends that even if he did receive such training, that fact would not establish that he was part of the Taliban or al-Qaida. *Id.*

### a. The Petitioner's *Kunyas*

The government has offered evidence that terrorists and insurgents commonly use *kunyas*, which are assumed names or pseudonyms used to conceal the individual's true identity. GE 14▮▮▮▮▮▮▮▮▮▮▮Decl. I") at 2.[38] In Muslim culture, the *kunya* is traditionally an honorific indicating that the person is either a mother or father and is constructed using the name of the first-born son or eldest daughter if the person has no sons. *Id.* The *kunya* for a man is "Abu," meaning "father of," plus the name of the first born. *Id.* Terrorists, on the other hand, use *kunyas* without regard to children's names or whether the individual has children. *Id.* *Kunyas* are often used by terrorists "as a security, denial and deception measure." *Id.*

---

[38]      For the reasons previously discussed, the court considers the statements made by ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to be sufficiently reliable for the court's consideration. *See supra* Part III.B.

In this case, the petitioner, who has no children, GE 27 at 1, has acknowledged that while in Afghanistan, he used the *kunya* "Abu Abdullah." GE 9 at 4; *see also* GE 27 at 1 (noting that the petitioner admitted using the *kunya* "Abu Abdullah" even before leaving for Afghanistan). Furthermore, it is undisputed that the petitioner also used the *kunya* ██████████████ during the time he was in Afghanistan. Nov. 15 (p.m.) Tr. 21-22, 34, 37. ████████████



### b. The Petitioner's Application to Attend an al-Qaida Training Camp

In support of its contention that the petitioner received military training, the government has submitted an FBI memorandum, dated March 27, 2002, which states that in December 2001, coalition forces "recovered numerous documents from an 'Arab' office in Kandahar, Afghanistan." GE 25 at 1. According to the memorandum, the documents recovered included "applications for training at Al Qaeda camps." *Id.* The FBI memorandum then provides an English-language translation of these applications. *See generally id.*

The FBI memorandum indicates that one of the individuals who applied to attend an al-Qaida training camp was ██████████████████ GE 25 at 4. The applicant indicates that he was born in 1977, hails from Mecca, Saudi Arabia, and has a ninth grade education. *Id.* The applicant also indicates that he was referred to the camp by two individuals, ████████ and ████████. *Id.* As previously noted ████████ is an individual whom the

petitioner met in Sana'a through ▮▮▮▮ and whom the petitioner has acknowledged was a member of al-Qaida. GE 3 at 5; GE 36 at 3; GE 41 at 2. The applicant also lists the names and telephone numbers of two brothers, ▮▮▮ and ▮▮▮ GE 25 at 4. This information too is consistent with biographical information provided by the petitioner. GE 1 at 1-3; GE 3 at 3. The application concludes by asking for "Plans after training," to which this applicant responded, "Jihad." GE 25 at 4.

It is clear that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ who submitted this training camp application is the petitioner. Each piece of biographical information contained in the application, including the names of his brothers, his city of origin and his level of education, corresponds with information that the petitioner has provided to interrogators. Indeed, the petitioner does not dispute that he is the individual referred to in the application. Nov. 15 (p.m.) Tr. at 21-22, 34. Accordingly, the government has established that the petitioner submitted an application to attend an al-Qaida training camp. [39]

The petitioner offers two arguments to diminish the significance of this evidence. First, he contends that even though the application states that the petitioner's intention was to engage in "jihad" after the completion of his training, "jihad" does not necessarily mean armed conflict. *See* Nov. 15 (p.m.) Tr. at 22-23; *see also* PE 95 ¶ 18; PE 138 at 1. Although the court does not doubt that the term "jihad" can encompass different meanings in different contexts, insofar as this particular training camp application is concerned, the petitioner's argument is implausible. As the FBI memorandum clearly indicates, each training camp application asked the applicant

---

[39]     The FBI memorandum specifies when and where the training camp applications were recovered and who recovered the materials. GE 25 at 1. Furthermore, the petitioner does not dispute that the application of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ described in the FBI memorandum reflects accurate, detailed biographical information regarding the petitioner. *Id.* at 4. Moreover, the information contained in other applications translated in the FBI memorandum corresponds with information recorded in other al-Qaida training documents. *See infra* Part IV.B.3.c. Accordingly, the FBI memorandum is sufficiently reliable for the court's consideration.

not only to provide background information, but also specifically directed each applicant to describe his "Previous military service." GE 25 at 1-4. Moreover, it is well established that al-Qaida training camps were designed "to train and indoctrinate fighters and terrorists." 9/11 COMMISSION REPORT at 66. Accordingly, the court concludes that by indicating on his training camp application that he intended to engage in "jihad" following his training, the petitioner was expressing a desire to take up arms with al-Qaida or the Taliban.

The petitioner also contends that even if he filled out an application to attend an al-Qaida training camp, it does not necessarily follow that he actually attended the camp. Nov. 15 (p.m.) Tr. at 21-22. Noting that the date of the application corresponds with the time that he was at the Haji Habash guesthouse, the petitioner claims that the application must have been completed when he was approached at that guesthouse by a training camp recruiter. *Id.* Because the petitioner ultimately declined the offer to attend the training camp, he argues, the application submitted as part of this unsuccessful recruitment effort does not show that he attended an al-Qaida training camp. *Id.*

The petitioner, however, has offered no evidence to substantiate his theory that the training camp application was submitted as part of this recruitment effort. Furthermore, even if the petitioner's training camp application does not conclusively prove that he received training from al-Qaida, it certainly offers significant support for that allegation, particularly in light of the detailed personal information contained therein. Indeed, if the petitioner had no intention of attending an al-Qaida training camp, it is not clear why he would provide such detailed biographical information about himself, including the names and telephone numbers of his brothers in Saudi Arabia and the name of his associate from the      boardinghouse,
*See* GE 25 at 4. Accordingly, the fact that the petitioner filled out an application to attend an al-

Qaida training camp strongly supports the government's allegation that he sought out military-style training in Afghanistan.

### c. Records of the Petitioner's Training

The government contends that the petitioner's receipt of military-style training is also documented in a ninety-two page collection of documents, which, the government asserts, are English-language translations of internal Taliban or al-Qaida records ("the AFGP Documents"). *See generally* GE 29. A corresponding DIA record, which the government submitted as a supplemental exhibit,[40] indicates that the AFGP Documents consist of English-language translations of Arabic-language documents captured by coalition forces during Operation Enduring Freedom.[41] GE 70 at 1. The record seems to reflect that these documents were recovered from the "Director of Al-Qa'ida Security Training Office" and that they are similar to other materials recovered from enemy forces. *Id.* at 2. The DIA, which prepared the translation, notes that the AFGP Documents "contain[] [t]he names of the students admitted to the training in the tactics of [a]rtillery, communication, infantry and their distribution. The training starting times, programs, instructions about the subject matters are discussed too." *Id.* at 2.

The AFGP Documents contain multiple records concerning the petitioner. For example, the exhibit contains several rosters of "arriving brothers," organized by their date of arrival. GE 29 at 48-53. One of these arriving brothers is ▮

---

[40] In its post-merits hearing submission, the petitioner complains that GE 70 was not admitted into the record. The hearing transcript, however, plainly documents that the court permitted the introduction of this exhibit as rebuttal evidence over the objection of the petitioner's counsel. Nov. 15 (p.m.) Tr. at 39-41.

[41] Operation Enduring Freedom is the military operation commenced by the United States and coalition forces against Taliban and al-Qaida forces in ▮
▮ of the operation is set forth in the declaration of Lieutenant Colonel Jerry Brooks, a veteran Army historian with twenty-three years of active and reserve Army service. *See generally id.*

who, according to the roster, has a high school education, no profession and was referred by an individual named        *Id.* at 52. The information contained in this entry is consistent with the information recorded in the petitioner's training camp application, GE 25 at 4, and with information provided by the petitioner to interrogators, GE 1 at 1; GE 3 at 1. That the petitioner is listed as an "arriving brother" on an al-Qaida roster captured with dozens of other documents concerning al-Qaida trainees suggests that the petitioner sought out and received training from al-Qaida or the Taliban.

The AFGP Documents also contain records reflecting the petitioner's attendance and completion of various training courses. *See generally* GE 29. One such record is a training roster issued by the "Office of Mujahadeen Affairs." *Id.* at 34. The roster indicates that[1]
[1]    was scheduled to attend "Communication Class #2" beginning in February 2001. *Id.* The AFGP Documents also include a memorandum issued by the "Ansar Allah Base" on August 24, 2001, listing a group of individuals, including[1]      who had "graduated from Anti Air Missiles" and who would therefore "have priorit[y] in joining the Artillery Sessions" which was to start shortly. *Id.* at 84. These internal al-Qaida records indicate that after applying to attend an al-Qaida training camp, the petitioner did, in fact, receive such training.

The petitioner contends that the government has not established the reliability of the AFGP Documents. Nov. 15 (p.m.) Tr. at 23-24. The court disagrees. As previously noted, the government has submitted an internal DIA record indicating that the exhibit represents a DIA translation of training records captured during Operation Enduring freedom. GE 70 at 1-2. Although the petitioner points out that the DIA record indicates that the ninety-two page exhibit represents intelligence that has not been evaluated, the Circuit has made clear that "raw"

SECRET

intelligence is not inherently unreliable. *Barhoumi*, 609 F.3d at 429 (citing *Parhat*, 532 F.3d at 836).

The petitioner also notes that the DIA record does not specify when and where the AFGP Documents were recovered. *See* GE 70 at 1. Yet the absence of this information, while significant, does not necessarily undermine the reliability of the AFGP Documents, particularly in light of the fact that the information contained in the document is corroborated by other materials in the record. *See Barhoumi*, 609 F.3d at 429 (observing that "an intelligence report's reliability can be assessed by comparison to 'exogenous information'" (quoting *Parhat*, 532 F.3d at 848)). As previously noted, the petitioner's biographical information recorded in the AFGP Documents' roster of "arriving brothers," GE 29 at 52, is consistent with that provided in the petitioner's training camp application, GE 25 at 4. Likewise, the other rosters of "arriving brothers" in the AFGP Documents contain information about trainees that also matches up with information recorded in the training camp applications translated in the FBI memorandum. *Compare* GE 29 at 48, 52[1] ████████████████████████████████████

[1] ██████████ *with* GE 25 at 2, 3 (entries for ████████████████████████

██████████████████████ The overlap in the information set forth in the AFGP Documents and the FBI memorandum provides substantial evidence of their authenticity and reliability.

The information in the AFGP Documents (and the FBI memorandum) is also corroborated by the petitioner's own statements. For instance, according to the petitioner, one of the individuals who traveled with him from the Daftar al-Taliban to the Haji Habash guesthouse was a twenty-three year old Yemeni man he knew as ██████ GE 1 at 6-7. The ██████ ██████ listed on the FBI memorandum is described as a twenty-three year old Yemeni man with an occupation in computers referred by ██████ who arrived in Afghanistan in

September 2000, the same time as the petitioner. GE 25 at 2. The ███████████ listed on the AFGP Documents training roster is described as a ████████████████████ ███████████████████████████████████████ GE 29 at 48. These corroborating details strongly suggest that the ████████ who traveled with the petitioner is the same man listed on the al-Qaida training roster and the training camp applications, and provide further support for the reliability of the AFGP Documents and the FBI memorandum.

The petitioner also contends that there is no proof that the ████████████ who was scheduled to attend a communications class, GE 29 at 34, and the ████████████ who had completed a course in anti-aircraft missiles and was scheduled to begin artillery training, *id.* at 84, refer to the petitioner. Nov. 15 (p.m.) Tr. at 24-28. The petitioner points out that the names █████████████████████████████████████████████████ are both common names that are used in the *kunyas* of many individuals listed in the AFGP Documents.

The petitioner, however, has not identified any instance in which an individual listed as an "arriving brother" or training camp attendee in the AFGP Documents used the *kunya* ████████ ████████ Moreover, the petitioner does not dispute that the entry for ████████████████ on the al-Qaida training roster found in the AFGP Documents refers to the petitioner. GE 29 at 52. Indeed, given the overlap between the information in that entry, the training camp application, *see* GE 25 at 4, and the petitioner's statements to interrogators, *see* GE 1 at 1-3, the evidence strongly indicates that the individual listed on the training roster is the petitioner. Having established that at least one of the references to ████████████ in the AFGP

---

[42]   The closest the petitioner comes to such evidence is an entry on an "arriving brothers" list in which one individual lists as a reference an individual named ████████████ GE 29 at 55. While this evidence supports the uncontroversial proposition that there were other individuals using the *kunyas* similar to that of the petitioner, it provides little support for the proposition that there were other individuals being processed for training at al-Qaida training camps around the same period using that *kunya.*

Documents refers to the petitioner, the court concludes that it is more likely than not that the other references to that *kunya* contained in the same collection of materials also refer to the petitioner, rather than some unidentified individual also using the same *kunya*.

### d. Authorization to Travel to the Front

Finally, the fact that al-Ghamdi subsequently authorized the petitioner to go to the Taliban battle lines also supports the government's contention that he received military-style training from al-Qaida. As previously noted, the petitioner has stated that when he first stayed at al-Ghamdi's guesthouse in Kabul, he requested permission to go to the front. GE 9 at 4. Al-Ghamdi denied that request "since he did not have any weapons training." *Id.* This account is, as previously noted, consistent with that of another detainee, who stated that al-Ghamdi similarly denied his request to go to the front because he needed "refresher training." GE 22 at 2. According to that detainee, al-Ghamdi sent him to the Malik training camp near Kabul. *Id.*

In this case, the petitioner stated that several months after al-Ghamdi denied his request, he returned to the al-Ghamdi guesthouse and again requested permission to go to the front. GE 9 at 4. During this second visit, al-Ghamdi authorized the petitioner to go to the battle lines. *Id.* The reasonable inference from the petitioner's own account is that between his first and second stays at al-Ghamdi's guesthouse, he remedied the deficiency identified by al-Ghamdi by obtaining weapons training.

The fact that the petitioner reached the Taliban battle lines also undermines the petitioner's argument that not everyone who received training from al-Qaida or the Taliban went on to become a member of those forces. *See* Nov. 15 (p.m.) Tr. at 31-35. The petitioner has presented substantial evidence that not every individual who attended an al-Qaida training camp would go on to become part of those forces. *See, e.g.*, PE 19 at 2, 7; 9/11 COMMISSION REPORT

at 67. In the petitioner's case, however, the petitioner, after receiving training, did not distance himself from the Taliban or al-Qaida; to the contrary, he "decided to return to Al Ghamdi's Arab house in Kabul to try and get to the fighting at the front line." GE 9 at 5.

### e. Conclusion

Based on the evidence presented by the parties, it is more likely than not that the petitioner applied for and received military-style training from the Taliban or al-Qaida during his time in Afghanistan. This fact strongly indicates that the petitioner was "part of" al-Qaida, the Taliban or associated enemy forces. *See Al-Bihani*, 590 F.3d at 873 n.2.

### 4. The Petitioner Traveled to Taliban Battle Lines

The government contends that the petitioner spent time at Taliban battle lines and that this fact further demonstrates that he was "part of" al-Qaida, the Taliban or associated enemy forces. Nov. 15 (p.m.) Tr. at 51-61; 71-74. Although the petitioner does not dispute that he went to the front, he contends that he traveled there essentially as a tourist and that this evidence does not demonstrate that he was affiliated with the Taliban or al-Qaida. *Id.* at 62-71.

The petitioner repeatedly admitted to interrogators that in or around May 2001, he traveled to the Taliban battle lines. GE 3 at 6; GE 4 at 3; GE 9 at 5-6. In one interrogation, the petitioner stated that after returning to al-Ghamdi's guesthouse "to try and get to the fighting at the front line," GE 9 at 5, he received permission to "to go to the 2nd line of defense near Bagram. [The petitioner] went there to support the Taliban who were positioned to fight Masood's Northern Alliance troops," *id.* at 6. In another interrogation, the petitioner stated that he "began traveling to Bagram to assist Taliban fighters in their efforts against the Northern Alliance fighters." GE 4 at 3. The petitioner stated that he spent a week at the fighting line, although he did not see any exchange of gunfire. *Id.* In yet another interrogation, the petitioner

stated that during the time he was in Jalalabad, he "traveled to the frontline near Kabul. [The petitioner] acknowledged that there was fighting going on there." GE 3 at 6.

The petitioner's admissions establish not only that he went to the front, but that he went there to support Taliban forces. GE 4 at 3; GE 9 at 5. Furthermore, the evidence that the petitioner requested authorization to go to the front, GE 9 at 5-6, received instruction from al-Ghamdi regarding battle lines, GE 24 at 1, followed al-Ghamdi's directives about when he could and could not go to the front, GE 9 at 4-6, and exchanged communications with his compatriot Abu Ghanem at the front, GE 6 at 2-3, strongly suggests that the petitioner was not acting as a "freelancer," but was instead operating within the Taliban or al-Qaida command structure as "part of" those forces, *see Bensayah*, 610 F.3d at 725; *Awad*, 608 F.3d at 11.

To blunt the significance of this evidence, the petitioner has suggested at various times that he went to the Taliban battle lines out of curiosity, or to find his former acquaintance, Abu Ghanem, or as a "Gucci jihadist" tourist.[43] These contentions are not plausible. As one judge in this district has remarked, "[i]t is inconceivable that the Taliban would allow an outsider to stay at their front line camp just to see what the fighting was like. An outsider, whose trustworthiness and loyalty are unknown, poses a threat to a military camp." *Al-Warafi*, 704 F. Supp. 2d at 42; *see also Sulayman*, 2010 WL 3069568, at *18 ("[T]he Court cannot fathom a situation whereby Taliban fighters would allow an individual to infiltrate their posts near a battle zone unless that person was understood to be a 'part of' the Taliban."). The court concurs with this assessment. In fact, this petitioner admitted in two separate interrogations that he went to the front to assist

---

[43]     The petitioner has submitted a declaration from an expert in Islamic cultures, who states that in the 1980s, foreign volunteers, known as "Gucci jihadists," traveled to Afghanistan on "jihad tours" to fulfill their religious obligation to engage in jihad. PE 42 at 4. Although the petitioner suggests that he may have been such a tourist, there is no evidence that these "jihad tours" continued into the 1990s and 2000s, nor is there any evidence that "Gucci jihadists" of the 1980s stayed in Taliban guesthouses or received military training like the petitioner.

Taliban fighters. GE 4 at 3; GE 9 at 5. The court therefore concludes that evidence that the petitioner spent time at Taliban battle lines strongly indicates that he was "part of" the Taliban, al-Qaida or associated enemy forces.

### 5. The Petitioner Remained "Part of" the Taliban, al-Qaida or Associated Enemy Forces at the Time of His Capture

The government contends that the petitioner remained "part of" those forces at the time he was apprehended. Nov. 15 (p.m.) Tr. at 74-86; Nov. 16 Tr. at 10-12. Indeed, the government asserts that the petitioner was captured after fleeing the battle of Tora Bora, where he had fought alongside the Taliban and al-Qaida against coalition forces. *Id.* The petitioner maintains that there is no evidence that he was "part of" the Taliban, al-Qaida or associated forces at the time he was captured and that the government's contention that the petitioner fought at Tora Bora is based on pure speculation. Nov. 16 Tr. at 3-10.

As noted, it is not enough for the government to show simply that the petitioner was, at one time, a member of the Taliban, al-Qaida of associated forces; to be lawfully detained, the petitioner must have been "part of" those forces at the time of his capture. *See Salahi*, 625 F.3d at 751; *Gherebi*, 609 F. Supp. 2d at 71. "A petitioner who may once have been part of al-Qaida or the Taliban can show that he was no longer part of such an entity at the time of capture by showing that he took affirmative actions to abandon his membership." *Khalif v. Obama*, 2010 WL 2382925, at *2 (D.D.C. May 28, 2010) (citing *Al Ginco v. Obama*, 626 F. Supp. 2d 123, 128-30 (D.D.C. 2009)).

The petitioner stated to interrogators that after spending time at the front in the summer of 2001, he returned to ▉▉▉▉▉ house in Afghanistan. GE 3 at 6; GE 4 at 3; GE 9 at 6. According to the petitioner, around the time that coalition forces approached Jalalabad in the fall of 2001 ▉▉▉▉▉ instructed the petitioner to travel with an Afghan guide to a village near the

Pakistan border. GE 6 at 3; GE 9 at 6. The petitioner claims that he waited in that village for almost a month for          to arrive with the petitioner's passport. GE 6 at 3; GE 9 at 6. The petitioner then traveled into Pakistan, where he was arrested by Pakistani authorities. GE 6 at 3; GE 9 at 6.

The petitioner's account is not credible. Although the petitioner claims to have stayed in the border village for nearly a full month, he asserted to interrogators that he could not recall the name of the village. GE 3 at 6.[44] This assertion is difficult to square with the petitioner's demonstrated ability to recall specific details about names and locations. *See infra* Part IV.B.2.d. Furthermore, it is difficult to believe that the petitioner would have waited a month in a hostile war zone simply to retrieve his passport, given that he had entered the country surreptitiously in the first place. *See supra* Part IV.B.1.d.

Nonetheless, the government has offered no persuasive evidence that the petitioner was, in actuality, fleeing after fighting in the battle of Tora Bora. Although the government points out that the timing of the petitioner's retreat to Pakistan is consistent with having fought in the battle of Tora Bora, Nov. 15 (p.m.) Tr. at 85-86, it is undisputed that around that time, coalition forces were advancing on Jalalabad. Accordingly, the timing of the petitioner's decision to flee to Pakistan is equally consistent with an individual fleeing from oncoming conflict. The government therefore has not established by a preponderance of the evidence that the petitioner fought in the battle of Tora Bora.

It is, however, not necessary for the government to prove that the petitioner fought at Tora Bora to demonstrate that he was "part of" al-Qaida or the Taliban at the time of his capture. The government has already offered compelling evidence that the petitioner traveled to Afghanistan specifically to fight with the Taliban or al-Qaida, pointing out that the petitioner had

---

[44]     This interrogation occurred in May 2002, less than six months after his capture. *See* GE 3 at 1.

extensive and lasting associations with al-Qaida associates prior to his departure and traveled with individuals who acknowledged that they were going to Afghanistan to become martyrs. *See supra* Part IV.B.1. The government also demonstrated that the petitioner stayed at multiple Taliban and al-Qaida guesthouses and received military-style training during his time in Afghanistan. *See supra* Part IV.B.2-3. Furthermore, the petitioner repeatedly admitted that just months before his capture, he had been at the Taliban battle lines where he had gone to assist Taliban forces fighting against the Northern Alliance. *See supra* Part IV.B.4. Viewed as a whole, the evidence plainly establishes that at least by the summer of 2001, the petitioner was "part of" al-Qaida, the Taliban or associated enemy forces.

There is no evidence that the petitioner took any steps to dissociate himself from these forces in the intervening months before his capture. *See Al Ginco*, 626 F. Supp. 2d at 128-30. Even if the petitioner did stay with ▇▇▇▇ during those months, that fact alone is hardly inconsistent with remaining "part of" the Taliban or al-Qaida; as previously discussed, after allegedly living with ▇▇▇▇ for several months on a prior occasion, the petitioner was permitted to stay at the al-Ghamdi guesthouse again and received authorization to travel to the front. *See supra* Part IV.B.2.d. The petitioner, whose descriptions of his time with ▇▇▇▇ are strikingly vague when compared to his accounts of other periods in Yemen and Afghanistan, has provided no evidence that he established contacts with anyone in Afghanistan outside the Taliban/al-Qaida network, that he took any steps to obtain employment or that he took any other affirmative actions inconsistent with being "part of" al-Qaida.

In sum, the court concludes that the petitioner traveled to Afghanistan to fight with the Taliban or al-Qaida, stayed at Taliban or al-Qaida guesthouses, received military training at al-Qaida facility, traveled to the battle lines and was captured during the same armed conflict. Even

if none of these findings would independently justify his detention, viewed as a whole, they plainly establish that the petitioner was "part of" the Taliban, al-Qaida or associated enemy during his time in Afghanistan. Moreover, there is no evidence that the petitioner dissociated with these enemy forces at any point prior to his capture. The weight of the evidence therefore supports the conclusion that the petitioner remained "part of" al-Qaida or the Taliban at the time of his capture and that he is therefore lawfully detained.

## V. CONCLUSION

The government has established by a preponderance of the evidence that the petitioner was "part of" the Taliban, al-Qaida or associated enemy forces and is therefore lawfully detained. The court therefore denies the petition for a writ of habeas corpus. An Order consistent with this Memorandum Opinion is issued separately and contemporaneously this 3rd day of February, 2011.

RICARDO M. URBINA
United States District Judge